**2014-1447**

**(Serial No. 95/001,656)**

In The

# United States Court of Appeals

For The Federal Circuit

## PLAS-PAK INDUSTRIES, INC.,

*Appellant,*

**v.**

## SULZER MIXPAC AG,

*Appellee.*

## APPEAL FROM THE UNITED STATES
## PATENT AND TRADEMARK OFFICE,
## TRADEMARK TRIAL AND APPEAL BOARD

––––––––––––––––

## BRIEF OF APPELLANT

––––––––––––––––

Andrew C. Ryan
CANTOR COLBURN LLP
20 Church Street, 22nd Floor
Hartford, Connecticut 06103
(860) 286-2929 (Telephone)
(860) 286-0115 (Facsimile)
ryan@cantorcolburn.com

*Counsel for Appellant*

Form 9

FORM 9.  Certificate of Interest

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Plas-Pak Industries          v. Sulzer Mixpac AG

No. 2014-1447

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)
Plas-Pak Industries          certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

Plas-Pak Industries

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None

4.  ☑   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

David Arnold, Cantor Colburn LLP

5/8/14
Date

Signature of counsel

Andrew C. Ryan
Printed name of counsel

Please Note: All questions must be answered
cc: See Attached

124

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................... iv

I.      STATEMENT OF RELATED CASES .......................................... 1

II.     STATEMENT OF JURISDICTION ............................................. 1

III.    STATEMENT OF THE ISSUES ................................................. 2

IV.     STATEMENT OF THE CASE ................................................... 2

        Statement of the Facts ................................................................ 5

        A.      The Nature of the Claimed Invention ................................. 5

        B.      The Invalidating Prior Art ................................................ 10

                1.      U.S. Patent No. 4,745,011 (Fukuta) ......................... 10

                2.      U.S. Patent No. 3,989,228 (Morris) .......................... 12

                3.      U.S. Patent No. 2,511,627 (Einbecker) ...................... 13

                4.      U.S. Patent Publication 2002/0110682 A1(Brogan) ..... 13

                5.      U.S. Patent No. 5,033,650  (Colin) ........................... 14

                6.      U.S. Patent No. 6,241,125 B1 (Jacobsen) ................... 15

                7.      U.S. Patent Publication 2002/0170982 A1 (Hunter) ..... 16

V.      SUMMARY OF THE ARGUMENT ........................................... 18

VI.     ARGUMENT ......................................................................... 20

        A.      Standard Of Review ........................................................ 20

B.     Claims 1-15 are Obvious Under 35 U.S.C. § 103(a) .........................24

1.     The Board Erred in Finding that Modification of the Apparatus of Fukuta with the Mixing and Dispensing Apparatus of Morris Would have Changed the Principle of Operation of the Apparatus of Fukuta ..................................24

    a)     The Board's overly narrow formulization of the "principle of operation" of Fukuta constitutes legal error.................................................................................24

    b)     Fukuta's principle of operation is not altered by the proposed combinations ...................................30

    c)     The Board erred in requiring a physical substitution of the elements of Fukuta with the elements of Morris ...........................................45

2.     Claims 1-6 and 15 are Obvious Over Fukuta in View of Morris and Einbecker....................................................47

3.     Claims 7-9 are Obvious Over Fukuta in View of Morris, Brogan and Einbecker.................................................50

4.     Claims 10-12 are Obvious Over Fukuta In View Of Morris and Einbecker With Evidence From Fukuta.................51

5.     The Board Erred in Finding that Modification of the Apparatus of Fukuta with the Mixing and Dispensing Apparatus of Colin Would Have Changed the Principle of Operation of the Apparatus of Fukuta ..................................52

6.     Claims 1-6 and 13-15 are Obvious Over Fukuta In View Of Colin and Einbecker ...........................................53

7.     Claims 7-9 are Obvious Over Fukuta in View of Colin, Brogan and Einbecker.................................................55

8.     Claims 10-12 are Obvious Over Fukuta in View of Colin and Einbecker with Evidence from Fukuta...............................55

9. The Board Erred in Finding that Modification of the Dispensing Apparatus of Jacobsen with the Spray Nozzle of Hunter Would Have Rendered the Dispensing Apparatus of Jacobsen Inoperable for its Intended Purpose.................................................................56

   a) The Board's overly narrow definition of Jacobsen's intended purpose constitutes legal error.......56

10. Claims 1-6 and 13-15 are Obvious Over Jacobsen In View of Hunter..........................................................61

11. Claims 7-9 are Obvious Over Jacobsen In View of Hunter and Brogan....................................................63

12. Claims 10-12 are Obvious Over Jacobsen In View of Hunter, With Evidence from Brogan.........................63

VII. CONCLUSION.................................................................63

ADDENDUM

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alza Corp. v. Mylan Labs., Inc.*,
   464 F.3d 1286 (Fed. Cir. 2006) ....................................................22

*Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*,
   776 F.2d 281 (Fed. Cir. 1985) .....................................................22

*Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*,
   246 F.3d 1368 (Fed. Cir. 2001) ....................................................51

*Consol. Edison Co. v. NLRB*,
   305 U.S. 197 (1938) ....................................................................20

*Dippin'Dots, Inc. v. Mosey*,
   476 F.3d 1337 (Fed. Cir. 2007) ....................................................22

*Graham v. John Deere Co.*,
   383 U.S. 1 (1966) ................................................................... 20-21

*In re Abbott Diabetes Care Inc.*,
   696 F.3d 1142 (Fed. Cir. 2012) ........................................ 20, 30-31

*In re Elsner*,
   381 F.3d 1125 (Fed. Cir. 2004) ....................................................21

*In re Etter*,
   756 F.2d 852 (Fed. Cir. 1985) ........................................ 21, 45, 46

*In re Keller*,
   642 F.2d 413 (CCPA 1981) ..........................................................46

*In re Mouttet*,
   686 F.3d 1322 (Fed. Cir. 2012) ............................................ *passim*

iv

*In re Ratti*,
    270 F.2d 810 (CCPA 1959) .................................................................. *passim*

*In re Schreiber*,
    128 F.3d 1473 (Fed. Cir. 1997) ..................................................................63

*In re Sernaker*,
    702 F.2d 989 (Fed. Cir. 1983) ...................................................................22

*In re Sneed*,
    710 F.2d 1544 (Fed. Cir. 1983) ............................................................ 46-47

*In re Umbarger*,
    56 CCPA 974 F.2d 425 (1969) ................................................ 25, 26, 30, 52

*In re Yamamoto*,
    740 F.2d 1569, 222 USPQ 934 (Fed. Cir. 1984) .........................................21

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2001) .......................................................................... *passim*

*Pro-Mold & Tool Co. v. Great Lakes Plastics, Inc.*,
    75 F.3d 1568 (Fed. Cir. 1996) ...................................................................22

## STATUTES

28 U.S.C. § 1295(a)(4) ...............................................................................1

35 U.S.C. § 103 ................................................................................. 22, 23

35 U.S.C. § 103(a) ........................................................................ 21, 24, 47

35 U.S.C. § 141 ........................................................................................1

35 U.S.C. § 282 .......................................................................................21

## REGULATION

MPEP § 2258(I)(G) ...................................................................................21

## I.  STATEMENT OF RELATED CASES

No other appeal in or from this proceeding has previously been before this or any other appellate court.

Appeal No. 2014-1451, captioned *Plas-Pak Industries*, *Inc. v. Richard Parks Corrosion Technologies*, *Inc.*, on appeal to this Court from the Patent Trial and Appeal Board (the "Board"), is directed to related U.S. Patent No. 7,144,170 ("the '170 patent").  The patent at issue in the present appeal, U.S. Patent No. 7,185,384 ("the '384 patent"), is a continuation of the '170 Patent.  The '170 patent and the '384 patent share a common specification and file history and have claim language that is similar and overlapping.  Certain assertions and arguments made by the parties in Appeal No. 2014-1451 are likely to be relevant to assertions and arguments made by the same parties in the present case, such that any decision of this Court in this case could directly affect or be directly affected by the Court's decision in that case.  On June 9, 2014, this Court issued an order designating the present appeal and Appeal No. 2014-1451 companion cases and assigned them to the same merits panel for oral argument.

## II.  STATEMENT OF JURISDICTION

This is an appeal from a final Board decision dated January 17, 2014.  Plas-Pak filed a Notice of Appeal on March 13, 2014.  This Court has jurisdiction pursuant to 35 U.S.C. § 141 and 28 U.S.C. § 1295(a)(4).

1

## III.   STATEMENT OF THE ISSUES

Whether the Board erred in confirming the patentability of claims 1-15 of U.S. Patent No. 7,815,384, including:

(i)     Whether the Board erred in finding that modification of the apparatus of Fukuta with the mixing and dispensing apparatus of Morris would have changed the principle of operation of the apparatus of Fukuta.

(ii)    Whether the Board erred in finding that modification of the apparatus of Fukuta with the multiple barrel dispensing device of Colin would have changed the principle of operation of the apparatus of Fukuta.

(iii)   Whether the Board erred in finding that modification of the dispensing apparatus of Jacobsen with the spray nozzle of Hunter would have rendered the dispensing apparatus of Jacobsen inoperable for its intended purpose.

## IV.   STATEMENT OF THE CASE

The '384 patent is titled "Dual Component Dispensing and Mixing Systems for Marine and Military Paints," and issued on October 19, 2010 to Richard Parks et al.  JA75.  The claims of the '384 patent are directed to a spray gun for applying multi-component liquid coatings, such as marine, military, and industrial paints. JA92.

On June 13, 2011, Plas-Pak filed a request for *Inter Partes* reexamination of the '384 patent (Control No. 95/001,656), challenging the validity of issued patent claims 1-15.  JA28 – JA317.  On August 15, 2011, the USPTO granted Plas-Pak's request for an *Inter Partes* reexamination (JA 337 – JA355) and the prosecuting examiner (hereinafter the "Examiner") issued a Non-final Office Action (JA318 – JA336) adopting Plas-Pak's proposed grounds for rejection in part (albeit modified, as discussed below in the Statement of Facts) and rejected each of claims 1-15 on multiple grounds as follows:

1.  Claims 1-6 and 15 as obvious over Fukuta et al. in view of Morris et al. and Einbecker (JA323 – JA324);

2.  Claims 7-9 as obvious over Fukuta in view of Morris, Brogan and Einbecker (JA324 – JA326);

3.  Claims 10-12 as obvious over Fukuta in view of Morris and Einbecker (JA326 – JA327);

4.  Claims 1-6, 13-15 as obvious over Fukuta in view of Colin and Einbecker (JA327 – JA328);

5.  Claims 7-9 as obvious over Fukuta in view of Colin, Brogan and Einbecker (JA329 – JA330);

6.   Claims 10-12 as obvious over Fukuta in view of Colin and Einbecker (JA330 – JA331).

The Examiner did not adopt Plas-Pak's proposed rejections of claims 1-6, 13-15 as obvious over Jacobsen et al. in view of Hunter, claims 7-9 as obvious over Jacobsen et al. in view of Hunter and Brogan, and claims 10-12 as obvious over Jacobsen et al. in view of Hunter because, according to the Examiner, the proposed combination of Jacobsen and Hunter would have rendered the device of Jacobsen unsuitable for its intended purpose. JA331 – JA335.

After additional briefing by both Sulzer (JA356 – JA371) and Plas-Pak (JA372 – JA388) the Examiner issued a Right of Appeal Notice ("RAN") on April 13, 2012. JA433 – JA477. In the RAN, the Examiner withdrew the previously adopted rejections based on combinations of Fukuta, Morris, Einbecker, Colin and Brogan (JA439 – JA458), continued to decline to adopt the proposed rejections based on combinations of Jacobsen, Hunter and Brogan, and found claims 1-15 to be patentable.

Plas-Pak appealed the Examiner's decision to the Board. Oral argument was held on October 23, 2013 and, on January 17, 2014, the Board issued its decision affirming the decision of the Examiner that claims 1-15 are non-obvious. JA2 – JS24. Specifically, the Board found that (i) the combination of Fukuta and Morris would have changed the principle of operation of Fukuta (JA7 – JA17), (ii) the combination of Fukuta and Colin would have changed the principle of operation of Fukuta (JA7, JA17 – JA18), and (iii) the combination of Jacobsen and Hunter

4

would have rendered Jacobsen inoperable foe its intended purpose. JA8, JA18 –

JA23.

Plas-Pak now appeals the Board's Decision on Appeal on the basis that the

Board erred in making the above findings and affirming the Examiner's decision.

### Statement of the Facts

### A.     The Nature of the Claimed Invention

The '384 patent, titled "Dual Component Dispensing and Mixing Systems

for Marine and Military Paints" (JA75) describes a "multi-component industrial

paint packaging system for use in simultaneously dispensing mixing, brushing,

rolling or spraying liquid coatings in one easy step." JA88, col.3:11-14.

Specifically, the '384 patent describes a device for applying a coating, and the

device contains the following components and assembly (1) at least two cylindrical

cartridges, (2) a static mixing nozzle in fluid communication with the cartridges,

(3) a spray tip in fluid communication with the static mixing nozzle, (4) a first

flexible hose disposed between and in fluid communication with the static mixing

nozzle and the spray tip, and (5) a second hose in fluid communication with the

spray tip for supplying the atomization air to the spray tip. *See* JA92, claim 1.

All 15 claims in the '384 patent were challenged in the reexamination.

JA30. Claims 1- 6 and 13-15 are directed to a device for applying a coating;

claims 7-9 are directed to a method of applying a non-skid coating to a surface

with a device for applying a coating; and claims 10-11 are directed to a method of applying paint to a surface with a device for applying a coating. JA92.

Claim 1 is directed to a device that includes at least two cylindrical cartridges (1, 1a), a static mixing nozzle (9) in fluid communication with cartridges (1, 1a), and a spray tip (21) in fluid communication with the static mixing nozzle (9). JA92, *see also* JA79, FIG. 3 (annotated below to illustrate the features of the claims and description in the specification); *see also* JA88 at col.4:49 – col.5:21. The device of claim 1 further has a first flexible hose (45) disposed between and in fluid communication with the static mixing nozzle (9) and the spray tip (21), and a second hose (22) in fluid communication with the spray tip (21) for supplying atomization air to the spray tip (21). JA89, col.5:22-41.



Claim 2 depends from claim 1 and further claims at least one flexible hose (12) is disposed between and in fluid communication with the cartridges (1, 1a) and the static mixing nozzle (9). *Id.*, col.5:42-44.

Claim 3 depends from claim 1 and further claims the spray tip (21) is an angled spray tip having an inlet with an axis defined by a fluid communication direction, and having a spray outlet with an axis defined by a spray direction, and an angle between the inlet and outlet is 15-90 degrees. *Id.*, col.5:11-18, 33-34.

Claim 4 depends from claim 1 and further claims that each cartridge further comprises an aperture (28, 29) in fluid communication with a common discharge nozzle (*see e.g.* JA82, FIG. 6, label 8), and the discharge nozzle being in fluid communication with the static mixer nozzle (9). *Id.*, col.6:32-34).

Claim 5 depends from claim 1 and further claims each cartridge (1, 1a) further comprises an aperture (28, 29) in fluid communication with a common discharge nozzle, the discharge nozzle being in fluid communication with the static mixer nozzle (9). JA82, FIG. 6, labels (28, 29) for aperture and label (8) for common discharge nozzle. JA89, col.6:32-34. Additionally, each cylindrical cartridge (1, 1a) further comprises an open filing end that is disposed opposite the aperture (28, 29) and that is slidingly sealed by a cartridge piston seal (4, 4a). *Id.*

Claim 6 depends from claim 1 and further comprises a manual, pneumatic, or hydraulic dispensing gun (13), in contact with the cartridges (1, 1a). *Id.*, col.5:23-29.

Claim 7 is directed to a applying a non-skid coating to a surface with a device for applying a coating. JA87, col.2:33-35. The device comprises at least two cylindrical cartridges (1, 1a), a static mixing nozzle (9) in fluid communication with the two cartridges (1, 1a), and a spray tip (21), in fluid communication with the nozzle (9). A first flexible hose (45) is disposed between and in fluid communication with the nozzle (9) and the spray tip (21), and a second hose (22), in fluid communication with the spray tip (21), supplies atomization air to the spray tip (21). JA88, col.4:49 – JA89, col.5:44; JA90, col.8:53-57.

Claim 8 depends from claim 7 in which the non-skid coating comprises an epoxy coating containing at least one aggregate material selected from the group consisting of aluminum oxide, silica, and a mixture thereof. JA90, col.8:53-57.

Claim 9 depends from claim 7 in which the non-skid coating comprises a bisphenol F epoxy, bisphenol A epoxy, polyurethane, or a mixture thereof. *Id.*, col.7:46-57.

Claim 10 is directed to a method of applying paint to a surface with a device for applying a coating. JA88, col.4:49 – JA89, col.5:10. The device comprises at least two cylindrical cartridges (1, 1a), a static mixing nozzle (9) in fluid

communication with the two cartridges (1, 1a), a spray tip (21), in fluid communication with the nozzle (9). *Id.* A first flexible hose (45) is disposed between and in fluid communication with the nozzle (9) and the spray tip (21), and a second hose (22), in fluid communication with the spray tip (9), for supplying atomization air to the spray tip (9). JA89, col.5:22-44.

Claim 11 depends from claim 10 in which the paint contains at least one selected from the group consisting of polyurea, polyaspartic, epoxy, acrylic, silicone, polyester, polyurethane, polyamide, bisphenol A epoxy, bisphenol F epoxy, epoxy-polyamide, epoxy-polyamine, epoxy-ketamine, C.A.R.C. paint, non-skid, aluminum oxide, silica, and a combination thereof. JA90, col.7:46-57.

Claim 12 depends from claim 10 in which the paint comprises bisphenol F epoxy, bisphenol A epoxy, polyurethane, or a mixture thereof. *Id.*

Claim 13 depends from claim 1, wherein the two cylindrical cartridges (1, 1a) have a side-by-side construction (*see* FIG. 3, above) or cartridge-within-a-cartridge construction (no illustrated embodiments). *Id.*, col.7:18-25.

Claim 14 depends from claim 1, wherein two cylindrical cartridges have a permanent connection between them (*see* FIG. 6) or are connected to one another by a snap connection. *Id.*, col.7:26-28.

Claim 15 depends from claim 1, wherein the two cylindrical cartridges independently have cross sectional area ratios ranging from 1:1 to 1:20. *Id.*, col.7:42-44.

### B. The Invalidating Prior Art

#### 1. U.S. Patent No. 4,745,011 (Fukuta)

Fukuta teaches a two-component mixing apparatus and method for coating car components. JA93, JA98 – 99, Abstract and claim 1. Fukuta further teaches that the apparatus uses a coating such as a urethane coating consisting of a mixture of two components, i.e. a main component and a hardener. JA96, col.1: 7-13.

Figure 1 of Fukuta, shown and labeled below, teaches a device for applying a coating comprising supply sources of a main component and a hardener, and the supply sources are connected to a conduit means. JA94, FIG. 1; JA96 – JA97, col.2:63-3:4; JA98-99, claim 1. The conduit means includes a main component flow portion connected to the main component supply, a hardener flow portion connected to the hardener supply, a premixed flow portion, and a combined flow portion. *Id.* The components are mixed together in a static mixer (3) and the mixture is sent through the combined flow portion to a coating spray gun (1). *Id.*

Fukuta's combined flow portion between the static mixer (3) and spray gun (1) is inherently flexible because, in order for Fukuta's spray gun to be hand-held

for applications such as coating car and machine components (JA96, col.1:6-12), the combined flow portion must be flexible.

Fukuta's coating spray gun (1) is in communication with an air supply source thorough an air supply line.  JA94, FIG. 1; *see also* labeled Figure 1 below). Fukuta's Fig. 2 shows in more detail that the air supply line is connected to an air regulator (28) and supply source, and the spray gun receives a supply of air for spraying the coating.   JA94, FIG. 2; JA98, col.5:38-43.

