No. 2014-1447

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

PLAS-PAK INDUSTRIES, INC.,

*Appellant*,

*v.*

SULZER MIXPAC A.G.,

*Appellee.*

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board

## BRIEF OF APPELLEE SULZER MIXPAC A.G.

| | |
|---|---|
| THOMAS C. BASSO<br>ALAN L. BARRY<br>MATTHEW S. DICKE<br>SUZANNE E. KONRAD<br>K&L GATES LLP<br>70 West Madison Street<br>Suite 3100<br>Chicago, IL 60602-4207<br>Telephone (312) 372-1121<br>Facsimile (312) 827-8000 | MICHAEL T. MURPHY<br>K&L GATES LLP<br>1601 K Street, NW<br>Washington, DC 20006-1600<br>Telephone (202) 778-9000<br>Facsimile (202) 778-9100 |

*Attorneys for Appellee*

August 25, 2014

Form 9

FORM 9.  Certificate of Interest

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Plas-Pak Industries                    v.  Sulzer Mixpac AG

No. 14-1447

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Appellee                        certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

Sulzer Mixpac AG

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Sulzer Mixpac AG

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Sulzer Ltd. is a parent corporation of Sulzer Mixpac AG.  Sulzer Ltd. is a publicly held company that is traded on the Swiss Stock Exchange.

4. ☑  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Thomas C. Basso, Michael T. Murphy, Alan L. Barry, Matthew S. Dicke and Suzanne E. Konrad of K&L Gates LLP

May 12, 2014
_____
Date

_____
Signature of counsel

Thomas C. Basso
_____
Printed name of counsel

Please Note: All questions must be answered
cc: _____

124

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED CASES ...................................................................1

STATEMENT OF THE ISSUES...........................................................................1

STATEMENT OF THE FACTS ............................................................................2

    I.     THE '384 PATENT.................................................................................2

    II.    U.S. PATENT NO. 4,745,011 (*FUKUTA*) .........................................3

    III.   U.S. PATENT NO. 3,989,228 (*MORRIS*) ...........................................5

    IV.   U.S. PATENT NO. 2,511,627 (*EINBECKER*) ....................................6

    V.    U.S. PATENT NO. 5,033,650 (*COLIN*) .............................................6

    VI.   U.S. PATENT NO. 6,241,125 B1 (*JACOBSEN*).................................7

SUMMARY OF THE ARGUMENT ......................................................................7

ARGUMENT .......................................................................................................10

    I.     STATEMENT OF THE STANDARD OF REVIEW........................10

         A.    The Board's Determination of a Reference's Principle of
             Operation Should Be Reviewed for Substantial Evidence .......11

         B.    The Board's Determination of the Intended Purpose of a
             Reference Should Be Reviewed for Substantial Evidence .......13

         C.    *KSR* and the Proper Standard of Review for Obviousness.......14

    II.    SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S
          FINDING THAT THE PROPOSED MODIFICATION OF *FUKUTA*
          IN VIEW OF *MORRIS* WOULD CHANGE THE PRINCIPLE OF
          OPERATION OF *FUKUTA*................................................................15

         A.    The Board Correctly Defined the Principle of Operation
             of *Fukuta* .................................................................................15

             i.     The Board's Determination of *Fukuta*'s Principle
                  of Operation Should Be Reviewed for Substantial
                  Evidence .......................................................................16

             ii.    *Umbarger* Does Not Stand for the General
                  Proposition that a Reference's Principle of
                  Operation Cannot Be Based on Its Contribution to
                  the Art .........................................................................17

iii.    *Mouttet* Did Not Hold Generally that a Reference's Principle of Operation Is Its "High Level Ability" ........18

iv.    The Facts of This Case Are Distinguishable from *Umbarger* and *Mouttet* and Are More Analogous to *Ratti* ..........................................................................19

B.    Substantial Evidence Supports the Board's Finding that Modifying the Mixing System of *Fukuta* with the Dual Cartridges of *Morris* Would Change the Principle of Operation of *Fukuta* ................................................................22

i.    *Morris* Teaches that Piston and Pump Systems Are Not Interchangeable........................................................25

ii.    The "Indicia of Obviousness" Cited by Plas-Pak Are Not Required for a Determination of Changing the Principle of Operation and Instead Relate Generally to Obviousness...............................................26

C.    The Board Did Not Require a Physical Substitution of the Elements of *Fukuta* with the Elements of *Morris* ....................27

D.    Plas-Pak's New Arguments Regarding the Combination of *Fukuta* and *Morris* Have Been Waived................................27

III.    *MORRIS* TEACHES AWAY FROM THE COMBINATION WITH *FUKUTA* ........................................................................................30

A.    *Morris* Teaches Away from the Upstream Mixing Valve of *Fukuta* ..................................................................................31

B.    *Morris* Teaches Away from a Flexible Hose Located Between a Mixing Nozzle and a Dispensing Tip ....................32

IV.    *BROGAN* AND *EINBECKER* FAIL TO REMEDY THE DEFICIENCIES OF *FUKUTA* AND *MORRIS* ...................................33

V.    SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDING THAT MODIFICATION OF THE APPARATUS OF *FUKUTA* WITH THE MULTIPLE BARREL DISPENSING DEVICE OF *COLIN* WOULD HAVE CHANGED THE PRINCIPLE OF OPERATION OF *FUKUTA* ........................................................34

VI.    THE PROPOSED MODIFICATION BASED ON *FUKUTA* IN VIEW OF *COLIN* WOULD NOT HAVE BEEN OBVIOUS BECAUSE *FUKUTA* AND *COLIN* ARE DIRECTED TO DIFFERENT DISPENSING TECHNOLOGIES ...............................35

VII. *BROGAN* AND *EINBECKER* FAIL TO REMEDY THE DEFICIENCIES OF *FUKUTA* AND *COLIN*.....................................36

VIII. SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDING THAT MODIFICATION OF THE DISPENSING APPARATUS OF *JACOBSEN* WITH THE SPRAY NOZZLE OF *HUNTER* WOULD RENDER THE DISPENSING APPARATUS OF *JACOBSEN* INOPERABLE FOR ITS INTENDED PURPOSE........37

    A. The Board Correctly Defined *Jacobsen*'s Intended Purpose as Dispensing Fluid Material into Cracks While Minimizing Leakage ...............................................................37

        i. Plas-Pak's References to *KSR* Are Inapposite to the Issue of Whether the Proposed Combination Would Have Rendered *Jacobsen* Unsuitable for its Intended Purpose ........................................................40

        ii. The Scope of *Jacobsen*'s Claims Is Not Dispositive of its Intended Purpose................................41

    B. Substantial Evidence Supports the Board's Finding that Modifying the Apparatus of *Jacobsen* with the Spray Nozzle of *Hunter* Would Render the Dispensing Apparatus of *Jacobsen* Inoperable for its Intended Purpose....................................................................................41

IX. *BROGAN* FAILS TO REMEDY THE DEFICIENCIES OF *JACOBSEN* AND *HUNTER* .............................................................42

CONCLUSION .................................................................................................43

# TABLE OF AUTHORITIES

**Cases**

*Broadcom Corp. v. Emulex Corp.*
  732 F.3d 1325 (Fed. Cir. 2013) ..........................................................40

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*
  567 F.3d 1314 (Fed. Cir. 2009) .................................................. 14, 40

*Forshey v. Principi*
  284 F.3d 1335 (Fed. Cir. 2002) ..........................................................29

*In re Abbott Diabetes Care, Inc.*
  696 F.3d 1142 (Fed. Cir. 2012) .................................................. 11, 13

*In re Baxter Int'l, Inc.*
  678 F.3d 1357 (Fed. Cir. 2012) ..........................................................10

*In re Berger*
  279 F.3d 975 (Fed. Cir. 2002) ..........................................................28

*In re Gartside*
  203 F.3d 1305 (Fed. Cir. 2000) ............................................. 10, 11, 28

*In re Icon Health & Fitness, Inc.*
  496 F.3d 1374 (Fed. Cir. 2006) .................................................. 13, 37

*In re Kahn*
  441 F.3d 977 (Fed. Cir. 2006) ............................................... 10, 13, 22

*In re Mouttet*
  686 F.3d 1322 (Fed. Cir. 2012) .................................................. passim

*In re Ratti*
  270 F.2d 810 (C.C.P.A. 1959)......................................... 20, 21, 24, 26

*In re Schreiber*
  128 F.3d 1473 (Fed. Cir. 1997) ..........................................................29

*In re Umbarger*
  407 F.2d 425 (C.C.P.A. 1969).............................................. 17, 20, 22

*In re Watts*
  354 F.3d 1362 (Fed. Cir. 2004) .............................................. 28, 29, 30

*KSR Int'l Co. v. Teleflex Inc.*
  550 U.S. 398 (2007) .................................................................. 14, 40

*Sage Prods., Inc. v. Devon Indus., Inc.*
   126 F.3d 1420 (Fed. Cir. 1997) ............................................................29
*Tec Air, Inc. v. Denso Mfg. Mich. Inc.*
   192 F.3d 1353 (Fed. Cir. 1999) ................................................... 14, 37

## STATEMENT OF RELATED CASES

This case has not previously been appealed to this Court or to any other appellate court.