**FIGURE 1**



Fukuta teaches that when the device is in operation, the stop valves (5a, 5b) are opened, escape value (6) is closed, and the check valves (4a, 4b) prevent backflow.  JA97, col.3:7-14.  When the device is stopped, escape valve (6) is

opened, while stop valves (5a, 5b) are closed. *Id.* As a result, the Fukuta device minimizes backflow both during operation through the use of the check valves (4a, 4b) and minimizes backflow after the device is stopped by allows the main component to be vented out of the escape valve. *Id.*, col.3:15-37, 56-67. Fukuta describes the containers for the "hardener" and "main component" as "supply sources." JA96, col.2:65-67. Both components are sent from the supply sources to the spray gun by operation of their respective pumps (2a, 2b). *Id.*, col.2:65-68.

### 2. U.S. Patent No. 3,989,228 (Morris)

Morris, titled "Mixing and Dispensing Apparatus," teaches several embodiments of a static mixing chamber for mixing multi-component compositions. JA100 – JA107. One of the devices is a hand-held device shown in FIG. 4 (reproduced below) that utilizes a ram and piston (JA102), and two other devices that utilize pumps as shown in FIGS. 1 and 2 (JA101).

In Morris' hand-held device (FIG. 4 below), a ram/piston (62) forces a base material and catalyst through cartridges (70), which are jointed together and passed through a static mixer (72) and dispensed through a nozzle (74). JA106, col.7:22-54.



FIG. 4.

70

62
63
66

63
64
61
60
65

Cartridge
piston means

73
72
71

74

Aperture

Connector fitting

Common discharge nozzle

Static mixer

### 3.    U.S. Patent No. 2,511,627 (Einbecker)

Einbecker, titled "Method for Producing Spatter Finish Coatings," discloses a device for applying a multi-component coating having flexible hoses (21,54, 61) disposed between the sources of the multicomponent coating and compressed air source and the spray tip (16,17).  JA662; JA665 – JA666, col.4:20 – col.5:34.  The flexible hoses allow a user to hand hold and manually manipulate the spray gun during discharge of the coating.  JA665, col.4:20-25.

### 4.    U.S. Patent Publication 2002/0110682 A1(Brogan)

Brogan, titled "Non-skid Coating and Method of Forming the Same," teaches a non-skid mixture of polymer resin particles and an aggregate, such as aluminum oxide, for spray coating a surface such as a military ship flight deck . JA111, [0007]; JA116, [0063]-[0068].  Brogan further teaches that it is known to

13

form polymer-based, non-skid coatings using liquid based epoxy, polyurethane, or alkyd systems that includes particulates such as polymer droplets, metals, ceramics, and polymerics.  JA111, [0004].  In addition to Brogan's invention, Brogan cites a conventional, non-skid, liquid based epoxy system such  MIL-W-5044C type II system as used by the U.S. military.  JA116, [0065].

### 5.    U.S. Patent No. 5,033,650  (Colin)

Colin, titled "Multiple Barrel Dispensing Device," teaches a multiple barrel device (15, 16) for separate storage of materials for dispensing and intermixing through a common static mixer.  JA119 – JA121, Abstract; FIGs. 1 and 3 (shown below)).  Colin further teaches that multiple barrels (15, 16) share a common partition wall (23).  JA120, FIG. 1.  Colin further teaches that a ratchet-type dispensing gun (not shown) can be used to drive pistons (29) through the barrels (15, 16).  JA120, FIG. 1; JA124, col.3: 12-20.



### 6. U.S. Patent No. 6,241,125 B1 (Jacobsen)

Jacobsen, titled "System and Kit Accessories for Dispensing Reactive Two Component Materials," teaches a device for dispensing multiple component fluid materials from cartridges over an indefinite distance via flexible hoses before mixing the components and discharging the materials. JA132, col.2:40-3:5. Jacobsen's arrangement of components eliminated the need for a user having to hold multiple cartridges close to the dispensing exit of the device. Jacobsen's arrangement positioned a flexible hose between and in fluid communication with the cartridges and a static mixer. *Id.* at col.2:57-3:4. This in turn allowed fast setting reactive substances to be conveyed over long distances before being mixed. *Id.* at col.7:59-65.

As shown in Figures 10 and 11, below, Jacobsen's device includes two cylindrical cartridges (C-1, C-2) threaded to two discharge "nozzle" (Z-1, Z-2), and an open filling end that is sliding sealed by operating rods. JA129 – JA130, FIGs. 10 and 11; JA134, col.6:45-58 (in Fig. 11, operating rods are labeled R-3, R-4, and R-5, and in Figured 10, operating rods are unlabeled). A mixing tube (M-1) is in fluid communication with each discharger "nozzle" (Z-1, Z-2) via a series of "conventional hoses" (H-1, -2, -3) and a tee (T-1). JA135, col.7:6-24. The conventional hoses are disposed between and in fluid communication with the cartridges (C-1, C-2) and the mixing tube (M-1).

15

**FIGURE 10**                                    **FIGURE 11**



### 7.    U.S. Patent Publication 2002/0170982 A1 (Hunter)

Hunter, titled "Spray Nozzle for Two-Component Air-Assisted, Low Pressure

Spray Systems," teaches a spray nozzle for a two component, air-assisted spray

system, suited for applying two-component coating compositions.  JA137,

Abstract.

As shown in Figures 1 and 3 (reproduced below), Hunter teaches a static

mixer (1) connected to a removable spray tip (5) at the downstream end of the

static mixer.  JA138, FIG. 1; JA139, FIG. 3); JA141 – JA142 [0038] [0039].  After

the two components are mixed in the static mixer (1), they are introduced into an atomizing zone of the spray section (10) where the mixed components are atomized with air that enters through tube (12), and exits through outlet port (18). *Id*. As shown in Figure 1, the system is assembled by inserting the static mixer (1) and spray tip through a shroud (7) and spray section (10). *Id*. As shown in Figure 3, shroud (7) is connected to dispensing unit (22), which is connected to two separate component compositions in storage tanks (23) and (24) via respective lines (25) and (26). *Id*.

**FIGURE 1**



inlet

**FIGURE 3**



## V.  SUMMARY OF THE ARGUMENT

The decision of the Board in this case not to find all claims of the '384

patent invalid as obvious should be reversed and the claims declared invalid.

With respect to the combinations involving Fukuta, the Board erred in

finding that incorporating the cartridge and mixing gun of either Morris or Colin

with the spray apparatus of Fukuta would change the principle of operation of

Fukuta.  To determine if a proposed combination would change the principle of

operation of a prior art device, one must first determine what the principle of

operation is for the device.  Here, the Board confused Fukuta's principle of

operation with its purported contribution to the art, which is legal error.

The principle of operation of a device properly refers to its "high level

ability."  *In re Mouttet*, 686 F.3d 1322 (Fed. Cir. 2012).  Fukuta's high level

ability, and therefore its principle of operation, is properly defined as the

"movement of two separate reactive components brought together at a mixer and dispensed through a dispenser." However, the Board repeatedly equated Fukuta's contribution to the art—viz., "providing an apparatus for bringing together a two component mixture [and] preventing backflow even when the propensity for backflow occurs repreatedly an at high velocity" (JA13)—with its "principle of operation," and therefore reached the wrong result. Once the Board's erroneous definition of Fukuta's principle of operation is corrected, the claims of the '384 patent are clearly rendered obvious by the proposed combination involving Fukuta, Morris and Colin.

With respect to the combinations involving Jacobsen, the Board erred in narrowly defining Jacobsen's intended purpose as "dispensing fluid materials directly into a surface crack such as floors, walls or ceilings so as to minimize leakage." *See* JA18. It is well established that a prior art reference must be read for all that it teaches, including uses beyond its primary purpose. *In re Mouttet*, 686 F.3d 1322, 1331 (Fed. Cir. 2012). Further, it is error to assume "that a person of ordinary skill attempting to solve a problem will be led only to those elements of the prior art designed to solve the same problem." *KSR*, 550 U.S. at 420, 127 S. Ct. at 1742.

Under *KSR*, the notion that a person of skill in the art making a device for applying a coating (as claimed in the '170 patent) would ignore Jacobsen because

it can be used for filling cracks, "makes little sense." *See KSR*, at 420. Rather, a person of skill in the art would understand that familiar components of Jacobsen would have applications beyond filling cracks. Indeed, the claims of Jacobsen are not limited to, and make no mention of, filling cracks. JA239 – JA240.

Therefore, Board's definition of Jacobsen's intended purpose overly constrictive and does not contemplate the disclosure of Jacobsen as a whole. The intended use of Jacobsen is more properly stated as Plas-Pak proposed: "a dispensing kit suited in alternate manners of connection for conveying multiple components of a reactive material before being discharged where and when needed." Once the Board's erroneous definition of Jacobsen's intended use is disregarded, the claims of the '384 patent are clearly rendered obvious.

## VI. ARGUMENT

### A. Standard Of Review

Legal determinations of the Board are reviewed without deference. *In re Abbott Diabetes Care Inc.*, 696 F.3d 1142, 1148 (Fed. Cir. 2012). Factual findings of the Board are reviewed for substantial evidence. *Id.* Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (*citing Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Obviousness is a question of law, based on underlying factual findings. *Graham v.*

*John Deere Co.*, 383 U.S. 1 (1966); *In re Elsner*, 381 F.3d 1125, 1127 (Fed. Cir. 2004).

The statutory presumption of validity under 35 U.S.C. § 282 has no application in reexamination. *See* MPEP § 2258(I)(G) (citing *In re Etter*, 756 F.2d 852 (Fed. Cir. 1985)). Claims in reexamination must "be given their broadest reasonable interpretation consistent with the specification, and limitations appearing in the specification are not to be read read into the claims." *In re Yamamoto*, 740 F.2d 1569, 1571, 222 USPQ 934, 936 (Fed. Cir. 1984).

A patent may not issue "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a). The Supreme Court's decision in *KSR* provides the background for the review of the obviousness issues raised in this case. Casting aside a rigid "teaching, suggestion, motivation to combine" test for obviousness, the Supreme Court warned against granting of a patent that is no more than "the predictable use of prior art elements according to their established functions." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (2001).

The Supreme Court cautioned that "[t]he obviousness analysis cannot be confined by a formalistic conception of the words, teaching, suggestion, and

motivation." *KSR*, 550 U.S. at 419. An "expansive and flexible approach" must be applied, and courts may utilize "common sense" in addressing obviousness under § 103. *Id.* at 420-22. The suggestion to combine references may flow from the nature of the problem (*see Pro-Mold & Tool Co. v. Great Lakes Plastics*, *Inc.*, 75 F.3d 1568, 1573 (Fed. Cir. 1996)), the teachings of the pertinent references (*see In re Sernaker*, 702 F.2d 989, 994 (Fed. Cir. 1983)), or from the ordinary knowledge of those skilled in the art that certain references are of special importance in a particular field. *See Pro-Mold*, 75 F.3d at 1573 (citing *Ashland Oil*, *Inc. v. Delta Resins & Refractories*, *Inc.*, 776 F.2d 281, 297, n. 24 (Fed. Cir. 1985)). "This test is a flexible one which may find motivation to combine in the knowledge of one skilled in the art or in the nature of the problem to be solved." *Dippin'Dots*, *Inc. v. Mosey*, 476 F.3d 1337 (Fed. Cir. 2007) (citing *Alza Corp. v. Mylan Labs.*, *Inc.*, 464 F.3d 1286, 1291 (Fed. Cir. 2006)).

In determining whether a patent's subject matter is obvious, "a court must ask whether the improvement is more than the predictable use of prior art elements according to their established functions." *KSR*, at 401. "Often, it will be necessary for a court to look to interrelated teachings of multiple patents, the effect of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in

order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *Id.* at 418.

In *KSR*, the Supreme Court was unequivocal in stating:

> When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known operations within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. In that instance the fact that a combination was obvious to try might show that is was obvious under § 103.

*Id.* at 421.

Here, the patentee is improperly attempting to claim a combination of known elements and techniques that produce a predictable result, *viz.*: the mixing and spraying of multi-component coatings via the simple use of (i) cylindrical cartridges for holding the components, (ii) a static mixing nozzle connected to the cartridges for mixing the components, (iii) a spray tip connected to the static mixing nozzle with a flexible hose, and (iv) a hose supplying atomization air to the spray tip. *See*, *e.g.*, JA92, claims 1, 7, 10. As claimed, each of these components is used in accordance with its well-known, established function to achieve a predictable result. Nothing set forth by the Examiner or the Board remotely suggests otherwise, and the '384 patent is therefore obvious as the Examiner initially concluded.

## B.      Claims 1-15 are Obvious Under 35 U.S.C. § 103(a)

In the reexamination, Plas-Pak argued that the claims of the '384 patent are rendered obvious by combinations of prior art primarily involving Fukuta and Morris, Fukuta and Colin, and Jacobsen and Hunter.  The Board erred in finding the claims non-obvious due to misapplications of the law involving whether combining the prior art would change the principle of operation of the prior art, and whether combining the prior art would require substantial reconstruction of the art.

### 1.      The Board Erred in Finding that Modification of the Apparatus of Fukuta with the Mixing and Dispensing Apparatus of Morris Would have Changed the Principle of Operation of the Apparatus of Fukuta

#### a)      The Board's overly narrow formulization of the "principle of operation" of Fukuta constitutes legal error

The Board's initial error in analyzing the "principle of operation" issue was its overly narrow, and legally erroneous, formulation of the principle of operation of Fukuta.  The Board improperly rejected Plas-Pak's definition of Fukuta's principle of operation, i.e., "movement of two separate reactive components brought together at a mixer and dispensed through a dispenser," (JA10) and instead confused Fukuta's principle of operation with its purported contribution to the art. *See*, *e.g.*, JA11, JA13, JA15.  This constitutes reversible error.

24

To determine if a proposed combination would impermissibly change the basic principles of a prior art reference—the principle of operation—the Court must first determine what the principle of operation is for the reference. *See In re Mouttet*, 686 F.3d 1322 (Fed. Cir. 2012). "[T]he principle of operation of [a reference] is its <u>high level ability</u>." *Id*. (emphasis added). A reference's principle of operation is not to be confused with its contribution to the art. Rather, a proposed combination can eliminate a reference's stated contribution to the art—and any advantages associated therewith— without impermissibly changing the reference's principle of operation. *See, e.g.*, *In re Umbarger*, 56 CCPA 974, 407 F.2d 425, 431 (1969) (holding that a modified apparatus was clearly obvious in view of the prior art and the principle of operation of the prior art was not changed even though the substitution of claim elements "omits the circuit portion which [the reference] apparently <u>regarded as his contribution to the art along with such advantages as it might provide</u>") (emphasis added). *See also In re Mouttet*, 686 F.3d at 1330 ("while [the prior art reference] notes <u>certain advantages</u> to optical devices, the reference in no way suggests that using electronic hardware instead of optical hardware would destroy [the prior art reference'] <u>operability as a programmable arithmetic unit</u>.") (emphasis added).

In *Umbarger*, the subject patent application was directed to a tachometer that functioned through an induction coupling with the spark plug. *Umbarger*, at

426-27.  The examiner rejected the application based on several references, including Horsch and Byerlay.  Horsch disclosed "a tachometer. . . equivalent to the tachometer comprising elements of applicant's [tachometer]" but lacked a teaching of the induction coupling.  The examiner found that "Byerlay shows that there is no invention in coupling a measuring or detecting circuit to the spark plug lead in an internal combination [sic] engine by means of an inductive coupling." The Board affirmed this rejection.

On appeal, Umbarger argued that the combination of Horsch's tachometer with Byerlay's induction coupling by "disconnecting Horsch's tachometer circuit from the terminal 11 and inductively connecting Horsch's tachometer. . . would result in a construction that is 'inoperable or, at best, operable in a manner not disclosed and not intended by Horsch.'" *Id.*, at 430.  The C.C.A.P. rejected this argument holding that "[i]t is true that such substitution omits the circuit portion which Horsch apparently regarded as his contribution to the art along with such advantages as it might provide.  However, the modified apparatus is clearly obvious in view of the prior art and the retained circuit . . . of Horsch will operate therein on the same principles as before to indicate engine speed as a function of applied pulse frequency."  *Id.*, at 430-31 (emphasis added).  Thus, under *Umbarger*, a reference's contribution to the art is not equivalent to the reference's principle of operation.

26

Here, the Board repeatedly equated Fukuta's "contribution to the art" with its "principle of operation," and therefore reached the wrong result.  For example, the Board stated "Fukuta makes clear that its contribution to the art is in providing such an apparatus which prevents backflow even when the propensity for backflow occurs repeatedly and at high velocity."  JA11 (emphasis added).  The Board then states that "[c]hanging the apparatus of Fukuta in the manner proposed by the Requester requires substantial reconstruction and affects the principle of operation of the disclosed apparatus."  In addition, the Board states that "Fukuta makes clear that its contribution to the art is not merely providing an apparatus for bringing together a two component mixture, but rather, it is in providing such an apparatus for preventing backflow even when the propensity for backflow occurs repreatedly an at high velocity."  JA13 (emphasis added).

The Board's preoccupation with Fukuta's contribution to the art resulted in a flawed analysis of whether the proposed combination with Morris would change the principle of operation of Fukuta.  Rather, as instructed by this Court in *Mouttet*, a reference's principle of operation is commensurate with its "high level ability." *Mouttet*, at 1332.

In *Mouttet*, the subject patent application was directed to "a computing device for processes such as addition, subtraction, multiplication, and division using nanoscale materials in a crossbar array."  *Id*. at 1324-25.  The examiner

rejected Mouttet's claims based primarily on three references, Falk, Das, and Terepin, and the Board affirmed. *Id*. at 1327. "The examiner found that Falk taught all of Mouttet's recited limitations in representative claim 1 except for (1) a crossbar array implemented with electrical wires rather than optical light paths, (2) crosspoints with programmable states based on elec-trical conductivity rather than optical intensity, and (3) conversion of analog signal outputs to digital output bit patterns in the post-processing unit." *Id*. at 1330. "The examiner relied on Das to teach the missing crossbar array using wires and crosspoints that are programmable to have electrical conductive states, and on Terepin to teach a component converting analog signals to digital bit patterns," and thus rejected Mouttet's claims as obvious over Falk, in view of Das and Terepin. *Id*.

On appeal, Mouttet argued that "substituting electronic hardware for optical hardware would destroy the Falk device's principle of operation and physical structure; and second, that Falk teaches away from the claimed invention." *Id*. at 1331. In rejecting Mouttet's principle of operation argument, the Court found that the "main difference" between Falk and Mouttet was the "type of circuitry used." *Id*. at 1332. The Court found that "this difference does not affect the operability of Mouttet's broadly claimed device—a programmable arithmetic processor." *Id*. The Court found that Falk's "principle of operation" did not lay in the details of its

circuity, but rather in its "high level ability to receive inputs into a programmable crossbar array and processing the output to obtain an arithmetic result." *Id*.

Similarly, the principle of operation of Fukuta does not lie in the details of its check valves, stop valves, or escape valve, as asserted by the Board. *See* JA16. Rather, "[a] reference may be read for all that it teaches, including uses beyond its primary purpose." *Mouttet*, at 1331 citing *KSR* at 418-21, 127 S. Ct. 1727. A person of skill in the art would understand that Fukuta is generally directed to a device for movement of two separate reactive components brought together at a mixer and dispensed through a dispenser. Fukuta describes its device in these general terms in the first half of its Abstract:

> A two-component mixing type coating method which is utilized for coating car components, and the like. A main component solution and a hardener solution are run together at an intermediate portion of a supply conduit and are mixed. The mixture solution is sent to a coating spray gun and injected from the gun for coating.

JA93.

Only after this general description does the Abstract mention the features of its check valves, stop valves, and escape valve. *Id*. Further, in the "Field of the Invention" section, Fukuta does not mention its backflow prevention features at all. Rather, it describes the apparatus more generally:

> This invention relates generally to a two-component mixing type coating method which is suitable for coating car bodies, machine components, for example. The

> method uses a coating such as a urethane coating
> consisting of a mixture of two components, i.e., a main
> component and a hardener.