Federal Circuit Appeal No. 2014-1451, *Plas-Pak Industries v. Richard Parks Corrosion Technologies, Inc.*, involves U.S. Patent No. 7,144,170 ("the '170 Patent"). The patent at issue in this appeal, U.S. Patent No. 7,815,384 ("the '384 Patent"), is based on a continuation application of the '170 Patent. On June 9, 2014, this Court issued an order stating that Appeal Nos. 2014-1447 and 2014-1451 are companion cases and will be assigned to the same merits panel for oral argument.

## STATEMENT OF THE ISSUES

Appellee disagrees with Appellant's broad statement of the issues as generally including whether the Board erred in affirming the patentability of Claims 1 to 15 of the '384 Patent. Instead, this appeal is limited to the following three discrete issues:

1.    Whether the Board erred in finding that modification of the apparatus of *Fukuta* with the mixing and dispensing apparatus of *Morris* would have changed the principle of operation of the apparatus of *Fukuta*.

2.    Whether the Board erred in finding that modification of the apparatus of *Fukuta* with the multiple barrel dispensing device of *Colin* would have changed

the principle of operation of the apparatus of *Fukuta*.

3.    Whether the Board erred in finding that modification of the dispensing apparatus of *Jacobsen* with the spray nozzle of *Hunter* would have rendered the dispensing apparatus of *Jacobsen* inoperable for its intended purpose.

## STATEMENT OF THE FACTS

Appellee disagrees with Plas-Pak's characterization of both the '384 Patent and the references cited during the reexamination of the '384 Patent. Plas-Pak overgeneralizes the teachings of the cited references in an attempt to persuade this Court that such references are properly combinable.

## I.    THE '384 PATENT

The '384 Patent is directed to a device for applying a coating and is not, as Plas-Pak contends, directed solely to a multi-component industrial paint packaging system. JA75, Abstract; JA92, col. 11, l. 20; col. 12, l. 1-2 and 19-20. Independent Claims 1, 7 and 15 each recite, in part, a device that comprises: (1) at least two cylindrical cartridges; (2) a static mixing nozzle in fluid communication with the cartridges; (3) a spray tip in fluid communication with the nozzle; (4) a first flexible hose disposed between and in fluid communication with the nozzle and the spray tip; and (5) a second hose in fluid communication with the spray tip, for supplying atomization air to the spray tip. JA92, col. 11, l. 20-28; col. 12, l. 1-11 and 19-28.

Appellee also disagrees with Plas-Pak's description of the dispensing gun in Claim 6. Plas-Pak asserts that reference character 13 is a dispensing gun, but reference character 13 refers to a manual or hydraulic pump, whereas reference characters 2 and 38 refer to dispensing guns. JA77, Fig. 1; JA80, Fig. 4; JA81, Fig. 5; JA86, Figs. 11-12; JA88, col. 3, l. 47-48 and 57; col. 4, l. 29-30, 38-45, 52-56 and 60-61; JA89, col. 5, l. 27-29 and 57-60; col 6, l. 16-19; JA90, col. 7, l. 5-12; JA91, col. 9, l. 44-45.

## II.   U.S. PATENT NO. 4,745,011 (*FUKUTA*)

*Fukuta* is directed not generally to a two-component mixing apparatus as asserted by Plas-Pak, but specifically to a two-component coating spray gun that uses a system of pumps, check valves and stop valves to reliably prevent backflow during the spraying operation. Appellant's Brief, p. 10, l. 6-7; JA96, col. 2, l. 61-68; JA97, col. 3, l. 1-37.

For example, *Fukuta* teaches that "[t]he object of the present invention is to provide a two-component mixing type coating method ***which can reliably check a backflow*** even when the backflow occurs repeatedly and even when the velocity of the backflowing liquid is great." JA96, col. 2, l. 10-14 (emphasis added). *Fukuta* more specifically teaches that both its stop valves and check valves are "necessary" to prevent backflow:

> For this reason, even if the time lag is great from the stopping of the spraying operation till the closing of the stop valves, the

3

> **backflow can be reliably checked by** the subsequent closing operation of **the stop valves 5a, 5b**. . . . Although the stop valves 5a, 5b and the escape valve 6 are disposed in the supply paths, they do not eliminate the **necessity** of the **check valves 4a, 4b**.  In other words, the check valves 4a, 4b are still **necessary** as **backflow prevention** members which prevent the backflow when it occurs during the spraying operation.

JA97, col. 3, l. 23-27 and 31-37 (emphasis added).

Appellee also disagrees that the components of *Fukuta* are simply supplied from "supply sources" then mixed together in a static mixer and sent through the combined flow portion to a spray gun.  Appellant's Brief, p. 10, l. 10-17.  Instead, *Fukuta* teaches that, "[i]n a coating apparatus which is useful in the coating method **of the present invention**," the main component is supplied from a container to a **pump** (2a) and the hardener agent is supplied from a container to a **separate pump** (2b) through check valves 4a, 4b and stop valves 5a, 5b:



FIG. 1

JA97, col. 4, l. 1-7; Fig. 1 (emphasis added).  *Fukuta* does not teach that its

components may be supplied via any method other than through its specific pump and valve network.

## III.    U.S. PATENT NO. 3,989,228 (*MORRIS*)

*Morris* does not merely teach a static mixing chamber for mixing multi-component compositions, but instead is directed to a mixing and dispensing apparatus in which a stop valve is provided ***downstream*** of a static mixer to increase the pressure drop across the mixer.   Appellant's Brief, p. 12, l. 9-11; JA101, Fig. 2; JA103, col. 2, l. 35-57; JA104, col. 4, l. 6-9 and 68; JA105, col. 5, l. 1-26.

*Morris* expressly distinguishes its device from prior art mixers having a shut-off valve upstream of the mixer.   JA103, col. 2, l. 53-57; JA105, col. 5, l. 27-44.   Although Plas-Pak appears to refer to Figure 1 as one of several embodiments of *Morris*' device, *Morris* labels the device in Figure 1 as "prior art" and teaches that "in the prior art system shown in FIG. 1," the pressure drop in the mixing means is less than that of its devices.   JA101, Fig. 1; JA105, col. 5, l. 19-26. *Morris* teaches that its downstream valve configuration advantageously improves the functioning of the mixer by maintaining a higher pressure on the mixer during start-up and shut-down as compared with such prior art devices.   JA103, col. 2, l. 35-37; JA105, col. 5, l. 41-44.

## IV.   U.S. PATENT NO. 2,511,627 (*EINBECKER*)

*Einbecker* does not broadly teach placing flexible hoses between a spray tip, an air source and a coating source to improve manipulation of a spray gun. Appellant's Brief, p. 13, l. 2-7.   Instead, *Einbecker* specifically discloses: (1) a flexible conduit 21 located <u>between a passage 20 in a spray gun and an air supply pipe 14</u>; (2) a flexible conduit 54 located <u>between a container 8 and a receiving chamber 41</u> of spray gun 16; and (3) a flexible conduit 61 located <u>between a container 7 and receiving chamber 41</u>.   JA662, Fig. 1; JA663, Fig. 4; JA665, col. 4, l. 30-32; JA666, col. 5, l. 6-15 and 25-29.   *Einbecker* fails to disclose a flexible hose disposed between <u>a static mixing nozzle</u> and <u>a spray tip</u> and fails to teach that its flexible lines allow for improved manipulation of its spray gun.   Instead, *Einbecker* merely teaches that its handle allows the gun to be held and manipulated.   JA665, col. 4, l. 20-25.

## V.   U.S. PATENT NO. 5,033,650 (*COLIN*)

Plas-Pak also oversimplifies the teachings of *Colin* as relating generally to dispensing and intermixing separate materials through a common static mixer. Appellant's Brief, p. 14, l. 7-10.   However, *Colin* is directed not merely to a system for dispensing and mixing material but rather to a system for ***controlled dispensing*** using a dual cartridge having pistons. JA120, Fig. 1; JA123, col. 1, l. 6-16; col. 2, l. 62-65; JA124, col. 3, l. 12-20 and 23-26.