JA96, col.1:6-12.  Thus, while Fukuta's check valves, stop valves, and escape

valve may offer certain advantages, and may help it achieve a contribution to the

art, its overall principle of operation is not limited to those features.  The Board's

confusion of Fukuta's principle of operation with its contribution to the art is legal

error under *Mouttet* and *Umbarger*, and should be reversed.  Once the Board's

erroneous definition of Fukuta's principle of operation is disregarded, the claims of

the '384 patent are clearly rendered obvious under *KSR*, as discussed further

below.

### b)    Fukuta's principle of operation is not altered by the proposed combinations

The Board erred in determining that Fukuta's principle of operation is

impermissibly changed and the Board failed to point to evidence that the proposed

combinations would impermissibly change the principle of operation of Fukuta.

Obviousness conclusions are made as a matter of law, as explained above,

and determining whether the combination impermissibly changes the principle of

operation is a question of fact and law.  Determining what the principle of

operation is for a given reference, much like claim construction, is a matter of law,

while determining whether that principle of operation is changed is a question of

fact.  *See Mouttet*, at 1331-32; *see also Abbott Diabetes Care Inc.*, 696 F.3d 1142,

1148. Thus, the Board must have substantial evidence in making its determination of whether the principle of operation is impermissibly changed. The evidence that supports this conclusion is espoused in *Mouttet* and *In re Ratti*, 270 F.2d 810, 813 (CCPA 1959), where, to determine whether the combination impermissibly changes the reference's principle of operation, this Court and the C.C.P.A. relied on the following indicia of evidence:

– Can the prior art function in the manner proposed?[1]

– Do the references "point away" or "teach away" from the combination?[2]

– Are the references from remote fields or are they from the same field of endeavor?[3]

*See Ratti*, at 813; *Mouttet*, at 1332.

Here, Fukuta's principle of operation is not altered by the proposed combinations. The indicia of evidence supporting this conclusion will be discussed in turn.

---

[1] *Ratti*'s prior art could not function in the manner proposed; *Mouttet*'s references could function in the manner proposed. *See Ratti*, at 813; *Mouttet*, at 1332.

[2] *Ratti*'s prior art pointed away from the combination; *Mouttet*'s references did not point away from the combination. *See Ratti*, at 813; *Mouttet*, at 1332.

[3] *Ratti*'s References were from remote fields; *Mouttet*'s references were from the same field. *See Ratti*, at 813; *Mouttet*, at 1332.

*The combination of Fukuta and Morris can function in the manner proposed.*

The Board failed to support its conclusion with substantial evidence by not determining that the proposed combinations could function as suggested.

As described above, evidence that a proposed combination can function as proposed is evidence in support of combining the references and, similarly, evidence that a proposed combination cannot function is evidence that a proposed combination would impermissibly change the principle of operation of the reference. *Ratti*, at 981; *Mouttet*, at 1332. A closer reading of *Ratti* and *Mouttet* illustrates this indicia of evidence.

In *Ratti*, the subject patent application was directed to an "'Oil Seal' for sealing the space between a bore in a housing and a relatively movable shaft centrally located in the bore." *Ratti*, at 977. Appellant's shaft seal comprised an annular sealing member of "resilient deformable material" for endwise insertion in a statically sealed engagement with a bore in a housing. *Id.* The examiner rejected the claims as being obvious over Chinnery in view of Jepsen, Norton, and/or Roth. According to the Court, Chinnery was directed to "a housing provided with a bore surrounding a centrally located shaft" and that the "seal construction disclosed in Chinnery et al. is such that the 'interference press fit' which that patent calls for is alone relied on to keep the seal tight." *Ratti*, at 981. The Court then determined that the Jepsen reference "relates to a gasket for sealing the space between the

upper and lower vessels of a vacuum-type coffee maker." The Court held that the

seal of Chinnery could not function as proposed in the combination, stating:

> Considering the incompressible nature of the rubber in the sealing element disclosed in Chinnery et al., its stiffening and reinforcement by the cyclindrical sheet metal member, and its 'interference press fit' in the bore, <u>it seems clear to us that the Chinnery et al. seal cannot function in the manner of appellant's seal</u>. Now, as to the contention that Jepson would suggest inserting a set of spring fingers, the resilient element of Chinnery et al. is forced so tightly into the bore and is so 'stiffened' that <u>the use of the resilient spring fingers of Jepson could not possibly increase the resilient deformation of the Chinnery et al. seal</u> in the direction of the bore or increase the sealing engagement of the seal with the bore.

*Id.* (emphasis added). The Court thus held that the principle of operation of

Chinnery was changed by the combination with Jepsen because, in part, the cited

prior art could not <u>actually function</u> in the manner proposed. *Ratti*, at 981.

In *Mouttet*, in contrast to *Ratti*, this Court held that the Board's

determination that the principle of operation was not changed by the

combination—that the claims were obvious—was supported by substantial

evidence in part because the Board determined that the "the reference in no way

suggests that [the combination] would destroy [the primary reference's]

operability." *Mouttet*, at 1330.

As described above, the subject patent application was directed to "a

computing device for processes such as addition, subtraction, multiplication, and

division using nanoscale materials in a crossbar array." *Id*. at 1324-25. On appeal, in addition to the arguments discussed above, Mouttet argued that "replacing Falk's optical crossbar circuitry with Das's electrical crossbar circuitry would destroy the physical structure of Falk." *Id.*, at 1332. Mouttet argued that "there is no evidence that electrical crossbar circuitry would have been recognized by ordinarily skilled artisans as equivalent to, or <u>able to be substituted for</u>, optical crossbar circuitry." *Id.*(emphasis added). In rejecting these arguments, the Court found that "[a person having ordinary skill in the art] would indeed have recognized that Falk's arithmetic processor <u>could have been combined</u> with Das's wired crossbar array to predictably yield Mouttet's claimed computing device." *Id.*, at 1333(emphasis added).

Here, just like in *Mouttet*, the proposed combination will function and there is no suggestion in any of the references that the art will not function in the proposed combination. As mentioned by the Board, more than one combination of Fukuta and Morris is possible. First, the Board considered substituting the supply sources and their associated pumps (2a, 2b) of Fukuta for the cartridges (70) and the mixing gun (60) of Morris. JA12. Second, the Board mentions a second construction in which the cartridges (70) and the mixing gun (60) of Morris are combined with the sprayer (1) of Fukuta. JA15. In either case, Fukuta nor Morris suggest that the resulting combination will be inoperable.

Turning to the first proposed combination substituting the supply sources and their associated pumps (2a, 2b) of Fukuta for the cartridges (70) and the mixing gun (60) of Morris, the combination can operate at least because the cartridges (70) and mixing gun (60) of Morris allows "solutions of a main component and a hardener [to be] sent from [the cartridges] to a coating spray gun 1," as is described in Fukuta. JA96, col.2:65-67. Even though the pumps (2a, 2b) are removed from the system in the combination, the mixing gun (60) and its associated piston/ram will send the solutions of the main component and hardener from within the cartridges (70), through the system "allow[ing] [the solutions] to run together at an intermediate portion, junction A, of their supply paths." *Id*. at col. 2:67 – col. 3:2.

Furthermore, a person having ordinary skill in the art will readily understand how to make the proposed combination and connect the system to the remaining components of the device of Fukuta at least because Fukuta only broadly describes supply sources—relying on knowledge of a person having ordinary skill in the art—and Fukuta specifically teaches that any control means can be used to control the system of Fukuta. Fukuta teaches that "[i]t is possible to use, for example, an electric circuit as the control means in the present invention" and Fukuta also teaches that "[i]t is possible to use an air pressure circuit which is disposed between the coating spray gun, air type stop valves, and an air type escape valve."

35

JA97, col. 3:38-55. Thus, it is readily apparent to a person having ordinary skill in the art that any known supply source can be coupled to the system as the system is controlled by any suitable control means, including those that are known to function with the cartridges (70) and mixing gun (60) of Morris.

Additionally, as in *Mouttet*, Fukuta does not suggest that substituting the supply sources and their associated pumps (2a, 2b) for a cartridge will render the remaining device of Fukuta inoperable. Fukuta actually suggests the opposite by only teaching a "supply source" generally and providing no teaching or limiting discussion of any particular supply sources.

In all three of Fukuta's figures, the supply sources are only generically and schematically shown. JA95 – JA95. For example, in FIG. 1, Fukuta provides a schematic drawing that provides no detail on the supply source, only showing a circle with the label "HARDENER" and another with the label "MAIN COMPONENT." FIG. 1 goes on to show an equally generic pump schematic 2a, 2b with little discussion thereof. FIG. 2 is a similar schematic drawing and FIG. 3does not show supply sources at all. Nothing in either of FIGS. 1–3 provide any evidential support for the conclusion that the substitution of Fukuta's supply sources and their associated pumps 2a, 2b with the cartridges (70) and the mixing gun (60) of Morris would render the combination inoperable. To the contrary, the

generic depiction of the supply sources and pumps would suggest to a person having ordinary skill in the art that any supply source could be used.

Though not required, as discussed above, the first proposed combination will not disable Fukuta's alleged contribution to the art of providing stop valves, check valves, and escape valves to prevent backflow because each and every stop valve (5a, 5b), check valve (4a, 4b), and escape valve (6) remains in the device after the proposed combination. The stop valves (5a, 5b), check valves (4a, 4b), and escape valve (6) of Fukuta appear down-stream of the supply sources and their pumps (2a, 2b) and thus would remain downstream after the cartridges (70) and mixing gun (60) of Morris are substituted; the combination does not remove the backflow prevention means.

Importantly, too, these stop valves (5a, 5b), check valves (4a, 4b), and escape valve (6) are controlled and operate independently of the supply sources and pumps (2a, 2b) of Fukuta and thus they would continue to do so in the proposed combination. Fukuta states:

> [t]he stop valves 5a, 5b are kept open while the escape valve 6 is kept closed by control means, not shown, during the spraying operation and when the spraying is stopped a spray stop signal is sent from the spary gun 1 to the escape valve 6, and then to stop valves 51, 5b by use of an air pressure circuit B, or the like, and the escape valves 5a, 5b are closed in response to this signal.

JA97, col.3:7-14.  Fukuta further states that "[m]ore preferably, the control means in the present invention is equipped with a sensor for sensing the occurrence of the backflow and with a timer mechanism for adjusting the open time of the escape valve in accordance with the supply pressure of the main component, for example."  JA98, col.6:29-34.  Thus, the escape valve (6) and the stop valves (5a, 5b) are expressly controlled by a control means that links the spray gun (1) to the stop valves and the escape valves.  Note that Fukuta <u>does not</u> connect the escape valve and stop valves to the supply sources, but only to the spray gun.  The spray gun (1) remains in the first proposed combination.  Therefore, the escape valve (6) and stop valves (5a, 5b) would still be operable to prevent backflow, as controlled by the control means (not shown), in accordance with the teachings of Fukuta.

Turning to the second proposed combination of Fukuta's spray gun (1) and static mixing nozzle (3) with the the cartridges (70) and the mixing gun (60) of Morris, the combination would be operable.  Fukuta teaches that the solutions of the main component and the hardener are sent from their supply sources to a mixer (3) and mixed.  Then, the "mixture is sent to the coating spray gun (1)."  JA97, col.3:2-4.  So too in Morris.

Morris teaches that a supply source (cartridge 70) sends solutions to a mixer (static mixer 72) and then dispenses the mixed solutions through a nozzle (74). The solutions flow from cartridges (70) to the static mixer (72) prior to dispensing

just as is taught in Fukuta. It is irrelevant that the backflow prevention means, such as stop valves (5a, 5b) and escape valve (6), are not present in this combination, because as discussed above the principle of operation of both Fukuta and Morris are not limited to this narrow feature described by Fukuta.

Additionally, the spray gun (1) and mixing nozzle (3) of Fukuta, are left to function exactly as described in Fukuta. Similarly, the combination does not alter the portions of the combination coming from Morris. Thus, nothing about the combination is inanthema to the teachings of either reference as they relate to the components being combined. Thus, a person having ordinary skill in the art would have no reason to believe the combination would not function and there is no evidence that this second combination would indeed be inoperable. Rather, a person having ordinary skill in the art would believe the combination of the spray gun (1) and mixing nozzle (3) of Fukuta and the cartridges (70) and mixing gun (60) of Morris would function exactly as taught by the references and therefore would be operable.

Additionally, the Board stated that the it was unclear whether the stop valves (5a, 5b) or the excape valve (6) could function together to achieve Fukuta's alleged contribution to the art of preventing backflow with the mixing gun (60) and cartridges (70) of Morris. This is in err, however, because a person having ordinary skill would have readily recognized that the stop valves (5a, 5b) and

escape valve (6) are controlled by a control means that acts independently of the supply source, and rather is coupled via a sensor to the spray gun (1) of Fukuta, which remains in tact in the proposed combinations. Therefore, this conclusion of the Board lacks substantial evidential support. This point is addressed in greater detail below with regards to the Board's errors in requiring a physical substitution of the elements of Fukuta with the elements of Morris.

Therefore, the Board failed to provide subtstantial evidence to support their conclusion that the principle of operation of Fukuta would be changed by the proposed combinations at least because the Board failed to show that the proposed combinations would actually not function.

*Fukuta and/or Morris  do not point away or teach away from the combination.*

The Board failed to support its conclusion that Fukuta's principle of operation would be changed by the proposed combinations because the Board failed to consider whether the references—either Fukuta or Morris—taught away or pointed away from the combination.

In *Ratti*, in addition to determining that the combination of Chinnery and Jepson would not actual be capable of functioning, the CCPA held that the basic principles under which the Chinnery construction was designed to operate were impermissibly changed in part because the "teaching of the Chinnery et al. patent

points away from the addition of any spring element." *Ratti*, at 981 (emphasis added).

In *Mouttet*, on appeal to this Court, Mouttet argued that "substituting electronic hardware for optical hardware would destroy the Falk device's principle of operation and physical structure; and second, that Falk teaches away from the claimed invention." *Id.*, at 1331. While a formal "teaching away" analysis was performed by this Court separate from the "principle of operation" analysis, the Court relied on the fact that the Board analyzed whether the references taught away from the combination—holding that they do not in fact teach away from the combination—as evidence that the Board's rejection was supported by substantial evidence. The Court stated that "[t]he Board found that while Falk notes certain advantages to optical devices, the reference in no way suggests that using electronic hardware instead of optical hardware would destroy Falk's operability as a programmable arithmetic unit, nor that it teaches away from electrical circuitry." *Id.*, at 1330 (emphasis added).

Here, Fukuta does not teach or suggest that a cartridge supply source is undesirable. Rather, as described above, Fukuta only generally discusses the supply sources and does not provide any discussion of particular supply sources. Fukuta, in its claims, also describes broadly the supply sources. Claim 1 of Fukuta is representative and teaches, among other things, "a first source of a pressurized

fluid main coating component," and "a second source of a pressurized fluid coating hardener." JA98, col.6:49-55. While the teachings of a reference are not limited to their claims for purposes of obviousness, they are still part of the disclosure and teachings. *See Mouttet*, at 1331 citing *KSR* at 418-21 ("[a] reference may be read for all that it teaches, including uses beyond its primary purpose"). Here, as can be seen, Fukuta broadly describes supply sources and does not further limit them to any particular type of supply. Nor does Fukuta teach that a cartridge type supply source—such as cartridge (70) and mixing gun (60) of Morris—is undesirable. Fukuta does not teach that any particular supply sources are problematic. For example, Fukuta states that check valves are placed in the fluid flow paths of the main component and the hardner to prevent backflow, but without stop valves and escape valves, "the check valve becomes fixed in a state where it is somewhat open and cannot be closed fully. Therefore, the backflow cannot be prevented effectively." JA96, col.1:35-43. As is seen, this is not peculiar to only one type of supply source and indeed does not teach away from the cartridges and mixing gun of Morris.

Morris also does not provide any teaching away from the combinations. Morris, in fact, points to the combination. For example, Morris addresses the problem of the fluids curing within the dispensing apparatus, just as Fukuta does. Morris describes:

> An additional problem with such prior art devices is that if the final material is of rapid curing, it must be dispensed out the dispensing end prior to curing. As the curing time decreases, it may <u>be possible that the material will not flow all the way out of the hose</u> and dispensing end prior to curing. This can either result in internal curing which will result in the loss of the equipmen, or will limit the length of the hose leading from the mixing chamber.

JA103, col.1:65-2:5 (emphasis added). Morris addresses the down stream of the cartridges (70) and mixing gun (60) by addressing the static mixing chamber. Furthermore, Morris points to the combination by stating that pumps (22, 23) can be used to supply base material from a supply source, as is discussed in Fukuta. JA104, col.4:36-63. Additionally, Morris teaches that the pistons can by "air-powered" pistons. *Id.* Fukuta also teaches that air-powered systems can be used, as is discussed above. Thus, a person having ordinary skill in the art would have thought that because the references address similar problems, in a similar way, that the references not only do not teach away from the proposed combination but actually point towards the combination and therefore would operate under the same principle of operation.

Furthermore, the Board did not address whether the art taught away or pointed away from the combination, as was done in *Mouttet* and *Ratti*. Therefore, the Board's decision was not supported by substantial evidence at least because the

references did not teach away or point away from making the proposed combinations.

*Fukuta and Morris are from the same field of endeavor.*

The Board failed to discuss whether the references were from the same or similar fields. In making a factual determination as to whether the principle of operation of a reference is impermissibly changed by a proposed combination, *Mouttet* and *Ratti* looked to whether the cited references were from the same field of endeavor.[4]

Here, Fukuta and Morris are from the same field of endeavor, just like in *Mouttet*. Fukuta is generally from the field of "two-component mixing type coating method which is suitable for coating car bodies, machine components, for example." JA96, col.1:7-9. Similarly, Morris is directed to a "dispensing apparatus for dispensing a composition of at least two materials." JA103, col.2:17-19. As is readily apparent, both references are from the field of two-component mixing. Thus, the Board could not support a conclusion of changing Fukuta's principle of operation based on determining that the references were from disparate fields and therefore the principles of each reference would be different. Rather,

---

[4] In *Ratti*, the court found that "[t]he two arts are at least somewhat remote from each other even if they both involve sealing." *Ratti*, at 981. There was no such finding in *Mouttet*.

here, the references are from the same field and indeed operate on identical

principles.

In conclusion, it is apparent that the prior art references can function in the

manners proposed, the references do not point or teach away from the proposed

combinations, and the references are from the same field of endeavor.  The Board,

therefore, did not—and indeed could not—support their conclusion that the

combinations of Fukuta and Morris impermissibly change the principle of

operation of Fukuta with substantial evidence.

> **c)** **The Board erred in requiring a physical substitution of the elements of Fukuta with the elements of Morris**

"It is well-established that a determination of obviousness based on

teachings from multiple references does not require an actual, physical substitution

of elements."  *Mouttet*, at 1332 citing *In re Etter*, 756 F.2d 852, 859 (Fed. Cir.

1985).  While the Board noted that "the ability for bodily incorporation need not be

demonstrated" (JA13), its actual analysis ignores this principle and repeatedly

insists that the cylindrical cartridges of Morris be interchangeable with the device of

Fukuta.

For example, the Board states that "Requester does not adequately address

the stop valves 5a, 5b or the escape valve 6 of Fukuta that function together as

discussed above and whether the objectives of Fukuta can be attained using the

manually actuated mixing gum in a spray device."  JA17.  Similarly, the Board

45

states that "[t]here is no indication, nor does the Requester persuade us, that the modification of Fukuta by using the cartridges and the manually actuated mixing gun of Morris would allow the various valves in Fukuta to function in their intended manner as with a pump so that the modified device would function in the same way and attain the objective to which the spray apparatus of Fukuta is directed." JA16. And further,

> Fukuta is directed to this very 'manner in which backflow of the mixture is prevented' (i.e., by using check valves, stop valves and escape valve). Hence the modification suggested by the Requester, where these components of Fukuta are replaced with the cartridges 70 and mixing gun 60 of Morris, would impact this functionality in a fundamental way so as to change the manner in which the apparatus of Fukuta functions.