## VI.    U.S. PATENT NO. 6,241,125 B1 (*JACOBSEN*)

*Jacobsen* is not directed merely to "dispensing multiple component fluid materials from cartridges over an indefinite distance via flexible hoses before mixing the components and discharging the materials" as asserted by Plas-Pak. Appellant's Brief, p. 15, l. 2-5.  Instead, *Jacobsen* addresses a specific problem - dispensing fluid materials directly into surface cracks while minimizing leakage. JA132, col. 1, l. 13-16 ("This invention relates to devices usable for dispensing fluid material(s) via conventional dispensing outlet nozzle(s) ***directly into a surface crack*** of a structure. . . ") (emphasis added); col. 2, l. 40-45 ("This invention relates to devices for establishing leakproof seated connections. . . for directing such fluid material into cracks in underlying structures.").

## SUMMARY OF THE ARGUMENT

Plas-Pak broadly contends the Board repeatedly erred in determining the principle of operation or the intended purpose of all references - all factual determinations reviewed only for substantial evidence.  The Board's non-obviousness analysis necessarily flows from these factual findings.  Knowing the difficulty in trying to second guess the Board's findings, Plas-Pak attempts to disguise issues of fact as issues of law and introduces new theories for the first time on appeal.  At best, Plas-Pak contends that based on the record, the Board could have come to different reasonable conclusions.  This Court has instructed

that such Board decisions are the very ones that should be affirmed. Because the Board's factual findings were reasonable and supported by substantial evidence, this Court should not disturb them and should affirm the Board's findings of non-obviousness.

Specifically, Plas-Pak contends the teachings of *Fukuta*, *Morris*, *Colin* and *Jacobsen* are limited to just mixing components together. Instead, as the Board properly held, *Fukuta* is directed to a spray gun that coats a two-component mixture using a system of pumps, check valves and stop valves. *Fukuta* teaches that its interconnected system of pumps and valves effectively addresses prior art problems with backflow during spraying.

Likewise, *Morris* is directed not merely to a simple mixing apparatus, but instead to a mixing apparatus in which a stop valve is provided downstream of a static mixer to increase the pressure drop across the mixer. *Colin* is also directed not merely to a mixing system but rather to a system for controlled dispensing using a dual cartridge having pistons.

Once the Board properly made the above factual findings in relation to *Fukuta*, *Morris* and *Colin,* the Board necessarily held that *Fukuta*'s principle of operation of preventing backflow using a system of pumps and valves would have been changed by substitution with the cartridges of *Morris* or *Colin*. While the Board's ultimate legal finding of non-obviousness is subject to *de novo* review, this

appeal is focused on review of the Board's many factual findings.

The Board also properly concluded that *Jacobsen* is not directed generally to a kit-like system and apparatus for dispensing a multiple component reactive material from cartridges, but rather to a device for dispensing materials into a surface crack while minimizing leakage. As such, the Board's conclusion - that modifying the device of *Jacobsen* to include the spray nozzle of *Hunter* would render the modified apparatus unsuitable for the intended purpose of *Jacobsen* - is reasonable and is supported by substantial evidence.

Plas-Pak's arguments also rely heavily on its mistaken reading of *In re Mouttet* and *In re Umbarger*. *Mouttet* does not broadly stand for the proposition that a principle of operation refers to a reference's "high level ability." Instead, *Mouttet* refers to the principle of operation at issue in that case - a specific reference's "high level ability to receive inputs into a programmable crossbar array and processing the output to obtain an arithmetic result." Furthermore, *Umbarger* does not stand for the proposition that it is legal error to discuss a reference's contribution to the art as its principle of operation.

As explained in detail below, Plas-Pak cannot show why the informed judgment of the Board should be disturbed, and, thus, the holdings of the Board should be affirmed.

## ARGUMENT

## I.    STATEMENT OF THE STANDARD OF REVIEW

"The scope of [this Court's] review in an appeal from a Board decision is limited." *In re Baxter Int'l, Inc.*, 678 F.3d 1357, 1361 (Fed. Cir. 2012).  Factual findings of the Board are reviewed for substantial evidence and legal conclusions of the Board are reviewed de novo.  *Id.* at 1361; *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000).  "A finding is supported by substantial evidence if a reasonable mind might accept the evidence to support the finding." *Baxter*, 678 F.3d at 1361; *In re Kahn*, 441 F.3d 977, 985 (Fed. Cir. 2006).

This Court explained clearly in *Baxter* that the review of Board decisions is limited in appeals like this where an obviousness determination is based on factual findings that only need be reviewed for substantial evidence.  678 F.3d at 1361 ("Although the ultimate determination of obviousness under 35 U.S.C. § 103 is a question of law, it is based on several underlying factual findings, including the differences between the claimed invention and the prior art.  Similarly, the determination of what a reference teaches is a question of fact.  Thus, we review those factual determinations for substantial evidence.") (internal citations omitted).

Substantial evidence may support a conclusion even where multiple conclusions are possible.  As explained by this Court, "where two different, inconsistent conclusions may reasonably be drawn from the evidence in record, an

10

agency's decision to favor one conclusion over the other is the epitome of a decision that must be sustained upon review for substantial evidence." *In re Mouttet*, 686 F.3d 1322, 1331 (Fed. Cir. 2012) (emphasis added) (quotation omitted); see also *Gartside*, 203 F.3d 1305 at 1312, 1316 (the possibility of drawing inconsistent conclusions from the evidence does not mean the Board's findings are not supported by substantial evidence).

Plas-Pak presents the standard of review in a way that attempts to confuse issues of fact with issues of law. Although the overall determination of obviousness is reviewed de novo, *Mouttet*, 686 F.3d. at 1330-31, all of the factual underpinnings at issue in this case - whether the proposed modifications would change the principle of operation of *Fukuta* or render *Jacobsen* unsuitable for its intended purpose - need only be reviewed for substantial evidence.

### A.    The Board's Determination of a Reference's Principle of Operation Should Be Reviewed for Substantial Evidence

Determining the principle of operation for a given reference is a not matter of law "akin to claim construction" as Plas-Pak's strained reading of this Court's decisions would suggest. Appellant's Brief, p. 30, l. 17-20. The cases cited by Plas-Pak, *Mouttet* and *In re Abbott Diabetes Care, Inc.,* 696 F.3d 1142, 1148 (Fed. Cir. 2012), actually indicate the opposite - that a reference's principle of operation, along with whether that principle of operation is changed, are questions of fact reviewed for substantial evidence.

Specifically, *Mouttet* holds that the Board's factual findings should be upheld if supported by substantial evidence and that "[t]he scope and content of the prior art, as well as whether the prior art teaches away from the claimed invention, are determinations of fact." 686 F.3d at 1330-31. *Mouttet* further holds that determining whether a reference's principle of operation has been changed should be reviewed for substantial evidence. *Id.* at 1332 ("We find the Board's determination that eliminating the optical components of Falk would not destroy its principle of operation to be supported by substantial evidence").

*Mouttet* does not, as suggested by Plas-Pak, separately address the standard of review for determining a reference's principle of operation, or otherwise indicate that the standard of review for determining a reference's principle of operation is a question of law. *Id.* at 1331-32. Instead, *Mouttet* analyzes the overall principle of operation issue, including both the determination of the reference's principle of operation and the determination of whether the principle of operation would be changed, under the substantial evidence standard. *Id.* at 1332.

Furthermore, *Mouttet*'s statement that "the scope and content of the prior art . . . are determinations of fact" indicates that determining the principle of operation is also a question of fact that should be upheld if supported by substantial evidence. *Id.* at 1330. Therefore, Plas-Pak's assertion that determining the principle of operation is a matter of law is wholly unsupported by *Mouttet*.

*Abbott* also does not support Plas-Pak's assertion regarding the appropriate standard of review.  In fact, *Abbott* does not even address the principle of operation of a reference anywhere in its opinion, let alone whether the determination of a principle of operation is a question of law.  696 F.3d at 1148.

As such, the Board's determination of the principle of operation and whether that principle of operation is changed by a proposed combination are issues of fact that should be reviewed for substantial evidence.  *Mouttet*, 686 F.3d at 1332.

### B.     The Board's Determination of the Intended Purpose of a Reference Should Be Reviewed for Substantial Evidence

The proper standard of review for a Board determination of whether a proposed combination defeats a reference's intended purpose is also substantial evidence.  Factual determinations of the Board are reviewed for substantial evidence and, thus, must be upheld "if a reasonable mind might accept the evidence as adequate to support the factual conclusions drawn by the Board." *In re Kahn*, 441 F.3d 977, 985 (Fed. Cir. 2006).

This Court has held that "[t]he scope and content of the prior art, as well as whether the prior art teaches away from the claimed invention, are determinations of fact."  *Mouttet*, 686 F.3d at 1330-31.  A reference teaches away from a combination when using it in that combination would produce a result inoperable for its intended purpose.  *In re Icon Health & Fitness, Inc.*, 496 F.3d 1374, 1382 (Fed. Cir. 2007) ("Icon correctly states the principle that a reference teaches away

13

from a combination when using it in that combination would produce an inoperative result."); *see also Tec Air, Inc. v. Denso Mfg. Mich. Inc.*, 192 F.3d 1353, 1360 (Fed. Cir. 1999) ("If when combined, the references 'would produce a seemingly inoperative device,' then they teach away from their combination."). Therefore, determining whether a proposed combination would render a prior art reference unsuitable or inoperable for its intended purpose is a question of fact that should be reviewed for substantial evidence.