JA12.

This line of the Board's analysis (which is pervasive throughout the Decision) is irrelevant and contrary to the well-established law that the "test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference....". *See In re Keller*, 642 F.2d 413, 425 (CCPA 1981). *See also In re Etter*, 756 F.2d 852 (Fed. Cir. 1985) (en banc) ("Etter's assertions that Azure cannot be incorporated in Ambrosio are basically irrelevant, the criterion being not whether the references could be physically combined but whether the claimed inventions are rendered obvious by the teachings of the prior art as a whole."); *see also In re Sneed*, 710 F.2d 1544

(Fed. Cir. 1983) ("[I]t is not necessary that the inventions of the references be physically combinable to render obvious the invention under review.")

Further, as the Court found in *Mouttet*, "it was not requisite to the Board's § 103(a) determination that Das's features be deemed equivalent for purposes of substitution into Falk's device. Rather, the test for obviousness is what the combined teachings of the references would have suggested to those having ordinary skill in the art." *Mouttet*, at 1332-33.

### 2. Claims 1-6 and 15 are Obvious Over Fukuta in View of Morris and Einbecker

Prior to the erroneous conclusion by the Examiner, and later the Board, that modifying Fukuta to include the cylindrical cartridges of Morris would change Fukuta's principle of operation and require a substantial reconstruction of Fukuta, the Examiner correctly found that claims 1-6 and 15 of the '384 patent are obvious over Fukuta in view of Morris and Einbecker. The Examiner's original conclusion is correct because, as shown in the claim chart provided at JA47 – JA49,[5]

---

[5] Plas-Pak's original claim chart (JA47 – JA49) does not include Einbecker. The Examiner modified Plas-Pak's proposed rejections "to the extent, if any, that the hose disposed between and in fluid communication with nozzle (3) and spray tip (1) of Fukuta may not be considered flexible, resort is had to Einbecker" … "which teaches a flexible hoses (21, 54, 61) disposed between the sources of multicomponent coating and compressed air source and the spray tip (16, 17), the flexible hoses thereby enabling a user to hand hold and manually manipulate the spray gun…." JA324.

Fukuta teaches the invention substantially as claimed, including a device for applying a coating containing a hardener and main component (JA47, *see also* JA93, Abstract), a static mixing nozzle in fluid communication with the hardener and main component (JA47, *see also* JA94, FIG. 1; JA96 – JA97, col.2:63 – col.3:4; JA98, col.6:56-64), a spray tip in fluid communication with the static mixing nozzle (JA47, *see also* JA94, FIG. 1; JA97, col.3:2-4), a first flexible hose between and in fluid communication with the static mixing nozzle and the spray tip (i.e. Fukuta's conduit means that includes a premixed portion, hardener flow portion, and a main component flow portion) (JA48, *see also* JA94, FIG. 1; JA96 – JA97, col.2:62 – col.3:4; JA98, col.6:56-64), and a second hose in fluid communication with the spray tip for supplying atomization air to the spray tip (i.e. Fukuta's air supply line) (JA48, *see also* JA94, FIG. 1; JA95, FIG. 2; JA98, col.5:38-43), but does not explicitly teach that the hardener and main component are contained in two cylindrical cartridges.

As further shown in the claim chart provided at JA47 – JA49, Morris teaches a two-component dispensing device in the form of a dispensing gun containing two cylindrical cartridges that are in fluid communication with a static mixer and a dispenser (*see also* JA102, FIG. 4; JA103, col.2:17-32, JA106, col.7:23-32). As discussed below, a person of ordinary skill in the art one of ordinary skill in the art, starting with Fukuta's two component spray apparatus, would have found it

obvious at the time of the invention to modify Fukuta's "hardener" and "main component" containers to include a dual cylindrical cartridge as taught by Morris.

Morris teaches that the portability of two component static mixing systems can be enhanced by using two cylindrical cartridges. JA106 (col.7:22-34, 55-60). Morris contrasts one embodiment, as shown in FIG. 2, a nonhand-held model containing two reservoirs labeled A and B (JA101), with a hand-held model containing two cylindrical cartridges as shown in Fig. 4. JA102, *see also* JA106, col.7:22-25, 55-60). Instead of Fukuta's containers, Morris simply teaches an alternative way of containing the mixture in dual cylindrical cartridges. The substitution is a predictable use of prior art elements according to their established functions. *KSR*, at 416.

Furthermore, there is nothing in the record to suggest that substituting a container for a cylindrical cartridge as taught by Morris would have been uniquely challenging or difficult for one of ordinary skill in the art. In fact, the '384 patent itself provides predictability evidence in reference to the preferred embodiment of multi-component cartridges of "1" and "1a" of FIGs. 1-5,

> "[o]ne skilled in the art will understand that reservoirs 26 and 27 can be fabricated in **various sizes** to accommodate necessary ratio of reactive components."

JA89, col. 6:29-50 (emphasis added). Accordingly, the substitution of the dual cylindrical cartridges of Morris for the containers of Fukuta is no more than "the simple substitution of one known element for another." *KSR*, at 416.

Further, Fukuta's FIG. 1, as represented by a line drawing, explicitly discloses a combined flow portion disposed between and in fluid communication with the mixing nozzle and spray tip JA94, FIG. 1; JA96, col.2:61 – col.3:14. Einbecker's use of a flexible hose is a predictable use of prior art elements according to their established functions. As noted in Einbecker:

> "Generally speaking, such a gun comprises a handle by which it may be held and manipulated, a nozzle from which liquid and compressed air are discharged, and suitable passages and valves by which the discharge of air and liquid are controlled."

JA664, col.4:20-25. Thus, one of ordinary skill in the art starting with Fukuta's two component spray apparatus would have found it obvious at the time of the invention was made to modify Fukuta's flow portions to include flexible flow portions as taught by Einbecker for providing manipulation of the spray gun.

### 3. Claims 7-9 are Obvious Over Fukuta in View of Morris, Brogan and Einbecker

As shown in the claim chart provided at JA51 – JA52, Fukuta and Morris teach the structural limitations of the claimed device in claims 7-9, therefore the device is capable of performing the intended use of applying a nonskid coating to a surface as stated in the preamble of claim 7. Preambles describing the use of an

invention generally do not limit the claims because the patentability of apparatus or composition claims depends on the claimed structure, not on the use or purpose of that structure. *See*, *e.g.*, *Bristol-Myers Squibb Co. v. Ben Venue Labs.*, *Inc.*, 246 F.3d 1368, 1375 (Fed. Cir. 2001). Brogan serves as evidence that it was well known to spray coat a two-part, non-skid composition containing an aggregate. JA108 – JA109 (Abstract, FIG. 1). Inasmuch as Fukuta teaches dispensing two component materials, such as a polyurethane including a main component and a hardener (JA96, col. 1:7-12), it would have been obvious to employ the coating device of Fukuta to dispense a variety of fluid materials including a nonskid composition containing an aggregate. *See* JA111 [0004], JA116 [0068].

### 4. Claims 10-12 are Obvious Over Fukuta In View Of Morris and Einbecker With Evidence From Fukuta

As set forth in the claim chart provided at JA53 – JA54, Fukuta and Morris teach the structural limitations of the claimed device in claims 10-12, therefore the device is capable of performing the intended use of applying paint to a surface as stated in the preamble of claim 10. *See*, *e.g.*, *Bristol-Myers Squibb Co.*, supra. Additionally, Fukuta provides evidence of a paint spray operation that includes applying a two-component urethane coating. JA96, col.1:7-12; JA97, col.4: 61.

### 5. The Board Erred in Finding that Modification of the Apparatus of Fukuta with the Mixing and Dispensing Apparatus of Colin Would Have Changed the Principle of Operation of the Apparatus of Fukuta

The Board committed essentially the same errors in its analysis of the proposed combinations of Fukuta and Colin as with the combinations of Fukuta and Morris. *See* JA17 – JA18. First, for the reasons discussed above at pp.24-30, the Board erred in its overly narrow formulation of Fukuta's principle of operation. The Board's confusion of Fukuta's principle of operation with its contribution to the art constitutes legal error under *Mouttet* and *Umbarger.*

Next, as with the Morris reference, the Board erred in finding that Fukuta's principle of operation is altered by the combination of Fukuta and Colin. As with Morris, Colin teaches a multiple barrel device for mixing and dispensing multiple components through a static mixing nozzle and using a piston-driven dispensing gun. *See, e.g.*, JA119 – JA121 (Abstract; FIGs. 1, 3). For the reasons discussed above at pp.30-47, the Fukuta's principle of operation would not be altered either by (i) substituting the supply sources and the associated pumps (2a, 2b) of Fukuta for the cartridges and mixing gun of Colin, or (ii) combining Fukuta's spray gun and static mixing nozzle with the cartridges and mixing gun of Colin. As with Morris, the combination of Fukuta and Colin can function in the manner proposed, there is no teaching away from the combination, and Fukuta and Colin are in the same field of endeavor.

52

Accordingly, the same reasons as with Morris, the Board erred in finding that the combination of Fukuta and Colin would change the principle of operation of Fukuta. Accordingly, the Board's decision upholding the patentability of the claims of the '384 patent should be reversed.

### 6. Claims 1-6 and 13-15 are Obvious Over Fukuta In View Of Colin and Einbecker

As with the combinations involving Morris discussed above, prior to the Examiner's erroneous conclusion that modifying Fukuta to include the cylindrical cartridges of Colin would change Fukuta's principle of operation and require a substantial reconstruction of Fukuta, the Examiner correctly found that claims 1-6 and 13-15 are obvious over Fukuta in view of Colin and Einbecker. JA327 – JA328. As shown in the claim chart provided at JA55 – JA576, Fukuta teaches the invention substantially as claimed.

One of ordinary skill in the art starting with Fukuta's two component spray apparatus would have found it obvious at the time of the invention was made to modify Fukuta's "hardener" and "main component" containers to include a dual cylindrical cartridge as taught by Colin. Colin demonstrates that the two component containers can be of any size, preferably cylindrical double-barrel ratchet-type. *See* JA123 – JA124, col.2:65 – col.3:11.

---

[6] Plas-Pak's original claim chart (JA55 – JA57) does not include Einbecker. As with Morris, the Examiner modified Plas-Pak's proposed rejections to include Einbecker. JA328.

Colin further notes that in an embodiment, a conventional double-barrel ratchet-type dispensing gun may be activated mechanically, automatically or using a hand-activated double plunger. JA124, col.3:12-20. Additionally, the '384 patent provides evidence that, in reference to the preferred embodiment of multi-component paint cartridges of "1" and "1a" of Figs. 1-5, "[o]ne skilled in the art will understand that reservoirs 26 and 27 can be fabricated in various sizes to accommodate necessary ratio of reactive components." JA89, col.6:29-50. Accordingly, combining Colin's cylindrical cartridges to Fukuta's hardener and main component flow portions would have been obvious in view of the '384 patent's recognition that the reservoirs can be fabricated in various sizes and Colin's recognition that the compartment containers in a static mixing dispenser system can be of any size, such as hand-held dispensers.

In addition, there is no evidence in the record suggesting that the use of Colin's cartridges in Fukuta's two-component spray assembly would not be a predictable variation of prior art elements or would be beyond the level of ordinary skill in the art.

Accordingly, based on the state of the prior art of two-component static mixing assemblies, the simplicity and availability of the cartridge making up the apparatus of the '384 patent, the explicit teaching in the prior art that the component container can be of any configuration, such as portable cylindrical

cartridges, and the statement in the '384 Patent that the reservoirs "can be fabricated in various sizes"—compel a conclusion that the claims 1-6 and 13-15 of the '384 patent are obvious.

### 7. Claims 7-9 are Obvious Over Fukuta in View of Colin, Brogan and Einbecker

As shown in the claim chart provided at JA58-JA59, Fukuta and Colin teach the structural limitations of the claimed device in claims 7-9, therefore the device is capable of performing the intended use of applying a nonskid coating to a surface as stated in the preamble of claim 7. Inasmuch as Fukuta teaches dispensing two component materials, such as a polyurethane including a main component and a hardener (JA96, col.1:7-12), it would have been obvious to employ the coating device of Fukuta to dispense a variety of fluid materials including a nonskid composition containing an aggregate. *See* JA111 [0004], JA116 [0068].

### 8. Claims 10-12 are Obvious Over Fukuta in View of Colin and Einbecker with Evidence from Fukuta

As set forth in the claim chart provided at JA60 – JA62, Fukuta and Colin teach the structural limitations of the claimed device in claims 10-12, therefore the device is capable of performing the intended use of applying paint to a surface as stated in the preamble of claim 10. Additionally, Fukuta provides evidence of a

paint spray operation that includes applying a two-component urethane coating.

JA96 (col.1:7-12), JA97 (col.4: 61).

> **9.** **The Board Erred in Finding that Modification of the Dispensing Apparatus of Jacobsen with the Spray Nozzle of Hunter Would Have Rendered the Dispensing Apparatus of Jacobsen Inoperable for its Intended Purpose**

During the Reexamination, the Board erroneously reached the conclusion that (i) claims 1-6 and 13-15, (ii) claims 7-9 are non-obvious over Jacobsen in view of Hunter and Brogan, and (iii) claims 10-12 are non-obvious over Jacobsen in view of Hunter. *See* JA5-6, *see also* JA18 – JA23. In reaching this conclusion, the Board erred in finding that modification of the apparatus of Jacobsen to include the spay nozzle of Hunter.

> **a)** **The Board's overly narrow definition of Jacobsen's intended purpose constitutes legal error**

The Board's definition of Jacobsen's intended purpose – "dispensing fluid materials directly into a surface crack such as floors, walls or ceilings so as to minimize leakage" (JA18)—is overly narrow and contrary to the law of *KSR*. As this Court recently observed, "[a] reference may be read for <u>all</u> that it teaches, <u>including uses beyond its primary purpose</u>." *Mouttet*, at 1331 citing *KSR* at 418-21, 127 S. Ct. 1727.

In *KSR*, the Supreme Court found error in the "assumption that a person of ordinary skill attempting to solve a problem will be led only to those elements of

prior art designed to solve the same problem." *KSR*, at 420. The Board has made the same error here. The Board questioned "how filling of cracks and voids which is the purpose of the dispensing apparatus described in Jacobsen can be attained with spray nozzles," and how "a spray nozzle can be used for filling cracks or voids, particularly while minimizing leakage of the fill material." JA19 – JA20. The Board's analysis demonstrates a misapplication of *KSR*, where the Court instructed that "[c]ommon sense teaches … that familiar items may have obvious uses beyond their primary purposes, and in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle." *KSR*, at 420.

In *KSR*, the asserted patent, Engelgau, was directed to "a position-adjustable pedal assembly with an electronic pedal position sensor attached to a fixed pivot point." *Id.* at 399. The key prior art reference, Asano, "was designed to ensure that the force required to depress the pedal is the same no matter how the pedal is adjusted, whereas Engelgau sought to provide a simpler, smaller, cheaper adjustable electronic pedal." *Id.* at 400. Notwithstanding the differences in intended purpose between Asano and Engelgau, "Asano taught everything contained in the claim except using a sensor to detect the pedal's position and transmit it to a computer controlling the throttle." *Id.* Such sensors were found in at least two other prior art references. *Id.*

The Supreme Court found that the combination of Asano and the other references rendered Engelgau obvious because, "[t]he idea that a designer hoping to make an adjustable electronic pedal would ignore Asano because Asano was designed to solve the constant ratio problem makes little sense.  A person of ordinary skill is also a person of ordinary creativity, not an automaton."  *Id*. at 420-21.

Similarly, the idea that a designer hoping to make a mixing and dispensing system for applying a coating[7] would ignore Jacobsen, because Jacobsen can be used to mix and dispense multi-component materials to fill cracks, makes little sense.  Under the Board's constricted analysis, a person of skill in the art would look to Jacobsen <u>only</u> in the context of filling cracks, which is directly contrary to the law of *KSR*.   Rather, a person of ordinary skill in the art, being a person of ordinary creativity and not an automaton, would understand that the piston-driven cartridges, static mixing nozzle, and flexible hose of Jacobsen (*see*, *e.g.*, JA66 – JA67) would have applications beyond filling cracks.  *See KSR*, at 420-21.

 This is particularly true in light of Jacobsen's overall disclosure.  For example, Jacobsen's Abstract makes no mention of filling cracks.  Rather, it more broadly describes "a kit-like system and apparatus for dispensing a multiple component reactive material from two cartridges each having an exteriorly

---

[7] *See* JA92, '384 patent, claim 1.

threaded semi-cylindrical outlet nozzle, where the respective components need not

be mixed together immediately, but only in close proximity of the intended use of

the material. …"  JA126.

Similarly, the claims of Jacobsen are not limited to filling cracks.  JA135 –

JA136.  The preamble of claim 1 states that the claim is directed to a "[m]ethod for

dispensing a multiple component reactive material from two cartridges each having

an exteriorly threaded semi-cylindrical outlet nozzle."  JA135, col.8:52-54.  Claim

1 goes on to describe an arrangement of cartridges, nozzles and hoses for mixing

the separate components "and defining a common flow path for the mixed

components to close proximity of the intended use of the material."  JA135 –

JA136, col.8:56 – col.9:4.  There are no limitations in claim 1, or any of the claims,

directed to filling cracks.

Indeed, in light of Jacobsen's broad claims, a person of skill in the art would

understand that Jacobsen suggests a "high level ability" beyond merely filling

cracks.  *See Mouttet*, 686 F.3d at 1322 (discussing the principal of operation of a

disclosed device as being its "high level ability").  A person of skill in the art

would also appreciate Jacobsen's disclosure of a general dispensing kit system for

multiple components that allow for different types of attachments to the hose

depending on the discharge location.  *See*, *e.g.*, JA129, FIG. 10, label "H-4."  A

person of skill in the art would understand that Jacobsen's first objective was to

design a general kit-like dispensing system with a series of optional components

for conveying multiple reactive materials to a discharge location, with no specific

dispensing device identified in this embodiment but instead left it open-ended for

"where and when needed."

> A basic object of this invention is to provide improved method and apparatus involving multiple piece kits suited in alternate manners of connection for conveying multiple components of a reactive material via isolated flow paths from the component containing cartridges over indefinite distances before mixing the components and then conveying the mixed components over a common flow path typically of significantly shorter length before being discharged where and when needed, and of controlling the material discharge by clamp means on the common flow path proximate the discharging material before such sets.

JA132, col.2:46-56. This first objective of a general kit system is also reflected in

the Abstract and in Figures 10 and 11, where there is no specific dispensing device

attached to H-4. JA129 – JA130.

In light of the disclosure of Jacobsen as a whole, and in light of the teachings

of *KSR*, a person of skill in the art, hoping to make a device for applying a coating,

would not ignore Jacobsen because the device of Jacobsen can be used to fill

cracks. *See KSR*, at 420-21. Rather, a person of skill in the art reviewing Jacobsen

would appreciate that its "familiar items" (e.g., piston-driven dual cylindrical

cartridges, static mixing nozzle, flexible hose) would have "obvious uses beyond

their primary purposes" of filling cracks. *Id.*

Therefore, the Board's definition of Jacobsen's intended use is overly constrictive and contrary to *KSR*. The intended use of Jacobsen is more properly stated as Plas-Pak proposed: <u>a dispensing kit suited in alternate manners of connection for conveying multiple components of a reactive material before being discharged where and when needed</u>. *See*, *e.g.*, JA498 – JS499.