### C.    *KSR* and the Proper Standard of Review for Obviousness

While a legal conclusion of obviousness is reviewed de novo, *Mouttet*, 686 F.3d at 1330-31, Plas-Pak overreaches in its characterization of *KSR* and the relevant standards in determining obviousness, because it ignores that proposed combinations must still function for their intended purpose. Although *KSR* holds that a combination of familiar elements according to known methods is likely obvious when it yields no more than a predictable result, the "predictable result" discussed in *KSR* requires that the proposed combination would have worked for its intended purpose. *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1326 (Fed. Cir. 2009) (citing *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 416-17 (2007) ).

As explained in further detail below, Plas-Pak's proposed combinations would not have produced a predictable result and, thus, the Board's findings on the

patentability of Claims 1 to 15 of the '384 Patent are supported by substantial evidence and should be affirmed.

## II. SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDING THAT THE PROPOSED MODIFICATION OF *FUKUTA* IN VIEW OF *MORRIS* WOULD CHANGE THE PRINCIPLE OF OPERATION OF *FUKUTA*

### A. The Board Correctly Defined the Principle of Operation of *Fukuta*

As the Board properly determined, *Fukuta* is not merely directed to mixing and dispensing two components through a dispenser, but rather to a method of coating a two-component mixture *using a system of pumps and valves* to *prevent backflow*. JA11, l. 20-25; JA12, l. 14-19 and 23-25; JA13, l. 1-3 and 6-16; JA16, l. 6-15. For example, *Fukuta* states that its "invention relates generally to a two-component mixing type coating method which is suitable for coating car bodies, machine components." JA96, col. 1, l. 7-9. *Fukuta* further teaches that the coating of car bodies and machine components is typically conducted using a two-component coating method in which a main component and a hardener are supplied to a spray gun using a system of pumps and valves. *Id.* at col. 1, l. 14-34. *Fukuta* explains that these systems use check valve(s) in the supply paths to prevent backflow of the components. *Id.* at col. 1, l. 32-34.

However, *Fukuta* notes that prior art backflow prevention systems using such check valves cannot effectively prevent backflow because the mixed

components cure and enter the check valve, later hardening and limiting the opening and closing of the check valve. JA96, col. 1, l. 35-43. Therefore, *Fukuta* teaches that "[t]he object of the present invention is to provide a two-component mixing type coating method ***which can reliably check a backflow*** even when the backflow occurs repeatedly and even when the velocity of the backflowing liquid is great." *Id.* at col. 2, l. 10-14 (emphasis added).

These passages demonstrate that the principle of operation of *Fukuta* is not merely mixing and dispensing reactive components through a dispenser, but rather coating a two-component mixture ***using a system of pumps and valves*** to ***prevent backflow*** as determined by the Board. JA11, l. 20-25; JA12, l. 14-19 and 23-25; JA13, l. 1-3 and 6-16; JA16, l. 6-15. The Board's finding is clearly supported by substantial evidence.

### i. The Board's Determination of *Fukuta*'s Principle of Operation Should Be Reviewed for Substantial Evidence

Plas-Pak asserts that determining a reference's principle of operation is an issue of law that is not entitled to any deference. Appellant's Brief, p. 30, l. 17-22 ("Determining what the principle of operation is for a given reference, much like claim construction, is a matter of law, while determining whether that principle of operation is changed is a question of fact"). Plas-Pak simply misreads the law.

As discussed above, a determination of a reference's principle of operation (i.e., the content of the reference) is a factual finding that must be reviewed for

16

substantial evidence. *Mouttet*, 686 F.3d at 1330-32. Therefore, even if two different conclusions as to the principle of operation can reasonably be drawn from the record evidence, the Board's decision to favor one over the other should be sustained. *Id.* at 1331.

### ii. *Umbarger* Does Not Stand for the General Proposition that a Reference's Principle of Operation Cannot Be Based on Its Contribution to the Art

Plas-Pak argues that the Board committed "legal error" in improperly confusing *Fukuta*'s principle of operation with its purported contribution to the art. Appellant's Brief, p. 24, l. 13-18; p. 25, l. 5-9; p. 26, l. 18-20; p. 27, l. 13-15. Plas-Pak's position is yet again unfounded in the law and is merely an improper extrapolation of the fact-specific holding in *Umbarger*.

In *Umbarger*, the United States Court of Customs and Patent Appeals held that the particular combination of prior art references would have rendered the claims at issue obvious despite that the proposed modification would have omitted the circuit portion that the inventor "apparently regarded as his contribution to the art." *In re Umbarger*, 407 F.2d 425, 430-31 (C.C.P.A. 1969) . However, the Court specifically based its holding on the fact that the modified apparatus would "operate therein on the same principles as before to indicate engine speed as a function of applied pulse frequency." *Id.* As such, the Court in *Umbarger* merely held that, based on the specific facts at issue in that case, the principle of operation

17

was not altered even though it would change what the inventor "apparently regarded" as his contribution to the art.

Nowhere did the Court state as a general matter that a reference's contribution to the art cannot be equivalent to its principle of operation. Furthermore, determining a reference's principle of operation and whether such a principle is changed are questions of fact that must be analyzed on a case-by-case basis. *Mouttet*, 686 F.3d at 1331-32. *Umbarger*'s statements regarding the "contribution to the art" are fact-specific and do not stand for the broad proposition that it is legal error to equate a reference's "contribution to the art" with its "principle of operation." Therefore, the Board's discussion of *Fukuta*'s "contribution to the art" was not legal error.

### iii. *Mouttet* Did Not Hold Generally that a Reference's Principle of Operation Is Its "High Level Ability"

As with *Umbarger*, Plas-Pak overgeneralizes the fact-specific holdings of *Mouttet*. Plas-Pak repeatedly asserts that *Mouttet* held that a reference's principle of operation is equivalent to its "high level ability." Appellant's Brief, p. 18, l. 11-12; p. 25, l. 4-5; p. 27, l. 15-17; p. 59, l. 14-15.

Plas-Pak selectively quotes *Mouttet* and takes this Court's statement about "high level ability" out of context. In fact, Plas-Pak even changes this Court's specific statement about *Mouttet*'s principle of operation by completely omitting

the facts and generalizing *Mouttet*'s specific fact analysis to *any* reference as shown below:

| *Mouttet* Opinion | Plas-Pak's Quote |
|---|---|
| "[T]he principle of operation of **[Falk's computing device]** is its high level ability **[to receive inputs into a programmable crossbar array and processing the output to obtain an arithmetic result]**." <br><br> 686 F.3d at 1332 (omitted/substituted terms bolded and bracketed) | "[T]he principle of operation of [a reference] is its <u>high level ability</u>." <br><br> Appellant's Brief, p. 25, l. 4-5. |

Nowhere does *Mouttet* suggest that its fact-specific holding regarding the "high level ability" of Falk applies to the principle of operation of other references, nor did *Mouttet* hold as a general matter that a reference's principle of operation is defined as its "high level ability."  As such, Plas-Pak's arguments regarding the "high level ability" of a reference do not govern the fact-specific findings of the Board in this case.

### iv.    The Facts of This Case Are Distinguishable from *Umbarger* and *Mouttet* and Are More Analogous to *Ratti*

The Board thoroughly considered the facts and holding of *Mouttet* and nevertheless concluded that the facts of this case are more analogous to *In re Ratti*, in which this Court reversed the Board's finding of obviousness.  JA10, l. 20 -

JA12, l. 2. In *Mouttet*, this Court held that the proposed modification - changing the circuitry from electrical to optical - rendered the claims obvious because the modification would *not* change the "overall principle of operation of a programmable arithmetic process." JA11, l. 10-15; *Mouttet*, 686 F.3d at 1332. The Court reasoned that (1) the reference's principle of operation was its ability to receive inputs into a programmable array and process the output to obtain an arithmetic result, and (2) there was nothing unique in the optical implementation of the programming and processing of junction states. *Mouttet*, 686 F.3d at 1332.

Similarly, in *Umbarger*, notably introduced for the first time on appeal, the proposed modification rendered the claims obvious, despite the omission of the circuit portion that the inventor regarded as his contribution to the art, because the modified apparatus would *not* change the underlying principle of operation - to indicate engine speed as a function of applied pulse frequency. *In re Umbarger*, 407 F.2d at 430-31.