With Jacobsen's intended use properly defined, it is clear that modifying the Jacobsen device to include a spray tip, roller, or brush would not render the device unsuitable for its intended purpose. To the contrary, a spray tip, roller, or brush would facilitate the operation of the dispensing kit in discharging the multiple components of reactive material where and when needed. Therefore, the Board's decision with respect to Jacobsen and the proposed combinations involving Jacobsen should be reversed.

### 10. Claims 1-6 and 13-15 are Obvious Over Jacobsen In View of Hunter

With the correct definition of Jacobsen's intended use in place, it is clear that claims 1-6 and 13-15 are obvious over Jacobsen in view of Hunter. As set forth in the claim chart provided at JA66 – JA67, Jacobsen teaches the invention substantially as claimed, including a device for applying a reactive two-component substance (JA66, *see also* JA126, Abstract), a static mixing nozzle in fluid communication with a multi-component cartridges (JA66, *see also* JA129, FIG. 10; JA135, col.7:15-24), and one flexible hose disposed between and in fluid

communication with the apertures of the cartridges and the static mixing nozzle (*see also* JA66, *see also* JA129, FIG. 10), but does not disclose a spray tip.

Hunter teaches a spray section (10) in fluid communication with a static mixing nozzle (1) (JA66, *see also* JA138 – JA139, FIGs. 1,3; JA141 – JA142, [0027, [0039]), and a tube (12) in fluid communication with the spray section (10) for supplying atomization air to the spray section (10) (JA66, *see also* JA138, FIGs. 1, 2; JA142, [0043]).  It would have been obvious to couple Hunter's spray section (10) to Jacobsen's static mixer (M-1) since Jacobsen's apparatus dispenses a multiple component reactive material as taught by Hunter.

The claims of the '385 patent were allowed largely due to the amendment of those claims to include the feature that "a second hose, in fluid communication with the spray tip, for supplying atomization air to the spray tip".  JA282, JA287 (summarizing an examiner's interview that the pending rejection is obviated by amendment because the cited art lacked a second hose in fluid communication with the spray tip for supplying atomization air to the spray tip).  As set forth above, Jacobsen in combination with Hunter teaches a device as recited in claims 1-6, 13-15, which includes "a second hose, in fluid communication with the spray tip, for supplying atomization air to the spray tip."

### 11. Claims 7-9 are Obvious Over Jacobsen In View of Hunter and Brogan

As shown in the claim chart provided at JA69-JA70, Jacobsen in combination with Hunter, with evidence from Brogan, teaches a device as recited in claims 7-9. Jacobsen and Hunter teach the structural limitations of the device, therefore the device is capable of performing the intended use of applying a nonskid coating to a surface. Brogan serves as evidence that it was well known to spray coat a two-part, non-skid composition containing an aggregate. JA108 – JA109 (Abstract, FIG. 1).

### 12. Claims 10-12 are Obvious Over Jacobsen In View of Hunter, With Evidence from Brogan

As shown in the claim chart provided at JA71 – JA72, Jacobsen in combination with Hunter teaches a device as recited in claims 10-12, with evidence from Brogan. Since Jacobsen in view of Hunter teach the structural limitations of the device, the device is capable of performing the intended use of applying paint to a surface with a device for applying a coating. It is well-settled that if a prior art structure is capable of performing the intended use as recited then it meets the claim. *In re Schreiber*, 128 F.3d 1473 (Fed.Cir.1997).

## VII. CONCLUSION

For all the reasons stated above, Plas-Pak requests that this Court overrule the Board's decision and reject as obvious all claims of the '384 patent.

Respectfully submitted,

/s/ Andrew C. Ryan
Andrew C. Ryan
CANTOR COLBURN LLP
20 Church Street, 22nd Floor
Hartford, Connecticut  06103
(860) 286-2929 (Telephone)
(860) 286-0115 (Facsimile)
ryan@cantorcolburn.com

CASE PARTICIPANTS ONLY

# ADDENDUM

# TABLE OF CONTENTS

**Addendum Page**

Decision on Appeal of
The United States Patent and Trademark Office
Re:  Affirming Examiner's Refusal to Maintain the
Withdrawn Rejections and Refusal to Adopt Proposed Regulations
  filed January 17, 2014 ........................................................................ Add. 1

U.S. Patent No. 7,815,384 B2
  dated October 19, 2010 ................................................................. Add. 26

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/001,656 | 06/13/2011 | 7815384 | PLP0067USR | 1141 |

29180        7590        01/17/2014

K&L Gates LLP
P.O. BOX 1135
CHICAGO, IL 60690

| EXAMINER |
|---|
| LEWIS, AARON J |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3993 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 01/17/2014 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

PLAS-PAK INDUSTRIES, INC.
Requester, Appellant

v.

SULZER MIXPAC AG[1]
Patent Owner, Respondent

———————————

Appeal 2013-007786
*Inter partes* Reexamination Control 95/001,656
Patent US 7,815,384 B2[2]
Technology Center 3900

———————————

*Before* STEVEN D.A. McCARTHY, JEFFREY B. ROBERTSON and
DANIEL S. SONG, *Administrative Patent Judges.*

SONG, *Administrative Patent Judge*

DECISION ON APPEAL

—————————————

[1] Sulzer Mixpac AG is the real party in interest (Respondent Brief
(hereinafter "Resp. Br.") 1).
[2] Patent US 7,815,384 B2 (hereinafter "'384 patent") issued October 19,
2010 to Parks et al.

Appeal 2013-007786
Reexamination Control 95/001,656
Patent US 7,815,384 B2

## STATEMENT OF THE CASE

Claims 1-15 are subject to reexamination and have been confirmed by the Examiner (Right of Appeal Notice[3] (hereinafter "RAN" 1)). The Requester appeals under 35 U.S.C. §§ 134 and 315 from the Examiner's withdrawal of certain previously adopted rejections, and the Examiner's refusal to adopt certain other proposed rejections of claims 1-15 (Appeal Brief (hereinafter also "App. Br.") 4, 7-8). We have jurisdiction under 35 U.S.C. §§ 134 and 315.

The Requester relies on its Appeal Brief and Rebuttal Brief (hereinafter "Reb. Br."). The Patent Owner relies on a Respondent Brief (hereinafter "Resp. Br.") in support of the Examiner's decision. An oral hearing with the representatives of the involved parties was held before the Patent Trial and Appeal Board on October 23, 2013, a transcript of which will be entered into the electronic record in due course.

The following proceedings have been identified as being related to the '384 patent (App. Br. 4; Resp. Br. 2):

1. Reexamination Control 95/001,371 (Appeal 2013-001649[4]) for U.S. Patent No. 7,144,170, which issued from an application parent to the continuation application that issued as the '384 patent; and

---

[3] The Examiner's Answer mailed December 12, 2012 merely incorporates by reference the RAN so we cite to the RAN herein.

[4] The Decision for Appeal 2013-001649 was mailed July 1, 2013. A Request for Rehearing has been filed by the Requester on July 30, 2013, and Patent Owner's Comments were received August 29, 2013. The Request for Rehearing has not yet been decided.

2

Appeal 2013-007786
Reexamination Control 95/001,656
Patent US 7,815,384 B2

2.     *Richard Parks Corrosion Tech Inc. v. Plas-Pak Indus Inc.*, *V.O. Baker Co. Inc.*, *Thomas Baker and Jason Baker*, Civil Action No. 2010-cv-00437 (D. Conn.), which is characterized by the Requester and the Patent Owner as a contract action.

We AFFIRM.

THE INVENTION

The '384 patent is directed to a device for applying a coating, and methods for using the same.  Representative independent claim 1 reads as follows (Claims App'x, italics added):

> 1. (Original) A device for applying a coating, comprising:
>         at least two cylindrical cartridges,
>         a static mixing nozzle in fluid communication with the cartridges,
>         *a spray tip*, in fluid communication with the nozzle,
>         *a first flexible hose is disposed between and in fluid communication with the nozzle and the spray tip*, and
>         a second hose, in fluid communication with the spray tip, for supplying atomization air to the spray tip.

Independent claims 7 and 10 are directed methods for applying a coating or a paint, respectively, using a device having the limitations of claim 1.

3

Appeal 2013-007786
Reexamination Control 95/001,656
Patent US 7,815,384 B2

### REJECTIONS PREVIOUSLY ADOPTED, NOW WITHDRAWN

The Requester appeals from the Examiner's withdrawal of the following previously-adopted obviousness rejections under 35 U.S.C. § 103(a):[5]

A)  Claims 1-6 and 15 over Fukuta[6] in view of Morris[7] and Einbecker.[8]

B)  Claims 7-9 over Fukuta in view of Morris, Brogan[9] and Einbecker.

C)  Claims 10-12 over Fukuta in view of Morris and Einbecker.

D)  Claims 1-6 and 13-15 over Fukuta in view of Colin[10] and Einbecker.

E)  Claims 7-9 over Fukuta in view of Colin, Brogan and Einbecker.

F)  Claims 10-12 over Fukuta in view of Colin and Einbecker.

### PROPOSED REJECTIONS NOT ADOPTED

The Requester further appeals from the Examiner's refusal to adopt the following proposed obviousness rejections under 35 U.S.C. §103(a):[11]

---

[5] We utilize the same sequential lettering used by the Requester in its Appeal Brief to identify the withdrawn rejections.

[6] Patent US 4,745,011 issued May 17, 1988 to Fukuta et al.

[7] Patent US 3,989,228 issued November 2, 1976 to Morris et al.

[8] Patent US 2,511,627 issued June 13, 1950 to Einbecker.

[9] US Patent Publication 2002/0110682 A1 to Brogan published August 15, 2002.

[10] Patent US 5,033,650 issued July 23, 1991 to Colin et al.

4

G)    Claims 1-6 and 13-15 over Jacobsen[12] in view of Hunter.[13]

H)    Claims 7-9 over Jacobsen in view of Hunter and Brogan.

I)    Claims 10-12 over Jacobsen in view of Hunter.

## PRINCIPLES OF LAW

"[A] patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art. … it can be important to identify a reason that would have prompted a person of ordinary skill . . . to combine the elements in the way the claimed new invention does." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). "To facilitate review, [an obviousness] analysis should be made explicit." *Id.* (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006) ("[R]ejections on obviousness grounds cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness")).

Combinations of references that render a prior art device inoperable, or that fundamentally change the manner of operation of the device, often will not support a finding of obviousness. *See In re Ratti*, 270 F.2d 810, 813 (CCPA 1959) ("This suggested combination of references would require a substantial reconstruction and redesign of the elements shown [in the prior

---

[11] We utilize the same sequential lettering used by the Requester in its Appeal Brief to identify the proposed rejections not adopted by the Examiner.

[12] Patent US 6,241,125 B1 issued June 5, 2001 to Jacobsen et al.

[13] US Patent Publication 2002/0170982 A1 to Hunter, published November 21, 2002.

art] as well as a change in the basic principles under which [the prior art] construction was designed to operate.").

In addition, if a proposed modification would render the prior art invention being modified unsatisfactory for its intended purpose, then there is unlikely to be a persuasive suggestion or motivation to make the proposed modification. *In re Gordon*, 733 F.2d 900, 902 (Fed. Cir. 1984); *see also DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1326 (Fed. Cir. 2009) (noting that "the 'predictable result' discussed in KSR refers not only to the expectation that prior art elements are capable of being physically combined, but also that the combination would have worked for its intended purpose," *citing KSR*, 550 U.S. 398); *In re ICON Health & Fitness, Inc.*, 496 F.3d 1374, 1382 (Fed. Cir. 2007) ("[A] reference teaches away from a combination when using it in that combination would produce an inoperative result").

## ISSUES

1.      Whether the Examiner erred in finding that modification of the apparatus of Fukuta with the mixing and dispensing apparatus of Morris as suggested by the Requester would have changed the principle of operation of the apparatus of Fukuta.

2.      Whether the Examiner erred in finding that modification of the apparatus of Fukuta with the multiple barrel dispensing device of Colin as suggested by the Requester would have changed the principle of operation of the apparatus of Fukuta.

6

Appeal 2013-007786
Reexamination Control 95/001,656
Patent US 7,815,384 B2

3.      Whether the Examiner erred in finding that modification of the
dispensing apparatus of Jacobsen with the spray nozzle of Hunter as
suggested by the Requester would have rendered the dispensing apparatus of
Jacobsen inoperable for its intended purpose.


ANALYSIS

Preliminarily, we note that only those arguments timely made in the
briefs of record in this appeal have been considered.  Other arguments not
made or those not properly presented to the Board have not been considered
and are deemed to be waived.  *See* 37 C.F.R. § 41.67(c)(1)(vii) ("Any
arguments or authorities not included in the brief permitted under this
section or §§ 41.68 and 41.71 will be refused consideration by the Board,
unless good cause is shown").


Rejections A)-C) Based on the Combination of Fukuta and Morris

In refusing to maintain Rejections A)-C), the Examiner finds that a
person of ordinary skill in the art would not combine the spray gun of
Fukuta with the mixing and dispensing apparatus shown in Figure 4 of
Morris as asserted by the Requester.  The Examiner finds that such
combination would not be made in the absence of hindsight because Fukuta
provides pumps, check valves, and stop valves to provide the components of
the coating while Morris requires manual manipulation of a trigger to move
a drive means (RAN 8, 11, 14, 31).  The Examiner concludes that "it would
not have been obvious to modify Fukuta et al. by simple substitution of the
dual cartridges of Morris et al. because doing so would have resulted in a

7

change of the principle of operation of Fukuta et al. thereby rendering it inoperable for its intended purpose." (RAN 8-9; *see also* RAN 11-12, 14-15; Resp. Br. 10, 12). The Examiner states that "[t]he simple substitution of the dual cartridges [of Morris] for the dual containers of Fukuta et al. (as put forth by the Third Party Requester) would have resulted in a device having incompatible parts" and neither references "provides a teaching of how to remove the material from the dual cartridges of Morris et al. using the pumping arrangement of Fukuta et al." (RAN 8, 11, 14; *see also* Resp. Br. 13).

The Requester argues that "[i]t would have been obvious to couple Morris' cylindrical cartridges to Fukuta's first flexible hose since the device of Fukuta dispenses a two component reactive coating material through a static mixer as taught by Morris." (Request for *Inter Partes* Reexamination, pg. 19). The Requester notes that Einbecker was previously relied upon by the Examiner for disclosing a flexible hose (App. Br. 10, fn. 2). The Requester also argues that the suggested modification to Fukuta does not change the basic principle under which Fukuta is designed to operate, or require substantial reconstruction thereof (App. Br. 13-14). According to the Requester,

> the basic principle under which Fukuta operates is a movement of two separate reactive components brought together at a mixer and dispensed through a dispenser. The basic principle under which Morris operates is the same in that Morris operates by a movement of two separate reactive components brought together at a mixer and dispensed through a dispenser. Providing a mechanism to move the mixtures through the system is subservient to this basic operating principle common

Appeal 2013-007786
Reexamination Control 95/001,656
Patent US 7,815,384 B2

to both Fukuta and Morris, and this principle of operation is not changed or eliminated by combining both references.
(App. Br. 13-14).

The Requester further asserts that "whether it is a ram/piston arrangement or pumping arrangement, does not impact the functional design of Fukuta to move two separate reactive components through a mixer and dispensed through a dispenser." (App. Br. 14). According to the Requester, "Morris teaches that a two-component device that utilizes a pumping arrangement, similar to Fukuta's pumping arrangement, can be adaptable to the previously described dual cartridge/ piston system shown in [Figure] 4." (App. Br. 15).

The Requester appears to rely on alternative bases for modifying the apparatus of Fukuta. The Requester's proposal appears to modify the apparatus of Fukuta by replacing the components upstream of its mixer 3 with the cartridges 70 and mixing gun 60 of Morris (shown in Fig. 4), or alternatively, replacing only the supplies of the hardener and main component and their corresponding pumps P in the apparatus of Fukuta with the cartridges 70 and the manually actuated mixing gun 60 of Morris. We are not persuaded by the Requester's arguments.

The Requester's formulation of the broad and general function of the two-component mixing apparatus (i.e., "movement of two separate reactive components brought together at a mixer and dispensed through a dispenser" (App. Br. 13)) is unpersuasive to demonstrate obviousness. In *In re Ratti*, the appellant's seal and the prior art seal performed the general function of sealing but the Federal Circuit found the suggested modification to the prior art seal inadequate to establish obviousness. *Ratti*, 270 F.2d at 811-13. In

9

particular, the court found that while the claimed invention and the prior art both functioned to seal, the suggested modification required substantial reconstruction and changed the basic principle of operation from attaining sealing through a rigid, press-fit, interface between the components, to attaining sealing by providing a resilient interface between the components. *Id.*

In contrast, the court reached a different result in *In re Mouttet* wherein the issue raised was whether changing the optical paths of a prior art computing device to electronic wires changed the principle of operation of the computing device. *Mouttet*, 686 F.3d 1322, 1332 (Fed. Cir. 2012). In concluding that "the Board's determination that the difference in the circuitry-electrical versus optical-does not affect the overall principle of operation of a programmable arithmetic processor was supported by substantial evidence," the court found "this difference does not affect the operability of Mouttet's broadly claimed device" and that "the examiner saw nothing in the programming and processing of junction states in [the prior art] that is unique to its optical implementation, and [the appellant] has not shown otherwise." *Id.*

The facts of the present appeal are more closely aligned to those of *Ratti* than to the facts of *Mouttet*. In a manner similar to that of *Ratti*, while the apparatus of Fukuta is directed to an apparatus for mixing a two component mixture, Fukuta makes clear that its contribution to the art is in providing such an apparatus which prevents backflow even when the propensity for backflow occurs repeatedly and at high velocity (Fukuta, col. 1, ll. 35-51; col. 1, l. 67-col. 2, l. 14). Changing the apparatus of Fukuta in

10

Appeal 2013-007786
Reexamination Control 95/001,656
Patent US 7,815,384 B2

the manner proposed by the Requester requires substantial reconstruction and affects the principle of operation of the disclosed apparatus of Fukuta.

The Requester argues that "modifying the pumping system in Fukuta with the dual cartridges ram/piston system of Morris does not rise to a substantial reconstruction of Fukuta's system" (App. Br. 14) and asserts that it not a requirement under *KSR* to require disclosure of how a modified device would work and that both references dispense a two component reactive coating material through a static mixer, and thus, can be combined (App. Br. 16). However, we fail to see how the removal of the various components associated with the operation the Fukuta apparatus, which allow for the very object of the apparatus, and substitution of a very differently constructed mechanism of Figure 4 in Morris, can reasonably be considered not a "substantial reconstruction" or redesign of the Fukuta apparatus.

As acknowledged by the Requester, the difference between the systems of Fukuta and Morris is the "manner in which backflow of the mixtures is prevented." (Reb. Br. 4). While the Requester further asserts that Morris teaches that a piston is equally effective as a pump, Fukuta is directed to this very "manner in which the backflow of the mixture is prevented" (i.e., by using check valves, stop valves and escape valve). Hence, the modification suggested by the Requester, where these components of Fukuta are replaced with the cartridges 70 and mixing gun 60 of Morris, would impact this functionality in a fundamental way so as to change the manner in which the apparatus of Fukuta functions. There is no indication, nor does the Requester persuade us, that the device shown in Figure 4 of Morris (or for that matter, the configuration shown in Figure 2)

11

Appeal 2013-007786
Reexamination Control 95/001,656
Patent US 7,815,384 B2

which is devoid of check valves and stop valves performs the function to
which the apparatus of Fukuta is directed, that is, to prevent backflow even
when the propensity for backflow occurs repeatedly and at high velocity.

The facts of the present appeal are also distinguishable from those of
*Mouttet.* The manner in which the two-component mixing apparatus of
Fukuta prevents backflow is unique in its implementation. As noted above,
Fukuta makes clear that its contribution to the art is not in merely providing
an apparatus for bringing together a two component mixture, but rather, it is
in providing such an apparatus for preventing backflow even when the
propensity for backflow occurs repeatedly and at high velocity (Fukuta, col.
1, ll. 35-51; col. 1, l. 67-col. 2, l. 14). It is the disclosed arrangement and
implementation of the stop valves 5a, 5b and the escape valve 6 in Fukuta
which allows the disclosed mixing apparatus to prevent such backflow to the
check valves 4a, 4b which can "adversely influence[] the opening and
closing operation of the check valve[s]." (Fukuta, col. 1, l. 67-col. 2, l. 14;
col. 3, ll. 7-37; Fig. 1).