In contrast, in *Ratti*, the court held that the proposed combination would not have rendered the claims obvious because such a combination would require a "substantial reconstruction and redesign" and would result in a change in the basic principle of operation of the reference. *In re Ratti*, 270 F.2d 810, 813 (C.C.P.A. 1959). The present case is more closely aligned with the facts of *Ratti*, because *Fukuta* would not operate on the same principle as before, i.e., preventing

backflow, if it were modified by *Morris* in the manner suggested by Plas-Pak.  As discussed previously, *Fukuta* is entirely directed to a method of coating a two-component mixture using a system of pumps and valves to prevent backflow. JA96, col. 1, l. 7-9 and 14-34; col. 2, l. 10-14.  Modification of *Fukuta*'s apparatus with the dual-cartridge ram/piston arrangement of *Morris* would require a "substantial reconstruction" because it would eliminate the pump and valve system of *Fukuta*, "which allow for the very object of the apparatus."  JA12, l. 9-13.

Plas-Pak argues that *Ratti* is distinguishable from the present case because its holding was based in part on the Court's finding that the prior art could not "actually function" in the manner proposed.  Appellant's Brief, p. 33, l. 16-18. However, the portion of *Ratti* cited by Plas-Pak does not state that the proposed combination would not "actually function."  Instead, it states that the modified seal could not function "in the manner of appellant's seal" due to the incompressible nature of the rubber in the prior art reference.  *Ratti*, 270 F.2d at 813.  Like the modified seal in *Ratti*, the modified apparatus of *Fukuta* in view of *Morris* would not function in the manner set forth in *Fukuta* because such a modification would eliminate the pump/valve arrangement that is essential to preventing backflow and would replace such elements with a piston/ram arrangement.  JA16, l. 16 - JA17, l. 9.

Appellee also notes that in both *Umbarger* and *Mouttet*, the Board's findings about changing the principle of operation were upheld on appeal.  *Umbarger*, 407 F.2d at 430-32; *Mouttet*, 686 F.3d at 1332 ("Thus, the Board's determination that the difference in the circuitry—electrical versus optical—does not affect the overall principle of operation of a programmable arithmetic processor was supported by substantial evidence.").  Like those cases, the determination of a reference's principle of operation and whether such principle is changed are matters of fact that should be upheld if a "reasonable mind might accept the evidence as adequate to support the factual conclusions drawn by the Board." *In re Kahn*, 441 F.3d 977, 985 (Fed. Cir. 2006).  Therefore, the Board's findings regarding changing the principle of operation are entitled to deference and should be upheld because, as explained in further detail below, at a minimum the evidence demonstrates that such findings are reasonable.

**B.    Substantial Evidence Supports the Board's Finding that Modifying the Mixing System of *Fukuta* with the Dual Cartridges of *Morris* Would Change the Principle of Operation of *Fukuta***

As properly found by the Board, *Fukuta* is directed to a coating method that uses a system of pumps, stop valves and check valves to supply components while also preventing backflow.  JA11, l. 20-25; JA12, l. 14-19 and 23-25; JA13, l. 1-3 and 6-16; JA16, l. 6-15; JA96, col. 1, l. 7-9 and 14-34; col. 2, l. 10-14.  In contrast, the portion of *Morris* relied on for the proposed combination is directed to an

"*entirely hand-held*" device that uses manual manipulation of a trigger to move components from cartridges to a mixer.  JA102, Fig. 4; JA106, col. 7, l. 22-62 (emphasis added).

Modification in the manner proposed by Plas-Pak would change the way the components of *Fukuta* are supplied and dispensed.  For example, as noted by the Board, Plas-Pak's proposed modification would remove the pump and valve system of *Fukuta*, which is how *Fukuta* teaches achieving its goal of preventing backflow, and replace it with the "very differently constructed" piston/ram arrangement of *Morris*.  JA12, l. 9-13; JA96, col. 1, l. 7-9 and 14-34; col. 2, l. 10-14.  Moreover, because *Fukuta* is directed to the specific manner of preventing backflow using a system of pumps and valves, replacing such a configuration with the dual-cartridge device shown in Fig. 4 of *Morris* "would impact [the] functionality [of *Fukuta*] in a fundamental way."  JA12, l. 14-25; JA13, l. 1-3.  As such, the Board's conclusion that the proposed modification would affect *Fukuta*'s ability to prevent backflow and, thus, change the principle of operation of *Fukuta*, is reasonable and should be upheld.  JA11, l. 22-25; JA12, l. 1-13.

Plas-Pak focuses heavily on whether the proposed modification would merely be "operable" and argues broadly that a proposed combination will not change the principle of operation of a reference as long as it is operable.  Appellant's Brief, p. 33, l. 16-24; p. 34, l. 4-20; p. 35, l. 1-11; p. 36, l. 5-19.

However, *Mouttet* and *Ratti* do not hold that a proposed combination must be inoperable to change the principle of operation of a reference. Instead, *Ratti* and *Mouttet* use the correct standard for determining whether the principle of operation is changed - whether the proposed combination would "change [] the basic principles under which the [reference's] construction was designed to operate." *Ratti*, 270 F.2d at 813; *see also Mouttet*, 686 F.3d at 1332. As such, Plas-Pak's arguments that the modified apparatus of *Fukuta* is "operable" are irrelevant to whether such a modification changes the principle of operation of *Fukuta*.

Plas-Pak also argues that the proposed combination would not disable *Fukuta*'s backflow prevention means because the valves would remain in the modified apparatus. Appellant's Brief, p. 37, l. 3-11. However, *Fukuta* teaches that its system functions using not only check valves and stop valves but also pumps - in other words, the backflow prevention works using the ***interconnected system*** of pumps and valves. JA96, col. 1, l. 7-9 and 14-34; col. 2, l. 10-14. Furthermore, Plas-Pak cannot explain why backflow prevention would even be necessary without the pump system of *Fukuta*. As such, Plas-Pak has failed to show that the modified apparatus would reliably prevent backflow in the manner suggested by *Fukuta*.

Even if Plas-Pak's position that the modified apparatus would not change the principle of operation of *Fukuta* were reasonable, Plas-Pak must still show that the

Board's finding was not reasonable. *Mouttet*, 686 F.3d at 1331. For the reasons discussed above, the Board's conclusion that modifying the apparatus of *Fukuta* with the dual-cartridge piston/ram arrangement of *Morris* would not function to reliably prevent backflow and would, thus, change the principle of operation of *Fukuta*, is more than reasonable. As such, the Board's finding that the proposed modification would change the principle of operation of *Fukuta* is supported by substantial evidence.

### i. *Morris* Teaches that Piston and Pump Systems Are Not Interchangeable

Appellee also submits that it would not have been obvious to merely replace just the pumps of *Fukuta* (and not the valves) as proposed by Plas-Pak because *Morris* teaches that pumps and piston/cartridge arrangements are not interchangeable. For example, *Morris* discloses two ***completely separate*** embodiments - in Figs. 2 and 4 - directed to a dispenser with pressurized supply means (i.e., pumps) and "an entirely hand-held" dispenser having piston-cartridge supply means, respectively. JA101, Fig. 2; JA102, Fig. 4; JA104, col. 4, l. 36-45; JA106, col. 7, l. 22-34. *Morris* fails to teach that the pumps are interchangeable with the piston-cartridge supply means, or that only the pumps and containers in Fig. 2 may be replaced with its cartridges. Instead, a comparison of Figs. 2 and 4 demonstrates that *Morris*, as noted by the Board, suggests replacing the ***entire*** fluid system upstream of the static mixer. JA16, l. 2-6; JA101, Fig. 2; JA102, Fig. 4.

Furthermore, because the embodiment in Fig. 4 of *Morris* is "entirely" hand-held, a skilled artisan would understand that the pumps in the separate embodiment of Fig. 2 are not interchangeable with the piston/cartridge arrangement in Fig. 4.

### ii. The "Indicia of Obviousness" Cited by Plas-Pak Are Not Required for a Determination of Changing the Principle of Operation and Instead Relate Generally to Obviousness

Plas-Pak attacks the Board's findings regarding *Fukuta* and *Morris* by creating a new three-factor "indicia of obviousness" test for determining whether a reference's principle of operation is changed. Appellant's Brief, p. 31, l. 1-15; p. 32, l. 1-4; p. 40, l. 7-16; p. 43, l. 12-24; p. 44, l. 1-8 and 15-17; p. 45, l. 3-8. However, the alleged "indicia of obviousness" listed in *Ratti* and *Mouttet* are not factors in determining whether a proposed combination would change the principle of operation of a reference and instead relate generally to whether something is obvious. *Ratti*, 270 F.2d at 813; *Mouttet*, 686 F.3d at 1331-33.