Furthermore, while the ability for bodily incorporation need not be
demonstrated, mere assertions of obviousness are not adequate, but instead,
such assertions must be supported by some articulated reasoning with
rational underpinnings. *See KSR*, 550 U.S. at 418. There is inadequate basis
to conclude that the suggested combination would likely be successful in
delivering the component materials so as to be suitable for spraying a
coating as disclosed in Fukuta and to attain the objective of preventing

12

Appeal 2013-007786
Reexamination Control 95/001,656
Patent US 7,815,384 B2

backflow under the specific noted operating conditions.[14] In particular, it is
not evident in the Requester's proposed rejections and the references relied

---

[14] The Requester asserted during the Oral Hearing that the use of cartridges
and ram/piston system such as that of Morris in a spray coating application
is known in the art. However, the Requester has not proposed rejections of
the claims of the '384 patent on such evidence. The rejections on appeal that
are actually before the Board are devoid of such evidence and we find it
improper to rely on such prior art that is not part of the rejections proposed
which are at issue and on appeal.

   During the Oral Hearing, the Requester's legal representative stated as
follows:

> MR. ARNOLD: David Arnold once again, Your Honors.
> Thank you very much.
> I'd first like to respond to Judge Song's question regarding the
> availability in the prior art of piston systems with a spray gun.
> They are most definitely in the prior art. They were known to
> Applicant at the time of filing the three-four patents, and they
> are in the IDS that was filed with the patent application in 2006.
> And I refer to Hunter, Patent No. 6764026. It discloses
> cartridge systems, side-by-side cartridge systems, with pistons,
> with a polypropylene flexible mixer that has a flexible tip
> connected to a spray tip with air line connected to the spray tip.
> That's Hunter 026.
>
> JUDGE SONG: And yet you didn't cite that in your proposed
> rejection?
>
> MR. ARNOLD: It was overlooked, Your Honor. It was in the
> IDS. It was considered that it had been fully considered by the
> Examiner. But it may or may not have been. But as the
> Federal Circuit in *In re Swanson* says, mistakes occur, Your
> Honor, and that's why the reexam process is an important
> quality check on patents that are defective and were erroneously
> granted and may be withdrawn.

13

Appeal 2013-007786
Reexamination Control 95/001,656
Patent US 7,815,384 B2

upon therein that the cartridges and mixing gun such as that disclosed in Morris can be used in the context of the spray apparatus of Fukuta. It was these references and the Requester's proposed rejections upon which substantial new questions of patentability were found under 35 U.S.C. §§ 312(a)[15] and 313, and this *inter partes* reexamination was instituted, Requester's proposed rejections being the basis of the rejections now on appeal at the Board under 35 U.S.C. § 315(b).

Even if the Requester's suggested modification is to replace just the supplies of the hardener and main component and their corresponding pumps P of Fukuta with the cartridges 70 and mixing gun 60 of Morris, the Requester's argument is not persuasive. The Requester refers to the inclusion of two different embodiments shown in Figures 2 and 4 of Morris to assert that "Morris teaches that ram/piston systems and [] pumping

---

JUDGE SONG: And yet as the Board, we review for examiner error, and the Examiner has reviewed what you had proposed as the rejections.

MR. ARNOLD: I understand, Your Honor. …
(Oral Hearing Transcript, pgs. 27-28).

[15] As to *inter partes* reexamination, "the scope of reexamination may encompass those issues that raise a substantial new question of patentability, whether proposed by the requester or the Director, but, unless it is raised by the Director on his own initiative, it only includes issues of patentability raised in the request under § 311 that the Director has determined raise such an issue. It otherwise may not include other prior art than what constituted the basis of the Director's determination of a substantial question of patentability." *Belkin Intern., Inc v. Kappos*, 696 F.3d 1379, 1383 (Fed. Cir. 2012).

14

systems are interchangeable in two-component dispensing system." (App. Br. 14; *see also* Reb. Br. 4). However, the Requester fails to appreciate that even if Figures 2 and 4 of Morris are considered to provide equivalent functions with each other, the resultant teaching of Morris is to replace the entire fluid system upstream of the static mixer, such replacement having been discussed above. In addition, both of these embodiments of Morris do not disclose the functions of check valves 4a, 4b, the stop valves 5a, 5b or the escape valve 6 disclosed in Fukuta which are described as functioning together to attain the objective of preventing backflow under specific conditions described in Fukuta. There is no indication, nor does the Requester persuade us, that the modification of Fukuta by using the cartridges and the manually actuated mixing gun of Morris would allow the various valves in Fukuta to function in their intended manner as with a pump so that the modified device would function in the same way and attain the objective to which the spray apparatus of Fukuta is directed.

The Requester asserts that the piston/ram/ratchet mechanism in Morris functions as a check valve disposed upstream of the mixer to prevent backflow from the mixer, and that the claims of the '384 patent do not require particular placement of a stop valve so that patentability cannot be based on particular placement thereof (Reb. Br. 5). However, we are not provided with persuasive evidence in support of this assertion of same functionality. *See In re Schulze*, 346 F.2d 600, 602 (CCPA 1965) ("Argument in the brief does not take the place of evidence in the record."); *see also Enzo Biochem, Inc. v. Gen-Probe, Inc.*, 424 F.3d 1276, 1284 (Fed. Cir. 2005). In addition, even if there is functional equivalence in the

15

mechanism of Morris to the check valve of Fukuta on their own, the
Requester does not adequately address the stop valves 5a, 5b or the escape
valve 6 of Fukuta that function together as discussed above and whether the
objectives of Fukuta can be attained using the manually actuated mixing gun
in a spray device. To any extent that the assertion of the Requester may be
that these valves of Fukuta would not be necessary if the piston/ram/ratchet
mechanism of Morris is used, we again fail to see how such modification to
the apparatus of Fukuta would not be a substantial reconstruction/redesign
which changes its principle of operation as discussed *supra*.

Therefore, in view of the above, we affirm the Examiner's refusal to
maintain Rejection A) principally based on the combination of Fukuta in
view of Morris as appealed by the Requester. The Requester relies on the
same arguments with respect to Rejections B) and C) (App. Br. 17).
Correspondingly, we affirm the Examiner's refusal to maintain these
rejections as well.

Rejections D)-F) Based on the Combination of Fukuta and Colin

In refusing to maintain Rejections D)-F), the Examiner finds that a
person of ordinary skill in the art would not combine the spray gun of
Fukuta with the mixing and multiple barrel dispensing device of Colin
because the "substitution of the dual compartments of Colin et al. for the
dual containers of Fukuta et al. (as put forth by the Third Party Requester)
would have resulted in a device having incompatible parts" and neither
reference "provides a teaching of how to remove the material from the dual
compartments of Colin et al. using the pumping arrangement of Fukuta et

Appeal 2013-007786
Reexamination Control 95/001,656
Patent US 7,815,384 B2

al." (RAN 18-19, 21-22, 24; *see also* Resp. Br. 18-19). The Examiner concludes that "it would not have been obvious to modify Fukuta et al. by simple substitution of the dual compartments of Colin et al. because doing so would have resulted in a change of the principle of operation of Fukuta et al. thereby rendering it inoperable for its intended purpose." (RAN 19; *see also* RAN 22).

The issues presented with respect to the withdrawn Rejection D) are substantively similar to that of Rejection A) except that this rejection relies on Colin instead of Morris. Indeed, the Requester relies on arguments similar to that of Rejection A) asserting that the basic principle under which Colin operates is the same as Fukuta in that it operates by movement of two reactive components brought together at a mixer and dispensed through a dispenser (App. Br. 19-20).

Thus, for substantially the same reasons already discussed with respect to Rejection A), we are not persuaded that the Examiner erred in refusing to maintain Rejection D) as appealed by the Requester and affirm the Examiner's decision. The Requester relies on the same arguments with respect to Rejections E) and F) (App. Br. 20). Correspondingly, we also affirm the Examiner's refusal to maintain Rejections E) and F).

## Rejections G)-I) Based on the Combination of Jacobsen and Hunter

In refusing to adopt proposed Rejections G)-I), the Examiner finds that Jacobsen discloses a device with dispensing nozzles for the stated objective of dispensing fluid materials directly into a surface crack such as in floors, walls or ceilings so as to minimize leakage, but does not disclose

17

dispensing of fluid by spraying or that a spray nozzle would attain this objective (RAN 25-26; *see also* Resp. Br. 22-23). The Examiner also finds that Hunter does not disclose using its spray nozzle "to dispense fluid material into cracks in a manner that would minimize leakage." (RAN 26). The Examiner concludes that "it would not have been obvious to modify Jacobsen et al. by substituting the atomizing spray nozzle of Hunter because it would have rendered the device of Jacobsen et al. unsuitable for its intended purpose." (RAN 25-30; *see also* Resp. Br. 22-23). We find no error in the Examiner's assessment and address the Requester's arguments *infra*.

The Requester argues that "combining Jacobsen's dispensing system with Hunter's spray nozzle for a two component system is nothing more than predictable variation of prior art elements according to their established function of a dispensing a multi-component reactive material." (App. Br. 25). However, we observe that the Requester has not demonstrated that an established function of a cartridge and plunger is to dispense a multi-component reactive material for spraying using a spray nozzle.[16] The Requester does not adequately explain how the modified device would work, and the manner in which the cartridges and mixing gun disclosed in Jacobson can be used in the context of the spray apparatus of Hunter to attain the specific function of dispensing fluid materials directly into surfaces cracks to minimize leakage. It is not evident based on the Requester's proposed rejections and arguments how filling of cracks and voids which is the purpose of the dispensing apparatus described in Jacobson

---

[16] *See also* Footnote 14 *supra*.

18

Appeal 2013-007786
Reexamination Control 95/001,656
Patent US 7,815,384 B2

can be attained with spray nozzles. Indeed, modifying Jacobsen to provide a spray nozzle would appear to render Jacobsen unsuitable for its intended purpose of dispensing the two component materials into cracks in walls, etc. *See In re Gordon*, 733 F.2d at 902; *DePuy Spine*, 567 F.3d at 1326; *In re ICON Health*, 496 F.3d at 1382. The Requester does not submit persuasive argument or evidence which establishes that a spray nozzle can be used for filling cracks or voids, particularly while minimizing leakage of the fill material.

The Requester argues that Jacobsen's disclosure is broader than the Examiner's view and asserts that it describes other purposes and features "such as a general kit system having alternate manners of connections." (App. Br. 21-22, *citing* Jacobsen, col. 2, ll. 46-56). The Requester argues that because the specification of Jacobsen states that only specific embodiments of the invention have been illustrated and that the invention is to be limited only by the scope of the claims which do not include limitations directed to filling cracks while ensuring minimum leakage, Jacobsen should be understood to disclose a broader intended purpose (Reb. Br. 8).

Similar arguments were also presented in Appeal 2013-001649 and found unpersuasive. *See Plas-Pak Indus., Inc. v. Richards Parks Corrosion Tech., Inc.*, 2013 WL 3804717 at *6-*7 (PTAB 2013). In particular, the Decision for Appeal 2013-001649 states:

> We believe that a person of ordinary skill in the art would not view the Jacobsen disclosure in the dissected manner that the Requester urges. In attempting to create the impression that Jacobsen discloses a separate embodiment that has broader usage, the Requester relies on what Jacobsen discloses, not as a

19

Appeal 2013-007786
Reexamination Control 95/001,656
Patent US 7,815,384 B2

separate embodiment, but as one of two basic objects of the
invention. App. Br. 18-19, quoting Jacobsen, col. 2, ll. 46-56
("[a] basic object of this invention is to provide ... multiple
piece kits ... ").

Jacobsen discloses two "basic objects" of "this
invention." Jacobsen, col. 2, l. 46-col. 3, l. 4. Those basic
objects, in short, are to provide multiple-piece kits suitable for
connection in alternate manners, to convey separately different
components prior to mixing and dispensing, and to provide a
modified dispensing tool and accessory kit for dispensing fluid
material into cracks and voids. *Id.* Importantly, both of these
objects are directed to what Jacobsen refers to as "this
invention." Immediately preceding the recitation of the basic
objects, Jacobsen describes "this invention" as:

> relat[ing] to devices for establishing leak-proof
> seated connections with great universality of use
> with many different types and sizes of dispensing
> tubes, nozzles, surface ports used in dispensing
> fluid material from cartridges, *for directing such
> fluid material into cracks in underlying structures*.

Jacobsen, col. 2, ll. 40-45 (emphasis added).

Elsewhere, Jacobsen similarly identifies "this invention"
as:

> relat[ing] to devices usable for *dispensing fluid
> material(s)* via conventional dispensing outlet
> nozzle(s) *directly into a surface crack of a
> structure*, such as concrete floors, walls or ceilings.

Jacobsen, col. 1, ll. 13-16 (emphasis added).

In contrast to these detailed statements as to the function
or intended purpose of the Jacobsen device, as mentioned
previously, the Requester maintains that the broader function or
intended purpose of the device is to dispense fluid "where and
when needed." Such a function or purpose would seemingly,
however, be the intent or desire of any and all fluid dispensing
systems of whatever design, and is not particularly instructive

Appeal 2013-007786
Reexamination Control 95/001,656
Patent US 7,815,384 B2

to the person of ordinary skill in the art in developing an understanding of the Jacobsen invention.

The Requester has not pointed to any portion of Jacobsen, and we see none, disclosing a location (where) and time (when) in which the device is provided to do anything other than dispense fluid to fill cracks in structures. Indeed, in the portion of the Jacobsen disclosure that discusses the hose H-4, to which no dispensing device is connected in the Figure 10 illustration relied on by the Requester, Jacobsen describes that the mixing hose provides a comparatively short mixed conveyance path before the mixed components are discharged, and goes on to discuss that a pinch clamp 301-1 disposed on the hose "is effective *for accurate and intermittent control of the material discharge in close proximity of the crack or void to be filled . ..* ". Jacobsen, col. 7, l. 65-col. 8, l. 3 (emphasis added). This further illustrates how the Requester has taken the Jacobsen expression "where and when needed" out of context and has attempted to imbue it with far greater significance than it has when read in context.

Accordingly, we are not persuaded that the Examiner erred in taking the position that the intended purpose of the Jacobsen device is to dispense fluid material into cracks in a manner that minimizes leakage in the course of dispensing. 2013 WL 3804717 at *6-*7.

Finally, while Requester argues that the claims of Jacobsen are not limited to filling of cracks, this does not detract from the fact that Jacobsen does not disclose using its disclosed system with spray nozzles. As discussed above relative to Rejections A)-C), the Requester has not adequately demonstrated through persuasive argument or evidence properly presented before the Board in the present appeal that the system of Jacobsen is suitable for use with a spray nozzle such as that of Hunter.

21

Appeal 2013-007786
Reexamination Control 95/001,656
Patent US 7,815,384 B2

Thus, for the reasons discussed above and set forth in the Board's Decision in Appeal 2013-001649, we are not persuaded that the Examiner erred in refusing to adopt Rejection G) as proposed by the Requester and affirm the Examiner's decision. The Requester relies on the same arguments with respect to non-adopted Rejections H) and I) (App. Br. 25-26). Correspondingly, we also affirm the Examiner's refusal to adopt Rejections H) and I) as proposed by the Requester.

## CONCLUSIONS

1.     The Examiner did not err in finding that modification of the apparatus of Fukuta with the mixing and dispensing apparatus of Morris as suggested by the Requester would have changed the principle of operation of the apparatus of Fukuta.

2.     The Examiner did not err in finding that modification of the apparatus of Fukuta with the multiple barrel dispensing device of Colin as suggested by the Requester would have changed the principle of operation of the apparatus of Fukuta.

3.     The Examiner did not err in finding that modification of the dispensing apparatus of Jacobsen with the spray nozzle of Hunter as suggested by the Requester would have rendered the dispensing apparatus of Jacobsen inoperable for its intended purpose.

## ORDERS

1.     The Examiner's refusal to maintain the withdrawn Rejections A)-F) is affirmed.

22

Appeal 2013-007786
Reexamination Control 95/001,656
Patent US 7,815,384 B2

2.     The Examiner's refusal to adopt proposed Rejections G)-I) is
affirmed.

Requests for extensions of time in this *inter partes* reexamination
proceeding are governed by 37 C.F.R. §§ 1.956.

<u>AFFIRMED</u>

Appeal 2013-007786
Reexamination Control 95/001,656
Patent US 7,815,384 B2


Patent Owner:

K&LGATES LLP
P.O. BOX 1135
CHICAGO, IL 60690


Third Party Requester:

CANTOR COLBURN LLP
20 CHURCH STREET, 22ND FLOOR
HARTFORD, CT 06103

24

(12) **United States Patent**
Parks et al.

(10) Patent No.: **US 7,815,384 B2**
(45) Date of Patent: **Oct. 19, 2010**

(54) **DUAL COMPONENT DISPENSING AND MIXING SYSTEMS FOR MARINE AND MILITARY PAINTS**

(75) Inventors: **Richard Parks**, Stafford, VA (US); **Heather Parks**, South Riding, VA (US)

(73) Assignee: **Richard Parks Corrosion Technologies, Inc.**, Stafford, VA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 562 days.

(21) Appl. No.: **11/563,791**

(22) Filed: **Nov. 28, 2006**

(65) **Prior Publication Data**

US 2007/0231047 A1 Oct. 4, 2007

**Related U.S. Application Data**

(63) Continuation of application No. 11/003,449, filed on Dec. 6, 2004, now Pat. No. 7,144,170.

(60) Provisional application No. 60/533,973, filed on Jan. 2, 2004, provisional application No. 60/551,200, filed on Mar. 8, 2004.

(51) **Int. Cl.**
*A46B 11/06* (2006.01)
*A46B 11/04* (2006.01)
*B43M 11/02* (2006.01)
*B28C 7/16* (2006.01)
*B01F 13/00* (2006.01)

(52) **U.S. Cl.** ............................. **401/47**; 401/44; 401/46; 401/270; 401/282; 401/219; 239/398; 366/77; 366/184; 366/341

(58) **Field of Classification Search** ............. 401/44–47, 401/197, 208, 270, 282, 219; 222/566, 567, 222/575; 366/77, 184, 189, 341; 239/398, 239/428.5

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,504,487 | A | 4/1950 | Anson |
| 3,166,221 | A | 1/1965 | Nielsen |
| 3,451,593 | A | 6/1969 | Dillarstone |
| 3,828,980 | A | 8/1974 | Creighton et al. |
| 3,847,112 | A | 11/1974 | Wise |

(Continued)

OTHER PUBLICATIONS

Mottram, D., "Interesting Applications of Two Component Cartridges," TAH Industries, Inc., Nov. 5, 2002.

(Continued)

*Primary Examiner*—David J Walczak
(74) *Attorney, Agent, or Firm*—John K. Pike; Law Office of John K. Pike, PLLC

(57) **ABSTRACT**

A device for applying a coating comprises at least two cylindrical cartridges, a static mixing nozzle in fluid communication with the cartridges, a spray tip, in fluid communication with the nozzle, a first flexible hose disposed between and in fluid communication with the nozzle and the spray tip, and a second hose, in fluid communication with the spray tip, for supplying atomization air to the spray tip. Methods of applying coatings with the device are also provided.