As such, the "indicia of obviousness" cited by Plas-Pak, including a showing of teaching away and that references are non-analogous art, are not required for an analysis of changing a reference's principle of operation. Instead, changing the principle of operation is an alternative ground for a finding of non-obviousness. For example, *Mouttet* describes and analyzes changing the principle of operation and teaching away as two separate arguments for non-obviousness. *See Mouttet*, 686 F.3d at 1331 and 1333. Contrary to Plas-Pak's assertions, *Mouttet* and *Ratti*

do not hold or even suggest that a finding of changing the principle of operation is based on a showing that: (1) one of the references teaches away from the proposed combination, or (2) the cited references are in different fields of endeavor (i.e., that the references are non-analogous art). Furthermore, even if such a showing were relevant to changing the principle of operation, *Morris* teaches away from the upstream mixing valve of *Fukuta* as explained in further detail below.

### C.    The Board Did Not Require a Physical Substitution of the Elements of *Fukuta* with the Elements of *Morris*

Plas-Pak asserts that the Board committed legal error in requiring a physical substitution of the elements of *Fukuta* with the elements of *Morris*. Appellant's Brief, p. 45, l. 9-17. However, as even Plas-Pak admits, the Board specifically noted that "the ability for bodily incorporation need not be demonstrated." Appellant's Brief, p. 45, l. 14-15; JA13, l. 17-18. Furthermore, the portions of the Board's decision relied on by Plas-Pak do not focus on whether the cartridges of *Morris* are physically combinable with the device of *Fukuta* and instead merely discuss whether the combination of *Fukuta* and *Morris* "function[s] in the intended manner." JA13, l. 20-23; JA14, l. 1-2; JA16, l. 10-25.

### D.    Plas-Pak's New Arguments Regarding the Combination of *Fukuta* and *Morris* Have Been Waived

Not only are Plas-Pak's arguments regarding the combination of *Fukuta* and *Morris* entirely improper on the merits - much of this new argument was waived

27

long ago by not being presented to the Board. Specifically, Plas-Pak waived the following arguments: (1) equating the "high level ability" of *Fukuta* to its principle of operation; (2) reliance on the Abstract and Field of Invention sections of *Fukuta* for determining the principle of operation; and (3) reference to the alleged "indicia of obviousness" as factors in a principle of operation analysis. Plas-Pak cannot introduce these new theories for the first time on appeal.

As this Court explained *In re Watts*, "[t]he Board is an expert body that plays an important role in reviewing the rejection of patent applications. In a proceeding before the Board the applicant is given full 'opportunity to bring forth the facts thought necessary to support his or her position.'" 354 F.3d 1362, 1367 (Fed. Cir. 2004) (affirming Board) (citing *In re Gartside*, 203 F.3d 1305, 1314 (Fed.Cir.2000) (affirming Board)). The Court further explains in *In re Watts* that "[o]n appeal to this court, 'we have before us a comprehensive record that contains the arguments and evidence presented by the parties' and our review of the Board's decision is confined to the 'four corners' of that record . . . [I]t is important that the applicant challenging a decision not be permitted to raise arguments on appeal that were not presented to the Board." *Id.*

This Court has repeatedly rejected arguments not presented to the Board, and the facts of this case indeed compel the same result. *See, e.g., In re Berger*, 279 F.3d 975, 984 (Fed. Cir. 2002) (affirming Board and declining to consider the

merits of indefiniteness rejections not contested before the Board); *In re Schreiber*, 128 F.3d 1473, 1479 (Fed.Cir.1997) (affirming Board and declining to consider whether prior art cited in an obviousness rejection was non-analogous art when that argument was not raised before the Board).[1]

Specifically, Plas-Pak's newly invented "high level ability" principle of operation standard is improper new argument neither raised before the Board nor a part of the "four corners" of the record in this case. Appellant's Brief, p. 18, l. 11-12; p. 25, l. 1-18.[2] Plas-Pak was free to introduce these arguments in its appeal to the Board, rather than attempting to repaint their case theory on a fresh canvas before this Court. Unable to show any reason why its failure to raise these arguments before the Board is excusable, Appellant has waived these arguments. *See In re Watts*, 354 F.3d 1362 at 1368 (citing *Forshey*, 284 F.3d at 1355 (listing

---

[1] This is the same rule this Court follows in appeals from district courts and other agencies. *In re Watts*, 354 F.3d at 1368 (citing *Forshey v. Principi*, 284 F.3d 1335, 1355 (Fed. Cir. 2002) (*en banc*) (explaining that generally appellate courts should not hear issues not considered below) and *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1426 (Fed. Cir. 1997). The Court's directive in *Sage Products* could not be clearer — "This is an appellate court. By and large, it is our place to review judicial decisions . . . reached by trial courts. . . . With a few notable exceptions, such as some jurisdictional matters, appellate courts do not consider a party's new theories, lodged first on appeal." *Sage Prods.*, 126 F.3d at 1426 (emphasis added).

[2] This is not the first time Plas-Pak has taken liberties with *Mouttet*. The *Mouttet* decision was published on June 26, 2012. Plas-Pak filed its Appeal Brief to the Board on July 12, 2012. Only at oral argument did Plas-Pak introduce this decision, at which time Appellee objected to its introduction. JA648, l. 3-7.

circumstances in which failure to raise an argument below may be excused, those circumstances including <u>new precedent</u>)).

Plas-Pak has similarly waived its specific reliance on the Abstract and Field of Invention sections of *Fukuta* as shedding light on its "principle of operation," only raising these arguments for the first time on appeal.  Appellant's Brief, p. 29, l. 9-20; p. 30, l. 1-6.  Just as in *In re Watts*, "[b]ecause the appellant failed to argue [its] current interpretation of the prior art below, [this Court] do[es] not have the benefit of the Board's informed judgment on this issue for [its] review."  354 F.3d 1362 at 1368.

Finally, Plas-Pak's reference to alleged principle of operation elements (i.e., "indicia of obviousness"), along with its elaborate application of this "test," is both legally improper and constitutes improper new argument.  Appellant's Brief, p. 31, l. 2-15; p. 32, l. 1-10; p. 34, l. 12-20; p. 40, l. 7-16; p. 44, l. 3-8; p. 45, l. 3-8.  This Court does not have the "informed judgment" of the Board on this reasoning for its review, as these arguments were never made before the Board.  *See id.*

## III. *MORRIS* TEACHES AWAY FROM THE COMBINATION WITH *FUKUTA*

Contrary to Plas-Pak's assertions, the proposed modification would not have been obvious because *Morris* teaches away from the proposed combination. Specifically, *Morris* teaches away from: (1) the upstream mixing valve of *Fukuta*, and (2) a flexible hose located between a mixing nozzle and a dispensing tip.

### A.    *Morris* Teaches Away from the Upstream Mixing Valve of *Fukuta*

*Fukuta* teaches a system in which check valves and stop valves are located **_upstream_** of a mixing nozzle to prevent backflow.  JA94, Fig. 1; JA96, col. 2, l. 28-32.  *Morris* teaches away from *Fukuta*, as it is directed to a system where a stop valve is provided **_downstream_** of the static mixer to increase the pressure drop across the mixer.  JA101, Fig. 2; JA103, col. 2, l. 35-57; JA104, col. 4, l. 6-9 and 68; JA105, col. 5, l. 1-26.

*Fukuta* teaches in its Abstract that its two-component mixing type coating method "is characterized in that check valves and stop valves are disposed at positions of the flow conduits **upstream** from the junction, an escape valve is connected to a flow conduit at a portion downstream from the junction, and when the coating spray operation from the coating spray gun is stopped, the escape valve is opened and then the stop valves are closed by control means."  JA93, Abstract, l. 6-15 (emphasis added).

In contrast, *Morris* is entirely directed to a system where a stop valve is provided **_downstream_** of the static mixer to increase the pressure drop across the mixer.  JA101, Fig. 2; JA103, col. 2, l. 35-57; JA104, col. 4, l. 6-9 and 68; JA105, col. 5, l. 1-26.  *Morris* teaches that it is advantageous to provide a valve after the downstream end of the mixer to maintain higher pressure on the mixer during start-up and shut-down.  JA103, col. 2, l. 35-37; JA105, col. 5, l. 41-44 ("[I]t is

advantageous to have the valve immediately ***after the downstream end*** of the static mixer to maintain higher pressure on the mixer during start-up and shut-down.") (emphasis added).  Furthermore, *Morris* expressly distinguishes its system from prior art systems having the shut-off valve ***<u>upstream</u>*** of the mixer and, thus, a smaller pressure drop across the mixer:

> The dispensing end which includes a valve is located adjacent the downstream end of the static mixing chamber. . . . This ***contrasts to the prior art system*** wherein there is a long pressure drop from the tubing leading from the downstream end of the static mixing chamber to the dispensing means so that the pressure drop over the static mixer is decreased. . . .
>
> One advantage of having the valve at the downstream end of the mixing means is that pressure can be maintained over the whole system.  ***In prior art devices, it is common to have the shut-off valve upstream from the static mixer*** near the pumps.  When the upstream valve is shut off, the pressure in the system slowly dissipates and ***consequently the pressure drop across the static mixer also falls off***.