**15 Claims, 10 Drawing Sheets**



## US 7,815,384 B2

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,936,199 | A | 2/1976 | Zimmermann |
| 4,538,920 | A | 9/1985 | Drake |
| 4,767,026 | A | 8/1988 | Keller et al. |
| 4,840,493 | A | 6/1989 | Horner |
| 4,850,705 | A | 7/1989 | Horner |
| 5,072,862 | A | 12/1991 | Keller |
| 5,174,653 | A | 12/1992 | Halat et al. |
| 5,249,709 | A | 10/1993 | Duckworth et al. |
| 5,310,091 | A | 5/1994 | Dunning et al. |
| 5,496,123 | A | 3/1996 | Gaither |
| 5,535,922 | A | 7/1996 | Maziarz |
| 5,686,507 | A | 11/1997 | Hermele et al. |
| 5,713,095 | A | 2/1998 | Wakat |
| 5,725,499 | A | 3/1998 | Silverstein et al. |
| 5,875,928 | A | 3/1999 | Müller et al. |
| 6,099,160 | A | 8/2000 | Flackett |
| 6,135,631 | A | 10/2000 | Keller |
| 6,241,125 | B1 | 6/2001 | Jacobsen et al. |
| 6,244,740 | B1 | 6/2001 | Wagner et al. |
| 6,484,904 | B1 | 11/2002 | Horner et al. |
| 6,505,983 | B1 | 1/2003 | Seo |
| 6,601,782 | B1 | 8/2003 | Sandholm et al. |
| 6,629,774 | B1 | 10/2003 | Gruenderman |
| 6,632,860 | B1 | 10/2003 | Hansen et al. |
| 6,672,519 | B2 | 1/2004 | Hunter et al. |
| 6,764,026 | B2 | 7/2004 | Hunter et al. |
| 6,769,578 | B1 | 8/2004 | Ciofalo et al. |
| 6,773,156 | B2 | 8/2004 | Henning |
| 2001/0030241 | A1 | 10/2001 | Kott et al. |
| 2002/0170982 | A1 | 11/2002 | Hunter |
| 2003/0048694 | A1 | 3/2003 | Horner et al. |

### OTHER PUBLICATIONS

"Ratio-Pak HSS Spray System," Plas-Pak Industries, Inc., Retrieved Dec. 3, 2004, <http://www.plaspakinc.com/hss.htm>.
"Manufacturers of Single and Dual Component Plastic Syringes, Cartridges, Static Mixers, Delivery Systems, Human and Veterinary Health Care Packaging," Plas-Pak Industries, Inc., Retrieved Oct. 8, 2004, <http://www.plaspakinc.com/about.htm>.
Request for Inter Partes Reexamination of U.S. Patent No. 7,144,170 submitted Jun. 7, 2010.
Order Mailed Aug. 24, 2010 Granting Request for Inter Partes Reexamination of U.S. Patent No. 7,144,170, Control No. 95/001,371.
Non-Final Office Action Mailed Aug. 24, 2010 in Inter Partes Reexamination of U.S. Patent No. 7,144,170, Control No. 95/001,371.



Figure 1



Figure 2



Figure 3



Figure 4



Figure 5



FIGURE 6

Case: 14-1447 Case: 14-1447 Document: 24 Page: 107 Filed: 07/11/2014 Filed: 07/11/2014



FIGURE 7



FIGURE 8



FIGURE 9

FIGURE 10



FIGURE 11

FIGURE 12

US 7,815,384 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

**DUAL COMPONENT DISPENSING AND MIXING SYSTEMS FOR MARINE AND MILITARY PAINTS**

CROSS-REFERENCE TO RELATED APPLICATION

This application is a continuation of U.S. application Ser. No. 11/003,449, filed Dec. 6, 2004, now U.S. Pat. No. 7,144, 170, issued Dec. 5, 2006, which is a non-provisional of and based on U.S. Provisional Application Ser. Nos. 60/533,973, filed Jan. 2, 2004, and 60/551,200, filed Mar. 8, 2004, both pending, the entire contents of each of which are hereby incorporated by reference.

BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention relates to multi-component dispensing and mixing systems for paints and coatings. More particularly, the present invention relates to devices and methods for packaging, mixing, and dispensing multi-component paints.

2. Related Art

U.S. Pat. No. 5,249,709 discloses cartridges for dispensing reactive materials in predetermined ratios. U.S. Pat. No. 5,072,862 discloses static flow mixers for use in dual cartridges. U.S. Pat. No. 4,538,920 discloses a dual cartridge with a static mixer in the nozzle. U.S. Pat. No. 4,767,026 discloses dual cartridge dispensing and mixing apparatus. U.S. Pat. No. 6,135,631 discloses a static mixer and nozzle for a multiple component dispensing cartridge having at least two cylinders. U.S. Pat. No. 5,535,922 discloses a caulking gun dispenser device, which allows one to use a multi-component cartridge dispenser in a regular caulking gun. U.S. Pat. No. 5,875,928 discloses a two-plunger dispensing gun suitable for mixing and discharging two-component compositions. U.S. Pat. No. 6,244,740 discloses a mixer for multi-component cartridges. U.S. Pat. No. 3,166,221 discloses a plastic, double-tube dispensing container. U.S. Pat. No. 3,828, 980discloses a dual cartridge dispenser. U.S. Pat. No. 6,601, 782 discloses a disposable spray nozzle assembly.

3. Background of the Technology

The use of high solids coatings is becoming increasingly popular. In the 1970's, regulatory bodies such as the Environmental Protection Agency (EPA) and the California Air Resource Board (CARB) began to scrutinize the paint and coating industries to reduce the amount of Volatile Organic Compounds (VOCs) released into the atmosphere. The regulatory bodies discovered that the solvents contained within paints were contributors to air pollution. The VOCs, which are released as the solvent evaporates from a painted surface during cure, react with nitrogen oxides to form ozone. As a result, the Clean Air Act (CAA) was developed by the EPA to regulate policies concerning the release of large amounts of VOCs into the atmosphere in an attempt to prevent further damage to the environment.

Each year coating application regulations reduce the amount of allowable VOC emissions released from coatings into the atmosphere. The military has begun specifying traditional solvent-based coatings and high solids, edge retentive coatings for construction and repair. These coatings were the government's solution to service life extension and reduced life cycle cost goals while at the same time addressing the tightening regulations. However, with the introduction of this new coating technology, new processes and handling requirements, unfamiliar to painters, were also introduced.

Multi-component, high solids paints cure by a chemical reaction that creates heat after mixing. With the small amount of solvent content, VOCs are greatly reduced, and the coatings provide a higher level of performance. These types of coatings have a much higher viscosity than traditional solvent-based systems, making them very difficult to apply. If the coatings are manually mixed and applied, the pot life of the mixture is shortened dramatically, often as short as 30 minutes and some measured on the order of seconds. Application environment and ratio control have more effect on these coatings than traditional coatings. Pot life, viscosity and curability are all dependant at least in part on temperature and humidity. Painters and supervisors need to continuously monitor these variables to produce the best product, which leads to increased costs.

SUMMARY OF THE INVENTION

The present invention solves the above problems, and others.

One embodiment of the present invention provides a device for applying a coating, which includes:

a multi-component cartridge,

a static mixing nozzle in fluid communication with the cartridge, and

at least one paint applicator selected from the group including a roller, a brush, and an angled spray tip, in fluid communication with the nozzle.

Another embodiment of the invention provides a method, which includes applying a coating to a surface with the above-described device.

Another embodiment of the invention provides a method, which includes applying a non-skid coating to a surface with the above-described device.

BRIEF DESCRIPTION OF THE FIGURES

The following description will be better understood when read in conjunction with the appended drawings. For the purpose of illustrating the invention, there is shown in the drawings some embodiments which are presently preferred, it being understood, however, that this invention is not limited to the precise arrangements and instrumentalities shown.

FIG. **1** shows the general parts of a preferred embodiment of the present invention.

FIG. **2** shows the general parts of a preferred embodiment of the present invention.

FIG. **3** shows the general parts of a preferred embodiment of the present invention.

FIG. **4** shows the general parts of a preferred embodiment of the present invention.

FIG. **5** shows the general parts of a preferred embodiment of the present invention.

FIG. **6** shows the detail of a preferred embodiment of the present invention.

FIG. **7** shows the detail of a preferred embodiment of the present invention.

FIG. **8** shows the detail of a preferred embodiment of the present invention.

FIG. **9** shows the detail of a preferred embodiment of the present invention.

FIG. **10** shows the detail of a preferred embodiment of the present invention.

FIG. **11** shows a preferred embodiment of the present invention.

US 7,815,384 B2

3

FIG. **12** shows a preferred embodiment of the present invention.

DETAILED DESCRIPTION OF THE INVENTION

Various other objects, features, and attendant advantages of the present invention will be more fully appreciated as the same becomes better understood from the following detailed description of the invention, which is not intended to be limiting unless otherwise indicated.

The invention provides a multi-component industrial paint packaging system for use in simultaneously dispensing, mixing, brushing, rolling or spraying liquid coatings in one easy step. Preferably, the coatings are multi-component, reactive, high-solids low-VOC paints. More preferably, the coatings are multi-component, reactive, high-solids low-VOC marine, military, and industrial paints. The present invention desirably allows one to dispense, mix, roll, or spray two component marine and industrial paints in one continuous step without having to pre-mix either component. It also allows dispensing of the exact amount of marine, military, and industrial paints while reducing or eliminating the mixer's or painter's exposure to unnecessary hazardous materials, reduces the amount of hazardous waste in application, disposal and clean up, and reduces the amount of VOC's released into the environment. The invention is particularly suitable for large-scale industrial applications because it enables significant and unexpected savings of both material and labor, which translates into significant cost savings. The invention eliminates the need for packaging paints in one and five gallon cans, eliminates the need to open and premix paints, eliminates the need to manually pre-measure paints into exact ratios for use, significantly reduces waste and generation of excess paint associated with conventional methods, and provides a direct delivery method for marine and industrial paint by rolling, brushing, spraying, or power rolling the paint onto the surface to be painted. For example, in the course of industrial or commercial painting on a large scale, the paint composition is often continually transferred from large containers to smaller containers to avoid mixing more paint than needed and to reduce the carry burden of the individual painter.

FIG. **1** shows one preferred embodiment of the present invention. This embodiment includes a power roller, and the reactive paint components are desirably kept separate from one another and away from the atmosphere until immediately before use, when they are intimately mixed and fed to the roller for direct application. FIG. **1** shows a manual dispensing gun **2** and multi-component cartridges **1** and **1**a. The cylindrical multi-component cartridges **1**, **1**a have respective cross sectional volumes that are proportional to predetermined mixing ratios. Each cartridge preferably contains one component of a multi-component coating, and thus the respective reactive components (for example a coating resin and catalyst) remain separate until mixing through a static mixer nozzle **9**, and dispensed through a roller **7**, which in this embodiment is a perforated or belted through roller.

In this embodiment, a manual dispensing gun **2** is shown. During operation, piston rods **3** attached to piston plates **3**a exert a force sufficient to push the piston plates **3**a and cartridge piston seals **4**, **4**a simultaneously through the multi-component cylindrical cartridges **1**, **1**a, which force ejects their respective contents, the reactive components. The reactive paint components flow through a common discharge nozzle **8** and into the static mixing nozzle **9**, where they contact one another. The reactive components are intimately mixed with one another as they flow through the static mixing nozzle **9**.

4

In this embodiment, manual dispensing is initiated and controlled by a trigger system **5**. The dispensing gun optionally has a handle **2**a for the user to hold onto the dispenser while rolling the coating onto the work surface. The mixed paint is fed from the static mixing nozzle **9** into a discharge tube **10** that feeds the mixed coating material into the roller **7** for direct application to the work piece. The manual dispensing gun **2** has a support arm **6** attached to it, which supports the roller attachment **7**.

The reactive components are ejected from their respective cartridges into the static mixing nozzle **9** in a ratio determined by the respective cross-sectional areas of the cartridges **1** and **1**a. In this way, the reactive components are thoroughly mixed and in the correct proportion, and thus two sources of potential error are avoided, in contrast with conventional mixing and formulating procedures. In addition, in one preferred embodiment, any or all of the roller **7**, static mixer **9**, and discharge tube **10** are disposable, being the only components that contact the mixed paint, so time-consuming and wasteful solvent cleaning is not necessary. The cartridges **1** and **1**a may either be resealed for future use if some remains or, if none remains, they may be disposed of as well.

Another preferred embodiment of the present invention is illustrated in FIG. **2**, wherein the reactive paint components are ejected from the multi-component cartridges **1**, **1**a with pneumatic or hydraulic force through individual dispensing apertures **11** and into and through hoses **12** to a remote roller applicator **17** that includes a power roller-type system for direct and continuous rolling. In this embodiment, pneumatic or hydraulic pumps **13** drive the piston rods **3**, which apply continuous pressure on the cartridge piston seals **4**, **4**a for a continuous supply of paint to the roller **7**. The pneumatic pump has an air regulator **14** that regulates the air pressure applied to the piston rods.

The twin hoses **12** attach to a coupler **15**. The coupler **15** has a securing nut **16** to attach it and thus the hoses **12** to the remote roller applicator **17**. The length of the hoses **12** may vary according to need. The remote roller applicator **17** has a trigger **18** that allows an operator to activate the pumps **13** and dispense and apply the mixed paint on demand and as needed. In the remote roller applicator, the reactive paint components are mixed in the static mixer **9**, and the thus-mixed paint proceeds, still under pressure from the pumps **13**, into a discharge tube **10** and to the roller **7** for direct application to the workpiece. The remote roller applicator **17** includes a support arm **6** supports the roller **7** in place during application. Preferably, the roller **7**, discharge tube **10**, and static mixer are each independently removable and/or disposable.

One preferred embodiment is illustrated in FIG. **3**, wherein pneumatic or hydraulic force to dispensing plugs for direct air assisted low pressure spray application of marine and industrial paints. The cartridges **1** and **1**a are pressurized by pneumatic or hydraulic force via pumps **13**, piston rods **3** and piston plates **3**a, which apply continuous pressure on the cartridge piston seals **4**, **4**a, and the reactive components are pumped through hoses **12**. Since each of the reactive components remains separate from the other in its hose there is no danger of curing and blocking the hoses **12**, and thus the hoses **12** may have any length as appropriate for remote painting. The pneumatic or hydraulic pump **13** has an air regulator **14** that regulates the air pressure. Hoses **12** attach to the cartridges **1**, **1**a by securing nuts **19** to individual dispensing apertures **11**, which are illustrated in FIG. **2**. The other end of the hoses **12** attach to a coupler **15**, which attaches in turn to a handheld remote spray applicator gun **20**. The remote spray applicator gun **20** has a trigger **18** that allows the operator to dispense the mixed paint on demand and as needed. The

US 7,815,384 B2

5

remote spray applicator gun **20** includes a disposable static mixer **9**, and a spray tip **21** that uses regulated air for atomization of the mixed paint to spray-apply the paint to a substrate. The regulated air for ejecting and atomizing the mixed paint is supplied by a hose **22** that is attached to the spray tip **21** and is controlled by the operator when he or she pulls the trigger **18**. In an alternative embodiment of the one described, a manual dispensing gun **2** is used to pump the reactive components from individual apertures through hoses **12** and on to the remote spray applicator gun.

One preferred spray tip **21** is available from V.O. Baker, Spray Tip Nozzle Manifold Part No. SPRYNZZL004-VOB. An angled spray tip **21** is preferred in view of reaching hard-to-access areas such as stiffeners near the hull of a ship. Such spray tips have an angle between the spray direction and the paint feed direction. Preferable angles range from 15 to 90 degrees and include 15, 25, 35, 45, 55, 60, 75, 85 and 90 degrees. The spray tip **21** may attach to the nozzle by any conventional fluid connection including Luhr-Lock, Bayonet, screw on, retaining nut, snap fit, friction fit, and the like. Friction fit is preferred.

In one embodiment of the invention, a flexible hose **45** connects the spray tip **21** and the static mixer nozzle **9**. In such an embodiment, the hose **22** remains attached to the spray tip **21**, but is suitably lengthened to accommodate the length of the flexible hose between the spray tip **21** and the static mixer nozzle **9**. In this embodiment, either a manual dispensing gun **2** or a pneumatic or hydraulic dispensing gun **38** may be used, and the remote spray applicator gun **20** may also be used. The operator may easily hold the spray tip **21**, the flexible hose **45**, and the hose **22** in one hand for paint application, and may initiate and control the liquid coating flow with the remote spray applicator gun **20** in the other. In this embodiment, the spray tip **21** may or may not be angled. This desirably allows the painter nearly complete freedom of movement, in contrast with bulky and awkward conventional application techniques. Heretofore, such freedom of movement and ability to spray apply was unknown. The flexible hose **45** may have any length so long as the dwell time of the mixed paint in the flexible hose does not exceed the pot life. This flexible hose may be suitably disposable.

In one embodiment, at least one flexible hose is disposed between and in fluid communication with the cartridge and the nozzle.

FIG. **4** illustrates one preferred embodiment of the invention, which includes a manual dispensing gun **2**, multi-component cartridges **1**, **1***a*, a static mixer nozzle **9**, and a brush applicator **23**. The trigger **5** is squeezed by the operator, forcing the piston rods **3** and piston plates **3***a* and thus the piston cartridge seals **4** and **4***a* along the length of the cartridges **1**, **1***a*. The reactive paint components are ejected through common discharge nozzle **8** into the static mixer **9**, where they are thoroughly mixed. The thus-mixed paint is fed to the brush **23** where it may be brush-applied to the work surface. A support arm, similar to the support arm **6** shown in FIGS. **1** and **5**, may be optionally attached to the dispensing gun **2** and the brush **23** to support the brush **23**. Of course, the brush **23** and mixing nozzle **9** may be attached to a hydraulic or pneumatic pump **13** or a hand-held pneumatic or hydraulic dispensing gun **38** instead of the manual dispensing gun **2**. In addition, the brush **23** and mixing nozzle **9** may be combined in a separate remote assembly similar to the remote spray applicator gun **20** connected by dual hoses **12** such as described herein.

The mixed paint may be applied from the static mixing nozzle onto an outer surface of the brush bristles, or the mixed paint may be applied to an interior portion of the bristles

6

via one or more hollow passages leading from the outlet of the static mixing nozzle through the body of the brush **23** and into the interior part of the bristles. In the present context, either alternative is considered to be a fluid connection. The latter alternative, using one or more hollow passages through the brush **23**, is preferred. The brush **23** and static mixing nozzle **9** are each independently removable and/or disposable.

FIG. **5** illustrates one preferred embodiment of the invention, which includes a manual dispensing gun **2**, multi-component cartridges **1**, **1***a*, a static mixer nozzle **9**, a roller **7**, and a roller coater **24**. In this embodiment, the mixed paint emerging from the static mixer **9** is fed through the roller coater **24**, which applies the mixed paint onto the exterior portion of the roller **7**. The operator then rolls the paint onto the work surface with the roller **7**. The roller coater **24** and roller **7** are stabilized and supported by the support arm **6**. Of course, the roller coater **24** and roller **7** may be attached to a hydraulic or pneumatic pump **13** or a hand-held pneumatic or hydraulic dispensing gun **38** instead of the manual dispensing gun **2**. In addition, the roller coater **24** and roller **7** and mixing nozzle **9** may be combined in a separate remote assembly similar to the remote brush applicator **17** connected by dual hoses **12** such as described herein.

In the context of the present invention, both the power roller type assembly using a perforated roller and the roller coater type assembly, such as described herein, are considered fluid connections. The former alternative, using the power roller assembly, is preferred.