JA103, col. 2, l. 45-57; JA105, col. 5, l. 27-34 (emphasis added).  Therefore, *Morris* teaches away from systems such as *Fukuta*'s, having a shut-off valve located upstream of the mixer and, thus, a small pressure drop across the mixer.

### B.     *Morris* Teaches Away from a Flexible Hose Located Between a Mixing Nozzle and a Dispensing Tip

*Morris* acknowledges prior art mixing devices having a flexible hose located between a static mixing chamber and a dispenser.  JA103, col. 1, l. 41-49.  However, *Morris* notes that such devices suffered several problems due to the potential curing of the mixing materials in the hose.  JA103, col. 1, l. 49-68; col. 2,

l. 1-16.  For example, the materials in the hose would need to be removed from the device during shut down in order to avoid curing, thus resulting in a loss of material during shut-down and the need for an auxiliary cleaning system to clean out the material.  *Id.* at col. 1, l. 49-64.  In addition, if the material is of rapid curing, the material may not flow all the way out of the hose prior to curing, either resulting in a loss of equipment or a shorter hose, which would undesirably limit the portability of the device.  *Id.* at col. 1, l. 65-68; col. 2, l. 1-16.

## IV.  *BROGAN* AND *EINBECKER* FAIL TO REMEDY THE DEFICIENCIES OF *FUKUTA* AND *MORRIS*

Plas-Pak relies on *Einbecker* for the teaching of a flexible hose to improve the manipulation of the spray gun of *Fukuta*.  Appellant's Brief, p. 50, l. 7-17.  However, for the reasons discussed previously, one of ordinary skill in the art would have had no reason to use a flexible hose in the modified apparatus of *Fukuta* and *Morris* because *Morris* teaches away from a flexible hose between the mixer and dispenser.

Furthermore, it would not have been obvious to modify the mixing system of *Fukuta* with the cartridges of *Morris* because it would change the principle of operation of *Fukuta*.  Plas-Pak asserts that "[i]nstead of Fukuta's containers, Morris simply teaches an alternative way of containing the mixture in dual cylindrical cartridges" and that such a substitution "is a predictable use of prior art

elements according to their established functions." Appellant's Brief, p. 49, l. 8-11.

For the reasons discussed previously, the Board correctly determined *Fukuta*'s principle of operation - coating a two-component mixture ***using a system of pumps and valves*** to ***prevent backflow*** - and that such a principle would be changed by the proposed modification with *Morris*. Nothing in *Einbecker* or *Brogan* suggests that such a modification would have been obvious or would not have changed the principle of operation of *Fukuta*. As such, the proposed combinations based on *Fukuta*, *Morris*, *Einbecker* and *Brogan* would not have been obvious.

## V. SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDING THAT MODIFICATION OF THE APPARATUS OF *FUKUTA* WITH THE MULTIPLE BARREL DISPENSING DEVICE OF *COLIN* WOULD HAVE CHANGED THE PRINCIPLE OF OPERATION OF *FUKUTA*

Substantial evidence supports the Board's determination of the principle of operation of *Fukuta* - coating a two-component mixture using a system of pumps, stop valves and check valves to supply components ***while preventing backflow***. JA96, col. 1, l. 7-9 and 14-34; col. 2, l. 10-14. Furthermore, as with *Morris*, modifying the apparatus of *Fukuta* with the multiple barrel dispensing device of *Colin* would alter *Fukuta*'s principle of preventing backflow using its system of valves and pumps.

For example, unlike *Fukuta*, *Colin* is directed to a system for ***controlled dispensing*** using a dual cartridge having ***pistons*** 17 and 18:



FIG. I

JA120, Fig. 1; JA123, col. 1, l. 12-16; JA124, col. 3, l. 12-20 and 23-26.  As with *Morris*, both of Plas-Pak's proposed modifications would change the principle of operation of *Fukuta* by affecting its ability to prevent backflow using its interconnected system of pumps and valves.  Appellant's Brief, p. 52, l. 15-19; JA18, l. 7-19.  Therefore, the Board's finding that the proposed modification based on *Colin* would impermissibly change the principle of operation of *Fukuta* is supported by substantial evidence.  *See Mouttet*, 686 F.3d at 1331.

## VI.   THE PROPOSED MODIFICATION BASED ON *FUKUTA* IN VIEW OF *COLIN* WOULD NOT HAVE BEEN OBVIOUS BECAUSE *FUKUTA* AND *COLIN* ARE DIRECTED TO DIFFERENT DISPENSING TECHNOLOGIES

The proposed combination based on *Fukuta* and *Colin* would not have been obvious because *Fukuta* and *Colin* are directed to different mixing technologies.  Plas-Pak loosely asserts that *Fukuta* and *Colin* "are in the same field of endeavor."  Appellant's Brief, p. 52, l. 21-22.  They are not.  *Fukuta* is entirely directed to a

*spray gun* for coating *car components* while preventing backflow. JA93, Abstract, l. 1-6; JA96, col. 1, l. 14-20, 35-40 and 64-66; col. 2, l. 15-35 and 61-68; JA97, col. 3, l. 1-4, 7-14 and 66-68.

In contrast, *Colin* is directed to a system for *controlled dispensing* of materials using pistons and cartridges. JA121, Fig. 3; JA123, col. 1, l. 12-16; JA124, col. 3, l. 12-20 and 23-26. For example, *Colin* teaches expelling a *dental impression material* in a controlled manner *through a syringe* when pressure is applied to pistons 17 and 18. JA124, col. 3, l. 23-26. Dispensing dental impression materials through a syringe requires precise and localized application (e.g., to a patient's teeth), whereas a spray gun for coating car components is designed to apply a material over a large area (e.g., a car). *Colin* fails to teach spray coating its materials, and *Fukuta* fails to teach that its method may be used for localized, controlled dispensing. Therefore, it would not have been obvious to combine the teachings of *Colin* and *Fukuta* as suggested by Plas-Pak.

## VII. *BROGAN* AND *EINBECKER* FAIL TO REMEDY THE DEFICIENCIES OF *FUKUTA* AND *COLIN*

As discussed previously, it would not have been obvious to modify the mixing system of *Fukuta* with the dual cartridges of *Colin* because it would change the principle of operation of *Fukuta*. Plas-Pak asserts that "Fukuta and Colin teach the structural limitations of the claimed device" in Claims 7 to 9 and 10 to 12 and, therefore, the modified device "is capable of performing the intended use of

applying paint to a surface" as stated in the preambles to Claims 7 and 10. Appellant's Brief, p. 55, l. 6-9 and 17-20.

For the reasons discussed previously, the Board correctly determined *Fukuta*'s principle of operation - coating a two-component mixture **using a system of pumps and valves** to **prevent backflow** - and that such a principle would be changed by the proposed modification with *Colin*.   JA18, l. 1-6 and 14-19. Nothing in *Einbecker* or *Brogan* suggests that such a modification would have been obvious or would not have changed the principle of operation of *Fukuta*.   As such, the proposed combinations based on *Fukuta*, *Colin*, *Einbecker* and *Brogan* would not have been obvious.

## VIII. SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDING THAT MODIFICATION OF THE DISPENSING APPARATUS OF *JACOBSEN* WITH THE SPRAY NOZZLE OF *HUNTER* WOULD RENDER THE DISPENSING APPARATUS OF *JACOBSEN* INOPERABLE FOR ITS INTENDED PURPOSE

### A.     The Board Correctly Defined *Jacobsen*'s Intended Purpose as Dispensing Fluid Material into Cracks While Minimizing Leakage

A determination of a reference's intended purpose is a factual finding that must be reviewed for substantial evidence.  *See Mouttet*, 686 F.3d at 1330-31; *Icon Health & Fitness*, 496 F.3d at 1382; *see also Tec Air, Inc.*, 192 F.3d at 1360. Therefore, even if two different determinations as to the intended purpose can reasonably be drawn from the record evidence, the Board's decision to favor one over the other must be sustained.  *Mouttet*, 686 F.3d at 1331.

As properly concluded by the Board, *Jacobsen* is not directed generally to a kit-like system and apparatus for dispensing a multiple component reactive material from two cartridges, but rather to a device for dispensing materials ***into a surface crack*** while ***minimizing leakage***.  JA19, l. 2-4 and 8-10; JA20, l. 5-8.[3]  For example, when describing its "invention," rather than a specific embodiment, *Jacobsen* states that "This invention relates to devices usable for dispensing fluid material(s) via conventional dispensing outlet nozzle(s) ***directly into a surface crack*** of a structure, such as concrete floors, walls or ceilings."  JA132, col. 1, l. 13-16 (emphasis added).