FIGS. **6**, **7** and **8** illustrate preferred multi-component paint cartridges **1**, **1***a* in more detail. Cartridges **1**, **1***a* include parallel reservoirs **26** and **27** having cartridge piston seals **4** and **4***a* sealing one end of each, respectively. Apertures **28** and **29** are formed in ends of reservoirs **26** and **27**, respectively, which oppose cartridge piston seals **4** and **4***a*. A discharge nozzle **8** is received in apertures **28** and **29**, and closed by a nose plug **32** removably inserted therein. A retaining nut **33** threads onto discharge nozzle **8**, holding plug **32** in position. Nut **33** is sealed by a disk **35**. The reactive paint components in reservoirs **26** and **27** are mixed in specific ratios according to the respective reservoir volumes and cross sectional areas to provide a curable paint composition. Depending upon the material employed, various ratios are required. FIG. **6** illustrates a preferred multi-component paint cartridge with reservoirs **26** and **27** having a 1:1 ratio. FIG. **7** illustrates a preferred multi-component paint cartridge with reservoirs **26** and **27** having a 2:1 ratio. FIG. **8** illustrates a preferred multi-component paint cartridge with reservoirs **26** and **27** having a 4:1 ratio. One skilled in the art will understand that reservoirs **26** and **27** can be fabricated in various sizes to accommodate the necessary ratio of reactive components.

FIG. **9** illustrates the cross-section of a preferred static mixer **9** with cap **40**. Mixing elements **41** are shown. The terms, I.D., O.D., A, and L represent inner dimension of the main tube, outer dimension of the main tube, outlet inner dimension and length, respectively.

FIG. **10** illustrates the cross section of a preferred static mixer **9** without cap **40**. Mixing elements **41** are shown. The inlet **42** is at the upstream side relative to fluid flow, and receives the reactive components. The reactive components contact and are mixed by the elements as the components traverse the length of the mixer **9**, until they exit in the mixed paint form from the outlet **43** at the downstream end of the static mixer **9**.

In operation, removal disc **35** and nose plug **32** are removed, providing an unobstructed passage for the reactive components from reservoirs **26** and **27** though apertures **28** and **29** and discharge nozzle **8**. The static mixer nozzle is

7

attached to the discharge nozzle **8**. The reactive paint components are forced from reservoirs **26** and **27** and through apertures **28** and **29** by the movement of cartridge piston seals **4** and **4a**, which are sealingly and slidably disposed within the reservoirs **26** and **27**. The ejection of the components is accomplished by the use of a pneumatic or hydraulic dispensing gun **38** or a manual dispensing gun **2**. FIGS. **11** and **12** show other embodiments of pneumatic or hydraulic and manual dispensing guns, respectively. The dispensing gun depresses cartridge piston seals **4** and **4a** with piston rods **3** equally to eject the correct proportions of each reactive paint component.

The piston plug **39** sometimes known as a bleeding pin or a burping pin is optionally present in the cartridge piston seals **4**, **4a** and is useful when bleeding gas or air out of the reservoirs **26** and **27** when they are filled with reactive component liquids such as paint, resin, or catalyst, for example.

The multi-component cartridge **1** and **1a** is not particularly limiting. Suitable cartridges are described, for example, in U.S. Pat. No. 5,249,709. Other suitable cartridges may be obtained commercially from Plas-Pak Industries, Norwich Conn. The cartridges **1** and **1a** may either have a side-by-side construction, or a cartridge-within-a-cartridge construction. Examples of the latter are disclosed in, e.g., U.S. Pat. No. 5,310,091.

The respective cartridges **1** and **1a** may have a permanent connection between them, or they may be separable, for example by one or more snap or similar connections. In one embodiment, the cartridges **1** and **1a** are connected to one another by a snap connection near the common discharge nozzle **8**. The cartridges **1** and **1a** may be made of any suitable material, such as polyethylene or nylon. Nylon is preferred. Individual reservoir **26** and **27** volumes in the cartridges **1** and **1a** may each independently range from 50 to 3000 ml, which range includes 50, 75, 100, 150, 250, 500, 750, 1000, 1250, 1500, 1750, 2000, 2250, 2500, 2750, and 3000 ml, and any combination thereof.

The reservoirs **26** and **27** in the cartridges may each independently have any suitable cross sectional area, in accordance with the formulation requirements of the reactive components. The cross sectional area ratio may range from 1:1 to 1:20, which range includes 1:1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, and 20 as appropriate. Ratios of 1:1, 1:2, 1:4 are preferred.

The present invention is particularly useful for applying liquid coatings such as reactive two-component solvent-based coatings, edge-retention coatings, anti-corrosive coatings, high-solids coatings, low VOC coatings, Chemical Agent Resistant Coatings (C.A.R.C. paints), non-skid coatings, and the like, including but not limited to topcoat and/or primer coatings of polyurea, polyaspartic, epoxy, acrylic, silicone, polyester, polyurethane, polyamide, bisphenol A epoxy, bisphenol F epoxy, epoxy-polyamide, epoxy-polyamine, epoxy-ketamine, non-skid, aggregate-containing, aluminum oxide-containing, silica-containing, and the like.

These coatings are suitable in a variety of marine, military, off shore, petrochemical, automotive, transportation, rail, aerospace, and industrial applications. Other suitable application examples include without limitation ship construction and repair of tanks, ship structure, weapon systems, military transport vehicles, weapons, missiles, rail car repair, industrial transpiration equipments, pleasure craft and commercial ship construction and repair, aerospace systems, off shore platforms and markings, airplane maintenance, facilities and structures, industrial machinery and equipments, lawn and

8

garden equipments, rigid container and closure coatings, and food processing equipment coatings. Marine and military applications are preferred.

The coating compositions are supplied as two or more separate components, usually referred to as the base and the curing agent. When these components are mixed, immediately before use, a chemical reaction occurs. These materials therefore have a limited 'pot life' before which the mixed coating must be applied. The polymerization reaction continues after the paint has been applied and after the solvent has evaporated to produce a densely cross linked film which can be very hard and has good solvent, mechanical, and chemical resistance. There are also chemically resistant paints often referred to as blast primers, shop primers, temporary primers, holding primers, and the like. These types of primers are more preferably used on structural steelwork, immediately after blast cleaning, to maintain the reactive blast cleaned surface in a rust free condition until final painting can be undertaken.

The reactive components, for example, resin and catalyst, or base and curing agent as more commonly referred to, may be formulated in proportions known to those of skill in the art. Preferred coatings include bisphenol A epoxies and bisphenol F epoxies, with one or more polyamide, polyamine, and ketamine being preferred as catalyst. Preferred curing agent: base ratios range from 1:1 to 1:20, with 1:1, 1:2, 1:3 and 1:4 being preferred.

High-solids, low solvent or low VOC coating compositions have solids content approaching 100% by weight of the coating. The solids content ranges from more than 80% to 100% by weight, which includes 85, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 99.5, less than 100, and 100% by weight. The VOC or solvent content approaches zero, ranging from typically less than 20% by volume to zero percent, which includes 19, 17, 15, 13, 11, 10, 9, 8, 7, 6, 5, 4, 3, 2, 1, 0.5, greater than zero, and zero percent by volume. Coatings having zero to 6% VOC's by volume are preferred. Coatings having 94 to 100% solids by weight are preferred.

The present invention is also suitable for high-VOC coatings, having solvent contents of 50 to 94% solids by weight. This range includes 50, 55, 60, 62, 64, 66, 68, 70, 75, 80, 85, 90, and 94% solids by weight. These types of coatings are particularly suited for application to antennas, specialty coatings, and the like. These coatings A preferred example of such high-VOC liquid coatings is MIL-DTL-24441.

The preferred coating compositions have short pot lives upon mixing the reactive components, ranging from 3 hours or less to 0.25 hours, which range includes 2.75, 2.5, 2.25, 2, 1.75, 1.5, 1.25, 1, 0.75, 0.5, and 0.25 hours.

One or more than one coat may be applied. The coating compositions may contain one or more pigments, inhibitive agents and/or pigments, and non-inhibitive agents and/or pigments, microballoons, and the like.

One embodiment of the present invention provides a method of applying a non-skid coating composition, which includes applying to a surface an epoxy composition that contains an aggregate, such as aluminum oxide or silica, with the paint dispensing system described herein. In this embodiment, one of the cartridges **1** and **1a** contains a hardener, and the other contains an epoxy resin and the aggregate. The reactive hardener and epoxy resin with the aggregate are combined and mixed in the static mixer nozzle **9**, and applied. A desirably tough non-skid surface results.

In another embodiment of the invention, a one component composition is applied using the paint dispensing system described herein. In this embodiment, a reactive two component paint is not used, and instead a one-component composition is contained in both cartridges. This embodiment pro-

US 7,815,384 B2

9

vides the ability to produces a superior conventional coating from a convenient packaging system, and reduces waste and cleanup.

One embodiment of the invention includes a cartridge 1, 1a that optionally has hermetically sealed dispensing and/or filling ends to prevent marine and industrial paints from leaking during handling, shipping and storage. The hermetic seal may be foil, plastic, or a combination thereof. Preferably, the hermetic sealing material is chemical resistant and forms a gas and liquid tight seal on either or both of the filling ends 25 (after being filled with one reactive liquid of the multi-component coating, cartridge piston seals 4, 4a, inserted, and degassed through piston plugs 39) and the aperture end 28, 29 of the multi-component cartridges. The hermetic seals at the aperture end of the cartridge may complement or replace the removal disc 35 and nose plug 32 if desired.

Static mixing nozzles 9 are not particularly limited so long as they progressively divide and recombine to thoroughly mix the reactive components of the coating. As the reactive components traverse the length of the static mixing nozzle 9, the number of mixing "folds" experienced by the fluid may be calculated as $2^n$, wherein n is the number of mixing elements present. Some examples of static mixing nozzles 9 are described, for example, in U.S. Pat. Nos. 4,850,705, 4,767,026, and 4,538,920. Suitable static mixers may also be obtained commercially from Plas-Pak Industries, Norwich Conn.; and V.O. Baker Co., Mentor Ohio. The size of the static mixing nozzles 9 may suitably range from ⅛" to 1 ½" or 1 to 25 mm as appropriate, which includes ⅛", 3⁄16", ¼", 5⁄16", ⅜", 7⁄16", ½", 9⁄16", ⅝", 11⁄16", ¾", 13⁄16", ⅞", 15⁄16", 1", 1¼", 1½" and any combination thereof. Preferably, a step-down static mixer is used, wherein the I.D. changes from ⅜" to ¼" as one nears the outlet. Such step-down static mixing nozzles are available from Plas-Pak Industries, Norwich Conn. The static mixing nozzle 9 may attach to the common discharge nozzle 8 on the cartridges 1 and 1a with any suitable connection such as screw threads, Luhr-lock, lock-on retainer nut, bayonet tip, snap fit, frictional fit, and the like.

The dispensing gun is not particularly limited so long as it is capable of applying sufficient force to the cartridge piston seals 4 and 4a to move the reactant components from their respective cartridges 1 and 1a through the static mixing nozzle 9 and on to the applicator roller 7, sprayer 21, or brush 23. The dispensing gun may be of the manual type 2, or the pneumatic or hydraulic type 38. The manual type may apply force through a clutch bar, screw, ratchet or similar mechanism connected to the squeeze trigger and handle assembly 5. One suitable manual dispensing gun is the NEWBORN 530™, manufactured by Newborn Bros. Other suitable manual guns are described, for example, in U.S. Pat. No. 5,875,928. The pneumatic type of dispensing gun is preferably regulated and air driven. Preferred pneumatic systems include the HSS™ systems by Plas-Pak Industries, Norwich Conn. Both manual and pneumatic dispensing guns are available, for example from V.O. Baker Co., Mentor Ohio. Hydraulic dispensing systems may suitably operate at pressures on the order of 800 psi.

The roller attachment 7 preferably includes a perforated or bleed through roller core and/or cover. Non-limiting examples of suitable perforated roller covers are available, for example, from Hennes-Johnson Equipment Co., Prague Minn.; and Wagner Spray Tech Corporation, Minneapolis Minn. For the roller coater embodiment, any roller 7 suitable for the paint may be used, including perforated roller cores and covers.

One preferred embodiment of the present invention provides a system that packages marine, military, and industrial

10

multi-component reactive liquid paints in cartridges for dispensing and direct rolling or spraying paints by manual, pneumatic, or hydraulic methods.

Another method of the present invention provides a method for applying a high-solids, low VOC marine or military paint, to a surface using a multi-component cartridge.

The current system is particularly suitable for use in dispensing and applying multi-component coating systems, marine and military paints. Just dispensing the components in the correct proportions is insufficient. When dispensed, the components must be mixed to activate the curing reaction. As stated previously, however, manual mixing has certain drawbacks. The present invention provides a means of storing, dispensing, mixing, and applying reactive multi-component paints at or near point of use, conveniently, safely and with significantly reduced waste and improved coating performance. In this manner any amount of paint can be prepared for use, from very small amounts to large amounts. This avoids waste and provides a system for providing just the right amount of prepared paint for the time available for application.

The present invention desirably reduces the problems encountered with multi-component, reactive and high-solids paints. These include the problems of hot potting, inaccurate proportioning, mixing, and human error. The present invention increases the ease of coating application for painters to apply coatings. In addition, because the coating reactants remain sealed until mixed and applied, it is safer for the painters as it reduces their exposure to often toxic reactants, such as curing catalysts, isocyanates, and the like. In addition, the present invention results in a more manageable process on an industrial scale, it drastically reduces paint can change out time, waste due to expired pot life and spillage, and clean-up solvent. The present invention is particularly suitable for marine and military paint multi-component paints.

In accordance with the present invention, preloaded disposable paint cartridges with disposable static mixers keep the base and hardener separate from one another as long as possible and allow dispensing of paint on demand. A preloaded disposable paint cartridge with disposable static mixer is used to mix the multi-component systems as close to the cartridge as possible. The use of preloaded disposable paint cartridges with disposable static mixers eliminates pot life problems and viscosity problems that result in waste and application difficulties.

Preloaded disposable military and marine paint cartridges with disposable static mixers reduce the problems encountered with viscosity and pot life by keeping the two components separate as long as possible. Keeping the reactive components of multi-component coatings separate eliminates the risk of the coatings curing before use. Components are mixed at the work site when needed. This not only reduces the amount mixed and waste generated, it improves product integrity by maintaining exact ratios, thereby allowing the end user to achieve maximum service life expectancy.

Military and marine coatings are much more sensitive than traditional solvent based epoxies and coatings. In the present application, marine and military paints are especially formulated to be used in a saltwater marine environment and/or are specified by the U.S. military, such as the U.S. Army, Navy, Marine Corps, Air Force, Military Sealift Command, and/or Coast Guard. These coatings must be mixed properly and thoroughly according to manufacturers specifications in order to cure. High solids coatings, and particularly those for marine and military applications, have specific mix ratios with very tight tolerances, generally plus or minus 3%. There are many different factors that affect whether a coating will be

US 7,815,384 B2

**11**

on or off ratio. In accordance with the present invention, preloaded disposable military and marine paint cartridges with disposable static mixers assures the mix ratios are maintained when dispensing. In accordance with one embodiment of the present invention, these dispensing systems are combined with a paint roller or brushing apparatus and method. In accordance with another embodiment of the present invention, a multi-component cartridge preloaded with one or more reactive components of a high solids, low VOC marine and military paint.

The entire contents of each of the references, patents, and patent applications cited herein is hereby incorporated by reference, the same as if set forth at length.

Obviously, numerous modifications and variations of the present invention are possible in light of the above teachings. It is therefore understood that within the scope of the appended claims, the invention may be practiced otherwise than as specifically recited herein.

What is claimed is:

**1**. A device for applying a coating, comprising:
at least two cylindrical cartridges,
a static mixing nozzle in fluid communication with the cartridges,
a spray tip, in fluid communication with the nozzle,
a first flexible hose disposed between and in fluid communication with the nozzle and the spray tip, and
a second hose, in fluid communication with the spray tip, for supplying atomization air to the spray tip.

**2**. The device of claim **1**, wherein at least one flexible hose is disposed between and in fluid communication with the cartridges and the nozzle.

**3**. The device of claim **1**, wherein the spray tip is an angled spray tip having an inlet with an axis defined by a fluid communication direction thereinto, and having a spray outlet with an axis defined by a spray direction, wherein an angle between the inlet and outlet is 15 to 90 degrees.

**4**. The device of claim **1**, wherein each cartridge further comprises an aperture in fluid communication with a common discharge nozzle, the discharge nozzle being in fluid communication with the static mixer nozzle.

**5**. The device of claim **1**, wherein each cartridge further comprises an aperture in fluid communication with a common discharge nozzle, the discharge nozzle being in fluid communication with the static mixer nozzle, and wherein each cylindrical cartridge further comprises an open filling end that is disposed opposite the aperture and that is slidingly sealed by a cartridge piston seal.

**6**. The device of claim **1**, further comprising a manual, pneumatic, or hydraulic dispensing gun, in contact with the cartridges.

**12**

**7**. A method, comprising applying a non-skid coating to a surface with a device for applying a coating, said device comprising:
at least two cylindrical cartridges,
a static mixing nozzle in fluid communication with the two cartridges,
a spray tip, in fluid communication with the nozzle,
a first flexible hose disposed between and in fluid communication with the nozzle and the spray tip, and
a second hose, in fluid communication with the spray tip, for supplying atomization air to the spray tip.

**8**. The method of claim **7**, wherein the non-skid coating comprises an epoxy coating containing at least one aggregate material selected from the group consisting of aluminum oxide, silica, and a mixture thereof.

**9**. The method of claim **7**, wherein the non-skid coating comprises an bisphenol F epoxy, bisphenol A epoxy, polyurethane, or a mixture thereof.

**10**. A method, comprising applying paint to a surface with a device for applying a coating, said device comprising:
at least two cylindrical cartridges,
a static mixing nozzle in fluid communication with the two cartridges,
a spray tip, in fluid communication with the nozzle,
a first flexible hose disposed between and in fluid communication with the nozzle and the spray tip, and
a second hose, in fluid communication with the spray tip, for supplying atomization air to the spray tip.

**11**. The method of claim **10**, wherein the paint contains at least one selected from the group consisting of polyurea, polyaspartic, epoxy, acrylic, silicone, polyester, polyurethane, polyamide, bisphenol A epoxy, bisphenol F epoxy, epoxy-polyamide, epoxy-polyamine, epoxy-ketamine, C.A.R.C. paint, non-skid aggregate, aluminum oxide, silica, and a combination thereof.

**12**. The method of claim **10**, wherein the paint comprises bisphenol F epoxy, bisphenol A epoxy, polyurethane, or a mixture thereof.

**13**. The device of claim **1**, wherein the two cylindrical cartridges have a side-by-side construction or cartridge-within-a-cartridge construction.

**14**. The device of claim **1**, wherein the two cylindrical cartridges have a permanent connection between them or are connected to one another by a snap connection.

**15**. The device of claim **1**, wherein the two cylindrical cartridges independently have cross sectional area ratios ranging from 1:1 to 1:20.

*　*　*　*　*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 11th day of July, 2014, I caused this Brief of

Appellant to be filed electronically with the Clerk of the Court using the CM/ECF

System, which will send notice of such filing to the following registered CM/ECF

users:

>Thomas C. Basso
>Alan L. Barry
>Matthew S. Dickie
>Suzanne E. Konrad
>K&L GATES LLP
>70 West Madison Street,
>Chicago, Illinois 60602
>(312) 372-1121
>
>Michael T. Murphy
>K&L GATES LLP
>1601 K Street, NW, 2nd Floor
>Washington, DC 20006
>(202) 778-9176
>
>*Counsel for Appellee*

Upon acceptance by the Clerk of the Court of the electronically filed

document, the required number of copies of the Brief of Appellant will be hand

filed at the Office of the Clerk, United States Court of Appeals for the Federal

Circuit in accordance with the Federal Circuit Rules.

/s/ Andrew C. Ryan
*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P.
        28.1(e)(2) or 32(a)(7)(B) because:

        [ X ] this brief contains [*13,976*] words, excluding the parts of the brief
        exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

        [    ] this brief uses a monospaced typeface and contains [*state the number
        of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P.
        32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P.
        32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

        [ X ] this brief has been prepared in a proportionally spaced typeface using
        [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

        [    ] this brief has been prepared in a monospaced typeface using [*state
        name and version of word processing program*] with [*state number of
        characters per inch and name of type style*].


Dated: July 11, 2014                    /s/ Andrew C. Ryan
                                        *Counsel for Appellant*