*Jacobsen* further states that its "invention relates to devices for establishing ***leak proof*** seated connections with great universality of use with many different types and sizes of dispensing tubes, nozzles, surface ports used in dispensing fluid material from cartridges, for ***directing such fluid material into cracks*** in underlying structures."  *Id.* at col. 2, l. 40-45 (emphasis added).  Because these passages of *Jacobsen* refer to the entire "invention," the Board's determination that the intended purpose of dispensing material directly into a surface crack applies to the entire invention - not just one embodiment - is reasonable and, thus, is

---

[3] The Board has determined the intended purposed of *Jacobsen* ***three times*** - first, in a July 1, 2013 decision regarding the '170 Patent at issue in related case 14-1451, second, in the January 17, 2014 decision at issue in this case, and third, in a January 21, 2014 decision denying a request for rehearing regarding the '170 Patent.

supported by substantial evidence.  JA19, l. 2-4, 8-10 and 22-24; JA20, l. 9-27; JA21, l. 1-35; JA22, l. 1-12.

In its attempt to show that *Jacobsen* has an intended purpose beyond filling cracks, Plas-Pak notes that *Jacobsen*'s Abstract makes no mention of filling cracks. Appellant's Brief, p. 58, l. 16-19; p. 59, l. 1-3.  However, even the portion of *Jacobsen* relied on by Plas-Pak also teaches that the components must be mixed "in close proximity of the intended use of the material."  JA126, Abstract, l. 5-6. This indicates that the intended purpose - crack filling - is narrower than merely a general kit dispensing system as asserted by Plas-Pak.  Furthermore, this passage is consistent with the intended purpose of dispensing materials directly into cracks while minimizing leakage.

Plas-Pak also attempts to analogize *Jacobsen*'s intended purpose to its "high level ability" by relying on this Court's holding in *Mouttet*.  Appellant's Brief, p. 59, l. 13-16.  However, as discussed previously, the "high level ability" referred to in *Mouttet* was case-specific and was not a general legal standard.  *Mouttet*, 686 F.3d at 1332.  Furthermore, *Mouttet* dealt with changing the principle of operation of a reference, not whether the proposed combination would be suitable for the intended purpose of a reference.  *Id.* at 1331-32.  Therefore, Plas-Pak's arguments regarding *Jacobsen*'s "high level ability" are irrelevant to *Jacobsen*'s intended purpose.

### i.    Plas-Pak's References to *KSR* Are Inapposite to the Issue of Whether the Proposed Combination Would Have Rendered *Jacobsen* Unsuitable for its Intended Purpose

In support of its argument regarding intended purpose, Plas-Pak cites to *KSR*'s discussion of the references at issue in that case and the differences in their intended purpose.  Appellant's Brief, p. 56, l. 15-22; p. 57, l. 1-20; p. 58, l. 1-15.  However, the "intended purpose" discussed in *KSR* relates to the field of endeavor or whether a certain reference constitutes analogous art to the patent at issue.  *KSR*, 550 U.S. at 420-21.  In contrast, here the issue is whether a proposed combination would render a reference ***unsuitable for its intended purpose***.  Post-*KSR* cases make clear that a proposed combination is not obvious if it would render a reference unsuitable for its intended purpose.  *DePuy*, 567 F.3d at 1326; *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1335 (Fed. Cir. 2013).

Plas-Pak also relies on *KSR* for its assertion that one of ordinary skill in the art would not ignore *Jacobsen* merely because *Jacobsen*'s device can be used to fill cracks.  Appellant's Brief, p. 60, l. 20-23.  However, the issue is not whether *Jacobsen* would be considered by a skilled artisan, but whether the proposed modification of *Jacobsen* would have been obvious because it renders *Jacobsen* unsuitable for its intended purpose.  As such, Plas-Pak's arguments regarding *KSR* are irrelevant to whether *Jacobsen*'s intended purpose was properly determined.

### ii.    The Scope of *Jacobsen*'s Claims Is Not Dispositive of its Intended Purpose

Plas-Pak also notes that the claims of *Jacobsen* are not limited to filling cracks.  Appellant's Brief, p. 59, l. 4-5.  However, as repeatedly pointed out by Plas-Pak, a reference must "be read for **all** that it teaches."  *Mouttet*, 686 F.3d at 1331 (emphasis added).  Therefore, the scope of the claims is not dispositive of the "intended purpose" of a reference and, thus, *Jacobsen*'s use of broadly drafted claims does not alter the scope of its intended purpose for obviousness purposes.

### B.    Substantial Evidence Supports the Board's Finding that Modifying the Apparatus of *Jacobsen* with the Spray Nozzle of *Hunter* Would Render the Dispensing Apparatus of *Jacobsen* Inoperable for its Intended Purpose

As discussed previously, the intended purpose of *Jacobsen* is to directly dispense fluid materials into a surface crack.  JA132, col. 1, l. 13-16; col. 2, l. 40-45. *Jacobsen* further teaches that a primary goal is to minimize or avoid leakage of the material when dispensing the material into surface cracks.  JA132, l. 40-45; JA133, col. 4 l. 1-14; col. 5, l. 44-67; JA134, col. 6, l. 1-14.

In contrast, *Hunter* is entirely directed to a spray nozzle for spraying a two-component coating composition.   JA137, Title; Abstract; JA140, [0002] and [0012]-[0022].  As such, one of ordinary skill in the art would have no reason to substitute the controlled dispensing nozzle of *Jacobsen* with the spray nozzle of *Hunter* because it would not minimize leakage or allow for controlled dispensing

of a material into small areas such as surface cracks and would thus render the device of *Jacobsen* unsuitable for its intended purpose.

## IX.   *BROGAN* FAILS TO REMEDY THE DEFICIENCIES OF *JACOBSEN* AND *HUNTER*

As discussed previously, it would not have been obvious to modify the dispensing device of *Jacobsen* with the spray nozzle of *Hunter* because it renders *Jacobsen* unsuitable for its intended purpose.  Plas-Pak asserts that "Jacobsen and Hunter teach the structural limitations of the device" in Claims 7 to 9 and 10 to 12 and, therefore, the modified device "is capable of performing the intended use of applying paint to a surface" as stated in the preambles to Claims 7 and 10. Appellant's Brief, p. 63, l. 3-7 and 12-16.

For the reasons discussed previously, substantial evidence supports the Board's determination of *Jacobsen*'s intended purpose - directly dispensing fluid materials into a surface crack with minimal leakage.  JA132, col. 1, l. 13-16; col. 2, l. 40-45.  Nothing in *Brogan* suggests that such a modification would have been obvious or would not have changed the intended purpose of *Jacobsen*.  As such, the proposed combinations based on *Jacobsen*, *Hunter* and *Brogan* would not have been obvious.

## **CONCLUSION**

For the reasons discussed above, this Court should not disturb the Board's informed judgment on the primarily factual issues present by Appellant and affirm the Board's finding that Claims 1 to 15 of the '384 Patent are patentable over the references cited in the reexamination.

Respectfully submitted,

 /s/ Thomas C. Basso

| | |
|---|---|
| THOMAS C. BASSO<br>ALAN L. BARRY<br>MATTHEW S. DICKE<br>SUZANNE E. KONRAD<br>K&L GATES LLP<br>70 West Madison Street<br>Suite 3100<br>Chicago, IL 60602-4207<br>Telephone (312) 372-1121<br>Facsimile (312) 827-8000 | MICHAEL T. MURPHY<br>K&L GATES LLP<br>1601 K Street, NW<br>Washington, DC 20006-1600<br>Telephone (202) 778-9000<br>Facsimile (202) 778-9100 |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 25, 2014, true and correct copies of the

foregoing **APPELLEE'S BRIEF** were electronically filed through the Court's

ECF system and served via the Court's transmission of the Notice of Docket

Activity to all counsel of record, and two courtesy copies of this document will be

sent to the party below:

Andrew C. Ryan
Cantor Colburn LLP
20 Church Street
22nd Floor
Hartford, CT 06103
Phone: 860-286-2929
Email: ryan@cantorcolburn.com

I further certify that I will file twelve copies of the foregoing with the Clerk

of Court by Federal Express to:

Clerk of Court
United States Court of Appeals for the
Federal Circuit
717 Madison Place, NW
Washington, DC 20005

/s/    Thomas C. Basso
        Thomas C. Basso

Form 19

FORM 19.  Certificate of Compliance With Rule 32(a)

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

☑    The brief contains [        10,097        ] words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

☐    The brief uses a monospaced typeface and contains [                ] lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

☑    The brief has been prepared in a proportionally spaced typeface using [        *Microsoft Word 2010*        ] in [        *14 pt Times New Roman font*        ], or

☐    The brief has been prepared in a monospaced typeface using [                ] with [ [                ] ].

_____
(Signature of Attorney)

Thomas C. Basso
_____
(Name of Attorney)

Attorney for Appellee
_____
(State whether representing appellant, appellee, etc.)

August 25, 2014
_____
(Date)

[ Reset Fields ]

142